IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 03-D-2474 (PAC)

---

CHARLOTTE SCHNEIDER AND DEAN WYMER,

       Plaintiffs,

v.

LANDVEST CORPORATION, a Kansas corporation,
and DAVID MASON, individually,

       Defendants.

---

**DEFENDANTS' SECOND REVISED PROPOSED
FINDINGS OF FACT
AND CONCLUSIONS OF LAW**

---

## FINDINGS OF FACT

**A.    Parties**

1.    Landvest Corporation is a Kansas corporation which manages self storage space.  The 50-plus facilities managed by Landvest Corporation are located in Colorado, Kansas, Louisiana, Missouri, New Mexico, Ohio and Texas [Doc. 67, Approving Final PTO; PTO: p. 5, ¶6,]

2.    At all times relevant to this action the Defendant corporation was doing business in Colorado. [Doc. 67, Approving Final PTO; PTO: p 5, ¶7.]

3.    Charlotte Schneider and Dean Wymer are natural persons who reside in El Paso County, Colorado. [Doc. 67, Approving Final PTO; PTO: p. 5, ¶1,3.]

4.    Schneider and Wymer were employed by the Defendant, Landvest Corporation, as resident managers of a storage facility located at 10601 Iliff, Aurora, Colorado from April10, 2002 until April 4, 2003. [Doc. 67, Approving Final PTO; PTO: p. 5 ¶2, 4.]i)ii)

**B.     Plaintiffs' Agreed Job Responsibilities**

5.     At the time of their hire, on April10, 2002, Schneider and Wymer signed a joint Managers Employment Agreement which set forth the terms of their employment, duties and compensation. [Record 30:6-11; Def. Ex. A0004.]

6.     Soon thereafter, they signed a revised joint Managers Employment Agreement dated July 23, 2002 ("July Agreement"). This contract was substantially similar to their April 2002 contract setting forth the terms of their employment, duties and compensation. [Def. Ex. A0005; Record 73:2-6 (Schneider).]

7.     Pursuant to the July Agreement, Schneider and Wymer agreed and understood that they were to perform, collectively, the following duties, as set forth in the July Agreement:

a.     Direct leasing to new tenants [and meet and greet customers]. . . .

b.     Generally promoting the rental space, by responding to phone calls, marketing to outside businesses, distributing informational leaflets to area businesses and apartment complexes, campaigning perspective tenants by phone and encouraging tenants to help through word-of-mouth efforts.

c.     Helping tenants solve problems; taking care of complaints.

d.     Handling "local books," i.e. keeping track of the fact about tenants, who are planning to move in or move out, on what dates, who has which unit, which units are vacant, accepting rental payments when necessary, and reminding tenants to make their payments by phone or written correspondence.

e.     Maintaining the mini warehouse complex in good condition and good order, keeping the areas swept clean, taking care of the public facilities, such as the restroom, and cleaning any units vacated in an untidy condition;

f.     Following office instructions to lock out any tenants listed as delinquent in rental payments.

g.     Collecting payments in arrears from locked-out tenants, and reopening the units restored to a current status.

h.     Conducting a regular, but unscheduled surveillance at least six times each day of the entire complex, watching to see that unauthorized persons are not allowed to remain on the premises; keeping an eye on the tenants to see that

they do not interfere with each other's activities.

    i.    Providing security for the complex by ascertaining that the outside gates are locked and unlocked on schedule; or that the computerized security system is on and working properly.  Making sure exterior lights and signs function correctly at night.  Examining perimeter protection, such as fencing to see that it is functional; phoning the police or fire department in case of an emergency.

    j.    Representing the Home Office/developer to the public; creating a favorable image of the entire operation to tenants and prospective tenants, thereby helping accomplish the overall objectives of the mini-storage project.

[Schneider Depo. 195:24-196:10; Def. Ex. A0004-006; Record 727:4-728:1 (Beck).]

8.    This job description set forth the job responsibilities of all of the resident managers in the Denver Region.

9.    The job description described generally the job responsibilities of a resident manager. The actual job tasks performed by the resident managers fell under one or more of the responsibilities listed in the job description.

10.    Not all of the job tasks that resident managers were required to perform had to be completed on a daily basis.  In fact,  many of these duties could be spread out throughout the week and, in some cases, throughout the month or year.

11.    In general, most resident managers were able to complete all job responsibilities in 22-35 hours per week. [Record 518:1-8 (Mason testified that it should only take approximately 22 hours to complete the job responsibilities expected of a resident manager and, even though they are allowed to work up to 70 hours combined or 35 hours each, most of the Landvest managers get the job completed with the 44 hours we're open); Record 752:22-753:1 (Shaw); Record 782:10-24 (Warren Fisher testified take maximum of 6-8 hours per day for one person or 3-4 hours per person where two people working to complete job responsibilities)[1].]

---

[1]Warren Fisher testified that the first month or so after he started on June 11, 2003, he and his wife "played catch-up" on cleaning up the site and worked more than 20-30 hours per week per person.  However, after the Fishers caught up with the site, neither manager recorded more than 35 hours each per week after August 11, 2003.  *See* Def. Exs.

12.     Several managers testified as to the job responsibilities required of a resident manager and the average length of time it took them to complete these job responsibilities.  These tasks, and their estimates can be summarized as follows:

13.     On a **daily basis**, resident managers were required to perform the following tasks and, on average, could be completed in the following times:

(a.)     Open the office (including turn on the computer and print tasks, play phone messages, etc.) - **1.5 HOURS A WEEK** (15 minutes a day):

      i.     Louise Adolphson: 15 minutes [Record 181:22-25.];

      ii.     Neil Murray: no particular amount of time  [Record 575:6-14];

      iii.     Derald Beck:  2-3 minutes [Record 728:4-9.];

      iv.     Judith Shaw: 15 minutes [Record 753:3-5.];

      v.     Warren Fisher: 15 minutes (20 minutes if include bank run) [Record 770:12-771:9.]; and

      vi.     Paul Stevens: 5-10 minutes (estimated at the Iliff site) [Record 844:25-845:3.].

(b.)     Take daily deposit to the bank - **3.5 HOURS A WEEK** (35 minutes a day):

      i.     Dean Wymer: 30 to 35 minutes [Record 283:5-9]

      ii.     Neil Murray: 10-15 minutes if walking from Iliff [Record 575:15-24]

      iii.     Derald Beck:  6-7 minutes [Record 728:4-9.];

      iv.     Judith Shaw: 15 minutes [Record 753:11-14.]

      v.     Warren Fisher: 5 minutes for Iliff site [Record 770:12-771:9.]

      vi.     Paul Stevens: 15 minutes for Iliff site [Record 845:4-9.]

---

A0065-001 through A0065-046; Record 803:14-20.]

(c.)   Sweep in front of the office: **2 HOURS A WEEK** (20 minutes a day):

    i.   Plaintiffs were the only ones who testified that they performed this task in addition to opening the office or making surveillance checks. Wymer testified he would sweep this "small little entryway going into the property" that would "open up to three or four parking places" which would take him an hour to an hour and a half. [Record 282:19-24 (Wymer).]

(d.)   Answer incoming telephone calls: **3 HOURS A WEEK** (30 minutes a day):

    i.   Plaintiffs averaged total 2.83 calls/walk-ins per day over course of employement [Record 863:4-17 (Millsap summarizing Illiff phone and customer log sheets, Def. Ex. A0042).]

    ii.   Derald Beck: 2-4 minutes each call [Record 728:10-21.];

    iii.   Judith Shaw: 1 hour a day [Record 753:6-10.]

    iv.   Warren Fisher: 5-10 minutes per call with average of 3-5 calls per day [Record 778:24-779:15.];

    iv.   Paul Stevens: 2-15 calls per day [Record 846:7-10.]

(e.)   Make outgoing telephone calls (collection calls): **3 HOURS A WEEK** (30 minutes a day):

    i.   Charlotte Schneider: Made 20-40 courtesy calls in one day until Mason instructed her that she no longer needed to make these calls. She then made approximately 15 late fee calls every day. [Record 103:11-104:1 (Scheider).]

    ii.   Derald Beck: average 8 calls a day at 2-3 minutes each call or 24 minutes a day [Record 728:22-729:8.];

    iii.   Judith Shaw: average 30 minutes a day [Record 754:2-4.];

    iv.   Warren Fisher: 20-30 minutes a day [Record 773:5-774:3.];

        v.        Paul Stevens: 1-2 hours a week [Record 846:11-17.];

(f.)    Lock checks/surveillance checks (usually performed in conjunction with picking up trash, pulling weeds, sweeping, could perform while showing units to customers) **15 HOURS PER WEEK** (assuming perform 6 per day at 25 minutes for each check):

        i.        Dean Wymer: 30 minutes to one and one half hours [Record 287:6-15]

        ii.        Neil Murray: 1 hour split between picking up trash, pulling weeds, etc. [Record 582:6-16]

        iii.        Derald Beck: average 15 minutes on golf cart; 20-25 minutes on foot [Record 733:24-734:25.];

        iv.        Judith Shaw: 15-20 minutes initial check; up to 1 hour if include cleaning out units for move-outs [Record 753:15-754:1.];

        v.        Warren Fisher (at Iliff site): 15 minutes on golf cart; 35 minutes if walk entire site [Record 771:15-772:2.]; and

        vi.        Paul Stevens (at Iliff site): 20 minutes on golf cart; 40-45 minutes if walk entire site but would only do 2-3 per week otherwise perform surveillance checks in car when came and left propery [Record 845:10-20; 852:14-853:8.].

(g.)    End of day reports: **3 HOURS PER WEEK** (30 minutes a day):

        i.        Charlotte Schneider: at least 30 minutes a day [Record 37:15-25];

        ii.        Derald Beck: average 10 minutes a day [Record 735:1-6.];

        iii.        Judith Shaw: average 10 minutes a day [Record 755:24-756:4.];

        iv.        Warren Fisher: 15 minutes a day [Record 781:7-12.];

        v.        Paul Stevens: 20-30 minutes a day [Record 846:18-847:1.].

(h.)    Assist customer walk-ins - **4.5 HOURS PER WEEK** (45 minutes a day)**;**

        i.        Neil Murray: maximum of 30 to 45 minutes per day [Record 582:17-

583:4];

ii.      Derald Beck: average 2-10 minutes per person [Record 735:19-13.];

iii.     Judith Shaw: average 10-15 minutes per person with 2-3 people visiting the site on a busy day (45 minutes a day maximum) [Record 754:5-9; 758:1-6.]**;**

iv.     Warren Fisher: average 5 walk-ins a week where spend maximum of 20 minutes per person if go out and show a unit (1.66 hours a week) [Record 779:16-780:14.]; and

v.     Paul Stevens: 10 minutes maximum if showed customer a unit [Record 847:21-848:4.].

(i.)    Assist existing tenants - **RARE - 10 MINUTES A WEEK**:

i.     Neil Murray: "there is rarely any contact. Folks have their code to get in the gate. They certainly know where their unit is. They have their own personal lock on that unit, and they have access 24 hours a day. There's rarely any, any reason for them to stop in the office, unless they have a question or something of that nature." [Record 582:6-20 (Murray).]

14.    On a **weekly basis**, resident managers were required to perform the following tasks and, on average, could be completed in the following times:

(a.)    Weekly reports - **20-30 MINUTES A WEEK:**[2]

i.     Charlotte Schneider: one to one and one half hours [Record 38:23-24]

---

[2]Plaintiffs desperately tried to rely upon the fax headers shown on the weekly occupancy reports to argue that those time-stamps proved the unreliability of the time stamp on the fax machine, the fax could be delayed for hours on a busy week-end where all faxes for all sites are trying to go through at the same time and it may not go through until later. Normally, these reports are faxed during business hours but there may be occasions where they are set aside to finish up other things and then fax it out. [Murray Depo. 32:8-33:2.] In any event, sending a fax requires minimal time and effort, requiring just a few seconds to place the fax on the machine and key in the numbers. [Record 746:4-748:12 (Beck).]

        ii.      Derald Beck:  maximum 30 minutes [Record 735:7-13.];

        iii.    Judith Shaw: 10 minutes [Record 756:7-8.];

        iv.    Warren Fisher: 20 minutes [Record 781:13-15.]; and

        v.     Paul Stevens: 10-15 minutes [Record 847:2-9.].

15.     On a **monthly basis**, resident managers were required to perform the following tasks and, on average, could be completed in the following times:

(a.)    Clean out units from move-outs - maximum of **2.5 HOURS WEEK** (average 30 move-outs per month at 30 minutes for each unit):

        i.      Plaintiffs averaged 29.5 move-outs per month during employment. [Record 864:15-865:24 (Millsap summarizing Illiff monthly rental activity reports during Plaintiffs' employment, Def. Ex. A0042.]

        ii.     Neil Murray: 5 minutes or less per unit [Record 576:22-577:4]

        iii.    Derald Beck: 3-5 minutes per unit [Record 730:22-10.];

        iv.    Judith Shaw: 15-20 minutes per unit [Record 754:24-25.];

        v.     Warren Fisher: 5-15 minutes per unit (depending on the size) [Record 775:10-23.]; and

        vi.    Paul Stevens: 5 minutes per unit (Iliff) [Record 848:5-9.].

(b.)    Perform all tasks associated with a lock-cut (after sent letters and phone calls, cut the lock on the unit with the Regional Manager; take a photograph of the contents; take a visual inventory of the property inside without entering the unit; close the door; overlock the lock; completing lock-cut paperwork) - **1.15 HOURS A WEEK** (5 hours a month):

        i.      Charlotte Schneider/Wymer:   Averaged 5 lock cuts per month but could not estimate how much time averaged per month to complete this procedure

[Record 106:14-107:17 (Schneider).  *See generally*, Def. Ex. A0046-0001 through Def. Ex. A0046-0082.];

ii.      Neil Murray: 5 minutes per unit  [Record 573:20-574:4];

iii.     Derald Beck:  7-8 minutes per unit (not including going to the post office) [Record 731:23-733:4.] ;

iv.     Judith Shaw: 1 hour a month per lock cut with 3-4 lock cuts a month [Record 757:4-25; 758:19-759:19.]; and

v.     Warren Fisher: 7-10 minutes per lock-cut with five lock-cuts in the worst month [Record 777:15-778:23.].

(c.)     Monthly paperwork: **6.92 MINUTES A WEEK** (30 minutes a month)

i.     Charlotte Schneider/Wymer: Described as the "manuscript becuase it was so thick of all the things that needed to be submitted."  Did not estimate a time. [Record 111:3-11 (Schneider).]

ii.     Derald Beck: average 30 minutes [Record 735:14-18.];

iii.     Judith Shaw: 25 minutes [Record 756:9-20.];

iv.     Warren Fisher: 45 minutes [Record 781:16-19.]

(d.)     Thorough cleaning of the office - **2 HOURS A WEEK**

i.     Charlotte Schneider: 2 hours a week or 8.67 hours a month. [Record 120:3-10.]

ii.     Judith Shaw: 20-30 minutes a week (4.33 hours a month) [Record 756:21-25.]

iii.     Paul Stevens: 30 minutes to 1 hour a week (4.33 hours a month) [Record 847:14-20.]

16.     On an **annual basis**, resident managers were required to perform the following tasks and, on average, could be completed in the following times:

(a.)     Paint all bollards on site - **41 MINUTES A WEEK** (3 hours a month):

i.      Dean Wymer: 20 minutes to 3 hours once a month [Record 288:2-15]

ii.     Neil Murray: one hour per shift over 4 to five days once a year [Record 575:25-576:10]

iii.    Derald Beck:  3 minutes paint entire bollard and 1-2 minutes for touch up [Record 729:9-730:5.];

iv.     Judith Shaw: 5 minutes for touch up; 2 hours to paint all bollards [Record 755:15-23.];

v.      Warren Fisher: 7 minutes to paint entire bollard with 32 total bollards; paint all bollards once a year; touch ups take 2 minutes each and do a total of 6-7 a year  [Record 772:3-17; 774:4-20.]; and

vi.     Louise Adolphson: Touch up every 3 months approximately 20-30 bollards [Record 187:19-9.].

(b.)     Snow removal (shovel light snow in front of the office and in front of storage unit doors when requested by tenant) - **3.46 MINUTES A WEEK** (1.5 hours a year):

i.      Dean Wymer: Worked 12 hours for 3 days following the 2002 "storm of the century." [Record 274:5-16 (Wymer).]

ii.     Neil Murray: done by TruGreen during 2003 storm [577:8-578:7]

iii.    Derald Beck:  3 times a year for 5 minutes each [Record 730:6-20.]; and

iv.     Paul Stevens: 30 minutes a storm [Record 849:5-16.].

(c.)     Change light bulbs (many were lithium bulbs so not necessarily need to be changed every year) **.38 MINUTES A WEEK** - (20 minutes a year):

i.      Plaintiffs: Did not testify as to this task.

ii.     Neil Murray: 5 minutes [Record 574:5-575:7]

iii.    Derald Beck:  2 minutes per bulb in the unit; outside lithium bulbs only replaced 2 in 6 years [Record 733:5-23.];

iv.     Warren Fisher: 5 minutes per bulb on outside lithium bulbs; only changed 12 in 3 years; 1 minute per bulb on bulbs inside the unit [Record 774:21-9.]; and

v.      Paul Stevens: 15 minutes per bulb on outside lithium bulbs and have 2 a year; 2 minutes per bulb on bulbs inside the unit [Record 848:10-849:4.].

17.    On **rare occasions**, resident managers might have to perform the following tasks and, on average, could be completed in the following times:

(a.)    Deal with contractors

i.      Derald Beck: never had to deal with contractors; responsibility of the area manager [Record 737:14-22.]

18.    Other tasks Plaintiffs testified to performing which took little to no time included:

(a.)    Tenants visiting unit - automatic gate and did not have to help tenant unless there was a problem with the gate or if they had trouble getting into their unit [Record 738:18-24.]

19.    Those managers who testified included:

(a.)    Neil Murray - Worked at the Austin Bluffs site in Colorado Springs, Colorado from January of 2001-May of 2005. [*See generally*, record 565:6-612:17.

(b.)    Derald Beck - Worked at the Fillmore site in Colorado Springs from July 28, 1998 through September 20, 2004.  Fillmore site had 294 units. [*See generally,* Record 724:13-748:14.];

11

(c.)    Judith Shaw - Currently works at the Nevada site in Colorado Springs.  Nevada site has 384 units. [*See generally*, Record 748:21-766:5.];

(d.)    Warren Fisher - Has worked at the Holly Holly site in Denver Colorado since June of 2003.  Holly site has 352 units. [*See generally*, Record 766:13-806:17.]; and

(e.)    Paul Stevens - Has worked at the Lakewood site in Denver Colorado since March of 1996.  Also worked as relief manager at the Iliff site.  Lakewood site has 397 units. [*See generally*, Record 844:1-854:12.].

20.    Itemizing all possible job tasks, and using the high average in estimating the amount of time spent on each task given by the resident managers, a weekly breakdown of the total time required by resident managers to operate a site is as follows:

(a.)    Daily tasks:                    35.6 hours a week

(b.)    Weekly tasks:                 .5 hours a week

(c.)    Monthly tasks:                3.27 hours a week

(d.)    Annual/seasonal tasks:    4.14 hours a week

(e.)    Rarely                            .10 hours a week

**TOTAL**                             **43.61 COMBINED HOURS A WEEK**

                                            **(21.8 hours each per week)**

21.    An effecient manager was able to "multi-task" and perform several of these task at one time.  For example, if a resident manager was running an end-of-the-day report, the manager would get the system up and running to print out and then could file documents or fill out deposit slips. [Record 620:4-13 (Murray).]

22.    With the exception of performing surveillance checks, it took the same amount of time to perform these tasks at the various sites, regardless of the size of the facility. [*See*, Record 749:35-750:15 (Judith Shaw worked at Nevada, Fillmore and Pikes Peak sites which were all 384 units or less

and she testified that there was no difference in amount of time spent performing job); Record 780:15-781:6 and 798:18-799:6 (Warren Fisher worked at other locations, including the Iliff site and in fact his site required more work than the Iliff site becuase had climate control buildings).]

23.     Plaintiffs were the only ones who testified that it took them 2 and 1/2 hours to clean the office on a weekly basis [*See generally*, Judith Shaw testimony, Record 758:9-12.]

24.     Plaintiffs also performed work that was not required by Landvest but were generally done by outside contractors, such as painting the stripes on the parking lot.  Landvest could not, therefore, have had knowledge that Plaintiffs were performing such work as painting the stripes on the parking lot.  [Record 804:22-805:3 (Fisher).]

25.     Further, Plaintiffs' estimation of the number and amount of time spent on collection calls was counterintuitive to the 20 percent delinquency rate at the Iliff facility the last few months before they left.  Plaintiff Schneider testified that she was making upwards of 40 "courtesy calls" per day until Mr. Mason instructed her she did not need to complete these calls, and after that made approximately 15 calls per day. [Record 103:11-104:9.]

26.     In fact, during the entire year they were employed by Landvest, Plaintiffs never got their delinquency percentage less than 5% which would have qualified them for a delinquency bonus.  To the contrary, their high delinquency rate suggested that they were not making their collection calls.  [Record 872:3-873:1 (Millsap testifying as to Plaintiffs' delinquency rate during relevant period.]

27.     Customer walk-ins and phone inquiries were recorded on a daily log sheet by Plaintiffs.  Plaintiffs received, on average, as few as two and as many as six walk-in and phone inquiries total per day. [*See generally*, Def. Ex. A0042-0001 through Def. Ex. A0042-130.]

28.     As part of their job responsibilities, Schneider and Wymer were trained and agreed that they were to "devote their entire time, attention and energies to the business of the Employer" by not engaging in any other full-time business activity. [Cramer Depo.  44:8-17; Def. Ex. A0004-002.]

29.     Plaintiffs were free, however, to engage in part-time work or outside of their employment with Landvest.  Plaintiffs were aware of this because they knew other resident managers in the Denver area, such as the Fishers, Caires, and Ricards who held part-time employment outside of Landvest.  [Record 541:11-542:12; Def. Ex. A0037-0001.]

30.     Landvest further clarified this provision in a memorandum dated May 28, 2002, whereby David Mason stated that the new employment agreement was revised to clarify several ambiguous areas and that under this new agreement "employees [would] not be allowed to run a separate business out of their home where customers can visit the premises." [Def. Ex. A0006-001.]

31.     Landvest did not require them to be on-site at all times. [Cramer Depo. 44:8-17.]

32.     In fact, Landvest only required that the site has to be open and available for business - not necessarily that one manager had to be in the office at all times. [Record 598:14-25 (Murray); Record 800:21-24 (Fisher).]

33.     Landvest expected them to also perform the regular responsibilities of showing storage space, picking up the grounds, maintaining the storage units, and conducting unscheduled surveillance of the property which required them to work outside of the office.  [Def. Ex. A004-006 (Exhibit A to Contract "Managers Job Description").]

34.     Schneider and Wymer were trained and understood that when there were no customers in the office; they could perform their duties outside of the office or could easily walk into the apartment and engage in activities not associated with work.  Their only responsibility in manning the office was to make sure that they answered the phone within a reasonable number of rings, greeted any and all people who came through the front door, and completed the required daily paperwork for the site. [Cramer Depo. 38:16:13.]

35.     Cramer specifically trained Schneider that she was not required to be in the office during the hours that the business was open, she could either be in her apartment or in her office and she was

allowed to keep the door open between the two during working hours.  [Cramer Depo. 39:20-40:8.]

36.    Many resident managers, including Plaintiffs, had a bell in the office that customers could ring to alert the manager if he or she was in the apartment.  [Record 736:21-737:3 (Beck); 754:14-23 (Shaw);

37.    In addition, the home office distributed a sign to resident managers that they could post on the door if they were on-site but doing other things, indicating that the manager is unavailable but will return. [Record 736:14-20 (Beck).]

38.    Resident managers, including Plaintiffs, also had cordless telephones so that they could answer incoming calls while they are away from the office. [Murray 38:16-19.]

**D.    Plaintiff's Agreed Compensation**

39.    Pursuant to the Managers Agreement, Schneider and Wymer agreed that, in exchange for performing their duties under the agreement, they would receive a combined annual salary of $21,600, or $10,800 each[3] [Def. Ex. A0005.]

40.    Landvest paid Schneider and Wymer on a bi-weekly basis.  As provided and agreed to in their Agreement, each were paid a fixed bi-weekly salary of $415.39 as straight time pay for a regular workweek of 35 hours.  The Agreement set forth that in exchange for this salary, Schneider and Wymer shall collectively "work approximately 44 hours per week but may be called upon to work additional hours as needed," but that "[e]mployees shall not work more than a combined total of 70 hours per week." [Def. Ex. A0005-002.]

41.    Other managers signed a similar agreement and understood that they were being paid a salary wage for a minimum of 22 hours and a maximum of 35 hours of work per week per manager. [Record 760:23-25 (Shaw testified she understood this because it was explained to her and it was stated as such in the contract).]

---

[3] This does not include compensation for bonuses.

42.     Except in cases of emergencies, however, Schneider and Wymer understood and agreed that they were not to perform work outside of their scheduled hours in the contract.  If there was work that could not be performed, they agreed and understood that they were to inform Landvest of this work. [Def. Ex. A0005-002 (employment contract).]

43.     "Emergencies" were classified by the contract as "a situation [occurring] outside of operation hours when it is impossible to reach management personnel and time must be spent to handle the emergency." [Def. Ex. A0005-002 (employment contract); Record 678:22-679:4 (Etter explained that managers were generally compensated for these emergencies even if they did not work more than 35 hours in a workweek).]

44.     In the event either Plaintiff, individually, worked over 40 hours in a workweek, the regular rate for purposes of calculating overtime was based on the 35-hour workweek set forth in the agreement. [Record 653:1-654:19 (Etter).]

45.     For example, where Schneider worked 45 hours in a workweek, she would be entitled to her regular salary wage ($207.69), plus $5.94 per hour for five hours ($29.70), plus $8.90 an hour for the remaining five hours ($44.50), for a total of $281.89 for that workweek. [Record 653:1-654:19; 662:11-663:23 (Etter).]

46.     At all times during their employment, Landvest compensated Plaintiffs pursuant to this agreed pay plan.  Often times, Plaintiffs were compensated in excess of their agreed salary amount for approved work performed in which they received a flat premium rate for those hours. [*See generally*, Record 679:10-680:23.]

### E.     Adequate Time Records

47.     Schneider and Wymer also agreed and understood that it was their responsibility to maintain accurate time records of work performed.  Their contract clearly spelled out that "Employees shall keep accurate records of work performed."  [Def. Ex. A0005-0002.]

48.     On every timesheet completed by Plaintiffs from their first week of employment to their last week of employment, Plaintiffs signed their timesheet certifying "that the above is a correct record of my time worked for the period indicated." [*See generally* Def. Exs. A0001-0003 through A00001-0081; and A0002-0004 through A0002-0080.]

49.     As part of the training process, Cramer reviewed the Landvest employment agreement with Plaintiffs, which specifically covered such areas as "compensation, hours, days of work, overtime, payroll records and job description as well as other work related items." [Def. Ex. A0029-001, ¶ 1 (written statement by Cramer).]

50.     John Cramer trained Schneider and Wymer, along with other resident managers, including Paul and Sarah Stevens and Louise Adolphson, in how to fill out their time sheets.  [Cramer Depo. p. 20:11-22:7.]

51.     Cramer had also trained resident manager Judi French, who assisted in training Plaintiff Schneider and Louis Adolphson. [Cramer Depo. p. 21:5-14.]

52.     Cramer trained managers consistent with the training that he received, which was to fill out the *actual* hours worked by the resident manager on the time sheet. [Cramer Depo. 20:4-21:2.]

53.     Cramer's testimony that he trained managers to record actual hours was supported by at least two other resident managers who worked under Cramer's supervision during the same time frame. [Record 726:6-727:3 (Beck testified that under the supervision of John Cramer, he was advised to write down all hours worked); Record 849:17-850:9 (Stevens testified that Cramer and Murray instructed him to write down the actual hours worked but told to try to balance out the number of hours worked with other team manager).]

54.     It also is clear from Cramer's written correspondence and his deposition read at trial that he trained resident managers to record *actual* hours; he told resident managers to only record four

hours per week, but if they worked more hours that they were to record those additional hours. [*See generally*, Def. Exs. A0026; A0028; A0029; Cramer Depo.]

55.     Cramer's first explanation of this was made to the Colorado Department of Labor on May 21, 2003, following Plaintiffs' complaint that they worked additional hours for which they were not properly paid for.  Cramer stated that "all employees in this region were told that they should record no more than 22 [hours] per person per [week] on the payroll records and that anything beyond that must be approved by the Regional Manager.  Overtime was approved by me when it was needed, ***and it is my understanding that overtime was paid to employees***." [Def. Ex. A0029-001, ¶ 1.]

56.     Cramer continues in the same letter regarding his instructions on recording actual hours, and states that "No manager was ever told by me that they could not record overtime hours."  [Def. Ex. A0029-001, ¶ 2.]

57.     In an effort to clarify any ambiguities contained in this first letter, a second letter was drafted by attorneys for Landvest based on David Mason's conversation with Cramer; he reviewed and signed it on June 5, 2003. [Record 874:11-875:9; 880:16-881:9.]

58.     Cramer reviewed this statement before signing it and Cramer felt that it accurately represented the events. [Cramer Depo. 60:8-61:24.]

59.     The letter clarified Cramer's previous statement that he "was trying to say he cautioned emplyees that they *shouldn't have to work more than 22 hours each* (which is entirely consistent with the 44-hour requirement for teams) but that more time could be worked when necessary with approval." [Def. Ex. A0026-002, ¶ 2.]

60.     In fact, the letter pointed out that after Landvest discussed his May 21 statement with Cramer, he "told [Landvest] that he never told the claimants to record only 22 hours per week regardless of the numbers of hours they actually worked. [Def. Ex. A0026-002, ¶ 2.]

61.     Cramer also confirmed that his first statement simply was meant to convey the notion that, under normal circumstances, employees should not need to work more than 22 hours per week." [Def. Ex. A0026-002, ¶ 2.]

62.     These two letters incited Plaintiffs to contact Cramer directly about his statements, and, according to Cramer, Schneider called and accused him of accepting a bribe for "changing" his first statement. Cramer responded to Schneider that he "received nothing" and that he "did not change [his] statement." [Def. Ex. A0028-003.]

63.     Cramer then sent a letter directly to the Department dated July 2, 2003. [Def. Ex. A0028.]

64.     In it, Cramer explained that when he was contacted by Landvest after he wrote his first statement (dated May 21), he refused to change it.  He further explained that he later met with Marshall Millsap with Landvest on June 5, 2003 and read over a letter that was prepared by Landvest and felt that "it contained the same things [he] had said in [his] first statement" and he signed it. [Def. Ex. A0028-003, ¶ 2.]

65.     Although Cramer indicated that he felt four hours per manager per day was not "always enough time to do the job as expected," he never states that managers were only to write down four hours regardless of the actual hours worked. [Def. Ex. A0028.]

66.     In fact, Cramer reiterated that he instructed Plaintiffs to record four hours on their timesheets and "they were free to record on there [sic] timesheets what ever time they believed they had work [sic] during the pay period." [Def. Ex. A0028-002, ¶ 1.]

67.     This resulted in a fierce response from Plaintiffs, dated July 6, 2003, alleging that "Mr. Mason continued to pressure Mr. Cramer to change his first statement - sometimes calling him two to three times in one day"; and that they "understood that the pressure applied by Landvest, coupled with

[Cramer's] personal and financial problems," and believed "that Cramer was not thinking clearly at the time he signed [the] interpreted version of his first statement." [Def. Ex. A0031-003, ¶ 2.]

68.    Plaintiffs make no reference to Cramer's third statement indicating that neither statements were inconsistent. [Def. Ex. A0031.]

69.    Finally, on April 6, 2004, Cramer testified under oath at his deposition regarding his instructions to Plaintiffs on recording their hours and his knowledge of the number of hours that they worked. [*See generally*, Cramer Depo. taken April 6, 2004.]

70.    Again, his testimony is consistent with his previous statements.  At that deposition, he again stated that he trained managers "to record four hours a day on the time sheets." [Cramer Depo. p. 21:15-22:1-8.]

71.    He did not, however, ever testify that he instructed resident managers to only record four hours a day regardless of the actual hours worked.  Although Plaintiffs' counsel refused to allow Cramer to clarify his testimony on several occasions regarding this issue, Cramer's testimony is clear. Cramer instructed Plaintiffs to write down four hours but if they worked more than four hours, they were to write down those hours; if they did not record those additional hours they did so at their discretion and contrary to his instructions.  Cramer testified:

**Cramer Depo. 21:24-22:8**

Dell'Olio: Did you train resident managers to record four hours a day on the time sheets.
Rupe: Object to the form.
Cramer: That's basically what was put out by the company, yes.  I'd like to expand on that answer.
Dell'Olio: You'll have a chance to.
Rupe: Let him expand on the answer.
Dell'Olio: No, this is my deposition.  We will get back to that. If you are not satisfied that I did, you know you can ask the question.

. . .

**Cramer Depo. p. 31:24-32:21**

Dell'Olio: So what you are saying is, when they read the contract, they didn't object. But later on, there were managers who objected to working more than four hours but being required by the company to only record four hours?
Cramer: Yes.
Dell'Olio: Okay.
Cramer: Now, I'm going to give you the rest of the story.
Dell'Olio: Uh-huh.
Cramer: Whether you want me to or not, you're going to listen.
Dell'Olio: Uh-huh.
Cramer: If they told me, we had to work extra hours because of something that had to be done, that had to be handled, I always informed the managers, put it on your time sheets, the company will pay you. And to my understanding and my belief, the company paid those people for any and all overtime that they recorded on their time sheets and turned in. If they didn't record it, that was their decision not to do that, it wasn't mine. And I don't believe it would have been anybody's in the company.

**Cramer Depo. p. 45:18-47:3**

Dell'Olio: And at that time you understood that she (Schneider) was recording on her time sheet fewer hours than the hours she said she was actually working?
Rupe: Objection. Mischaracterization.
Cramer: I can't answer that. You are trying to put words in my mouth, and you are not going to do it.
Dell'Olio: Okay.
Cramer: I can explain to you what took place there, if you like.
. . .
Dell'Olio: I think that's a yes or a no.
Cramer: No, it's not.
Dell'Olio: Are you refusing to answer that question?
Cramer: In that fashion, you bet.
Dell'Olio: I want the question flagged, if you would.
Rupe: Can you explain?
Cramer: I'll be glad to give you an explanation if you like.
Dell'Olio: I didn't object to an explanation; it's a yes or no answer and you haven't provided an answer. Do you want it read back again?
Cramer: Yes, please.
Dell'Olio: Le't hear it again and see if you can give a yes or no answer. Would you read it again please.
(The record was read as requested)
Cramer: Yes.
Dell'Olio: Thank you.
Cramer: Now, would you like the rest of the story?

Dell'Olio: No, I don't.  You are going to wait, and you are going to answer the questions that I as you or--

**Cramer Depo. p. 53:15-54:3**

Dell'Olio: When you reported to [David Mason] that the "Claires" had complained about not being paid for all hours worked, what was his response? Cramer: I think that his response, and I've got to give you the answer as how I recall, okeay?  But I think his response was probably exactly the same response that I had to them.  If you feel like you've got overtime hours, put it on your timesheets.  If that's truly what you feel like, put it on your timesheets. And this young lady [Schneider] knows it for a fact that that's what was told to her, as well.
Rupe: You are indicating Ms. --
Cramer: Ms. Schneider.

**Cramer Depo. p. 58:23-59:19**

Dell'Olio: Did you ever question why there was a practice of having employees record four hours a day?
Rupe: Same objection.
Dell'Olio: Did you ever question?
Cramer: I think I asked about it, yes.
Dell'Olio: Who did you ask?
Cramer: Probably David.
Dell'Olio: And what did he say?
Cramer: And I'm sure, I'm sure that I asked Jim Kelly as well.
Dell'Olio: and what did Mr. Mason say?
Cramer: To the best of my recollection, he indicated that it was–that it had been their policy for a long time that the couple managing the unit would record and be responsible for working four hours per day, each.  But there were times that they might have to work more than that.  And that if anything come up like that, that they were free to put it on their time sheets.
Dell'Olio: What about Jim Kelly, what did he say to you?
Cramer: Probably the same thing.

**Cramer Depo. p. 65:3-7**

Dell'Olio: Did you ever tell any manager they should work no more than four hours?
Cramer: Yeah.
Dell'Olio: Who did you say that to?
Cramer: I told that to probably all of them.

**Cramer Depo. p. 72:25-73:7**

Rupe: Now let's go to that, those occassions in which Charlotte complained to you that she wasn't able to get the work done within the four hours allotted: It sounds like to me, tell me if I'm wrong, it sounds like on those occasions you told her to report the additional hours.

Cramer: I most certainly did, and she is very much aware of that.

**Cramer Depo. p. 75:7-13**

Rupe: The letter, Exhibit 28 [Def. Ex. A0026, June 5, 2003 letter] now that you have had an opportunity to review it, even if you can't recall if you reviewed it at the time you sat with Marshall, have you pointed out any inaccuracies or anything you disagree with in that letter?

Cramer: It is a valid description of what the company policies are.

72.    Cramer also states in his first letter to the Department of Labor, dated May 21, 2003, that "I had several managers complain that they were not being allowed by Landvest to record the full amount of hours they worked." [Def. Ex. A0029-001, ¶ 3.]

73.    It is clear, however, from Cramer's subsequent statements that this was not because they were being instructed to only record four hours, it was because of their misinterpretation of the portion of the contract which spoke to "Extent of Services."  This particular provision provided:

"The employees shall devote their entire time, attention and energies to the business of the Employer, and shall not during the term of this Agreement be engaged in any other full time business activity whether or not such business activity is pursued for gain, profit, or other pecuiary advantage; but this shall not be construed as preventing the Employees from investing their assets in such form or manner as will not require any services on the part of the Employees in the operation of the affairs of the companies in which such investments are made."

[Def. Ex. A0004-002, ¶ 8.]

74.    Cramer explains that the manger complaints "was based on the fact that Landvest work agreement required both managers to devote their full time and attention to the business of the employer.  Their complaint was that they both had to devote 8 [hours] each on every day worked but they were only being allowed by Landvest to record 4 [hours]each on every day worked." [Def. Ex. A0029-001, ¶ 3.]

75.     Cramer again points out, however, that any confusion on the part of the managers was not created by him because he "explained to the Managers that they could spend time in their apartments as long as one manager was available to answer the business phone and greet customers that came into the office."

76.     Further, Cramer also agreed that Landvest does "not require off-duty managers to remain on the premises during business hours," although "some managers grossly interpreted the language and may have believed they were not free to pursue part-time business interests or opportunities even when off-duty." [Def. Ex. A0026-002, ¶ 4.]

77.     This is consistent with Cramer's memo to David Mason, dated April 16, 2002[4], in which Cramer informs Mason that he spoke with two resident managers regarding their second job and Bill agreed to "either quit his outside work or reduce it to a point that he puts 4 [hours] each day working on the site during regular office business hours." Consistent with Cramer's testimony, the resident manager was not being asked to quit his job to perform 8 hours a day; rather he was being asked to perform the minimum agreed to under the contract - 4 hours. [Def. Ex. A0037-0001.]

78.     This is also consistent with other resident manager's understanding based on their training that they received from John Cramer and their interpretation of the contract. [Record 585:23-25 (Murray); Record 769:16-770:2 (Fisher testified that he worked a part-time job when he first started with Landvest and he knows other resident managers who currently hold part-time jobs with Landvest). *See also,* Record 541:11-542:12 (Mason testifies as to a number of managers that worked part-time while working for Landvest and history behind provision in contract on "Extent of Services.").]

---

[4]Cramer's memo was authored on April 16, 2002 - almost three weeks before Plaintiffs even brought their wage and hour complaint with the Department of Labor. [Def. Ex. A0021; A0037.]

79.     Finally, Plaintiffs were instructed by David Mason in December of 2002 that Landvest "must report the hours worked by each Manager." [Record 217:1-23 (Schneider).]

80.     Plaintiffs did in fact keep daily time records and submitted these to Defendant Landvest bi-weekly. [*See generally*, Trial Exhibits Def. Ex. A0001 and Def. Ex. A0002.]

81.     At all times, Plaintiffs were compensated for all hours worked.  [*See generally*, Trial Exhibits Def. Ex. A0001 and Def. Ex. A0002.]

82.     During each week of employment, Plaintiffs received their regular salary pay, and, in most instances where they recorded hours outside of their normal scheduled office hours for training, late lease or an emergency, they received additional compensation for this straight time at a premium rate.  [*See generally*, Trial Exhibits Def. Ex. A0001 and Def. Ex. A0002.]

83.     There were occasions in which Schneider and Wymer worked only their scheduled office hours for a total of 22 hours per week (or 44 hours bi-weekly).  [Def. Ex. A0001 and Def. Ex. A0002.]

84.     There were also occasions in which Schneider and Wymer worked and recorded hours in addition to their scheduled office hours up to 35 hours per week.  [Def. Ex. A0001 and Def. Ex. A0002.][5]

85.     In both instances in which Plaintiffs worked and submitted time records for up to 35 hours per week each (or 70 hours total), they were compensated their regular salary wage of $415.39. [Def. Ex. A0001 and Def. Ex. A0002.]

86.     Plaintiffs' workweek was Monday through Sunday.  They each had one scheduled day off during the week.  If they were required to work Sundays, the office was only open for 4 hours. They generally each recorded 2 hours on Sundays.  [Def. Ex. A0001 and Def. Ex. A0002.]

---

[5] See Def. Ex. A0001-0019; Def. Ex. A0001-0022; Def. Ex. A0002-0020; Def. Ex. A0002-0023

87.     As a reward for doing a good job of leasing units, resident managers were not required to work Sundays if they achieved a high occupancy at the site.  Regardless of whether a  manager worked on Sundays, he or she still received the fixed salary wage.  [Record 585:12-22 (Murray).]

88.     Plaintiffs, however, routinely worked on Sundays because their site was not performing as well as it should have been and from approximately November 10, 2002 through their resignation, their site was open on Sundays.  [Record 95:5-13 (Schneider).]

89.     As an incentive and a reward for working beyond their normal scheduled hours, Landvest compensated its resident managers, in addition to their salary wage, an hourly premium rate wage for approved straight-time work performed.  Such work included attending training or working on a scheduled day off or where they had to work additional hours due to an "emergency".[6] [Record 662:11-663:10 (Etter described Landvest's fixed workweek pay plan).]

90.     The premium pay was a flat rate of $14.16 per hour for approved hours.  This rate was pre-determined as a set amount for all resident managers employed at Landvest during that period regardless of their salary rate.  This figure was picked so that it would be high enough to cover the minimum regular and/or overtime rate for all employees, regardless of their salary, as well as any other type of compensation such as the residence.  [Record 647:14-650:4 (Etter testified regarding the basis for the $14.16 per hour used for the premium rate).]

91.     "Premium pay" was reflected on Plaintiffs' pay stubs in the "overtime" column as there was no other place to indicate this additional payment on their paycheck.  [Record 706:18-707:2. (Etter).]

---

[6] "Premium pay" was termed "overtime pay" on Plaintiffs' timesheets and pay stubs although it was not necessarily an overtime rate as calculated under the FLSA.

26

92.     Plaintiffs were employed by Landvest for a total of 52 calendar weeks.  Plaintiffs did not work an entire workweek (Sunday through Monday), the first or last weeks of their employment. [Record .]

93.     Out of the 50 calendar weeks where Schneider and Wymer worked the entire workweek, Schneider recorded work performed outside of the 22 scheduled office hours in 22 of those weeks.  [Def. Ex. A0001.][7]

94.     In all but seven of those 22 weeks, Schneider received a flat premium pay rate of $14.16 an hour for each hour worked over 22 hours a week for working her day off, training or other special "emergency" situations.  [Def. Ex. A0001.]

95.     During those remaining seven weeks, Schneider was not paid a premium rate for a total of 26.5 hours as those hours were not considered hours eligible for the premium pay.  [Def. Ex. A0001.]

96.     Regardless, Schneider was paid her salary wage for each workweek that she worked up to 35 hours.  There were only two weeks where Schneider recorded more than 35 hours in one workweek.  During those weeks, Schneider's premium pay sufficiently compensated Schneider for her regular and overtime rate for those hours worked that were not covered under her salary wage.  [Def. Ex. A0001.][8]

---

[7] See Def. Ex. A0001-0006; Def. Ex. A0001-0009; Def. Ex. A0001-0012; Def. Ex. A0001-0017; Def. Ex. A0001-0020; Def. Ex. A0001-0023; Def. Ex. A0001-0029; Def. Ex. A0001-0032; Def. Ex. A0001-0035; Def. Ex. A0001-0038; Def. Ex. A0001-0044; Def. Ex. A0001-0053; Def. Ex. A0001-0056; Def. Ex. A0001-0062; Def. Ex. A0001-0066; Def. Ex. A0001-0069; Def. Ex. A0001-0078; Def. Ex. A0002-0007; Def. Ex. A0002-0010; Def. Ex. A0002-0021; Def. Ex. A0002-0024; Def. Ex. A0002-0033; Def. Ex. A0002-0036; Def. Ex. A0002-0045; Def. Ex. A0002-0056; Def. Ex. A0002-0062; Def. Ex. A0002-0054; and Def. Ex. A0002-0077.
[8] See Def. Ex. A0001-0004 through Def. Ex. A0001-0006; Def. Ex. A0001-0021 through Def. Ex. A0001-0023.

97.     The first week ended May 5, 2002, and Schneider recorded 20 hours in addition to her regularly scheduled 22 hours.  She was paid a premium rate of $14.16 an hour for these 20 hours worked and recorded.  [Def. Ex. A0001.] [9]

98.     The second week ended July 7, 2002, and Schneider recorded a total of 13.5 hours in addition to her regularly scheduled 22 hours.  She was paid a premium rate of $14.16 an hour for 9.5 hours where she was engaged in training.  Although Schneider did not receive a premium rate for 4 of the additional recorded hours, these hours were considered part of her regular duties "up to the 35 hours" which she received her regular salary compensation for.  [Def. Ex. A0001.][10]

99.     Similarly, out of the 50 calendar weeks where Wymer worked the entire workweek, Wymer recorded work performed outside of the 22 scheduled office hours in 12 of those weeks.  [Def. Ex. A0002.]

100.     In all but one of those 12 weeks, Wymer received a flat premium pay rate of $14.16 an hour for each hour worked over 22 hours a week for working his day off, training or other special "emergency" situations.  [Def. Ex. A0002.]

101.     The week that Wymer did not receive premium pay, he worked a total of 26 hours.  He was compensated only his regular salary wage for these hours worked because they fell within the 22 to 35 hour contracted hours.  [Def. Ex. A0002-0022-24 (Wymer wage records); Record 662:20-22 (Etter testimony that if worked between 22 and 35 hours in a workweek, received salary wage pursuant to fixed workweek pay plan).]

102.     On the occasions in which Plaintiffs recorded that they worked over 40 hours in a workweek, they were compensated a premium rate.  This rate was a flat-rate that was arrived at to sufficiently compensate all managers at time and one-half their regular rate of $5.94 an hour, including

[9] See Def. Ex. A0001-0004 through Def. Ex. A0001-0006.
[10] See Def. Ex. A0001-0021 through Def. Ex. A0001-0023.

lodging. [Record 649:13-652:15 (Etter testified that he completed a "litmus test" whereby he took the salary of the highest paid manager and confirmed that the premium rate of $14.16 an hour would cover the overtime rate and lodging.). *See generally,* Def. Ex. A0001 and Def. Ex. A0002.]

103.    In sum, Plaintiffs' were compensated based on one of the four following scenarios:

(a.)    If Plaintiffs worked less than 22 hours per week, then they were paid a pro-rated salary.

(b.)    If Plaintiffs worked greater than 22 hours per week, but less than 35 hour per week, then they were paid their salary wage (premium pay paid for qualifying hours only).

(c.)    If Plaintiffs worked greater than 35 hours per week, but less than 40 hours per week, then they were paid premium pay in addition to their salary wage.

(d.)    Worked greater than 35 hours per week and greater than 40 hours per week, then they were paid premium pay in addition to their salary wage.

104.    Under all of these scenarios, Plaintiffs were paid for all hours worked and were properly paid for all hours worked over forty in a single work week at a rate of not less than one and one half times the employee's regular rate of pay.

## F.    Plaintiffs' Claimed Unpaid Wages

105.    Notwithstanding the hours that they recorded and submitted to Landvest on their timesheets, Schneider and Wymer filed separate complaints with the Colorado Department of Labor ("CDOL") after they resigned their employment effective April 4, 2002. [Def. Ex. A0022.]

106.    Schneider claimed that she arrived at the amount of her claim by "adding the additional (actual hours worked) but forbidden to put down on the time sheet, times the regular hourly rate. Then added the overtime hours worked but denied payment for, times 1 ½ regular hourly rate." [Def. Ex. A0022-0001.]

107.    Wymer claimed that he "added all hours worked but not allowed to put down on time sheet times the hourly rate plus the amount of overtime on time sheet that was not paid." [Def. Ex. A0022-0002.]

108.    In their complaint to the CDOL, Schneider and Wymer claimed that they each worked "at least 4 hours more per day than allowed to record on our time sheets." "In order to operate a Security Self Storage facility to Landvest's specifications, it was necessary for us to work 8 hours each per day." [Def. Ex. A0031-0001.]

109.    This consisted of working four week days per week from 10:00 a.m. until 6:00 p.m. and Saturdays from 9:00 a.m. until 5:00 p.m. In addition, they claimed to have worked four hours on every Sunday except one from November, 2002 - March 2003. [*See generally*, Def. Ex. A0031-0001.]

110.    They continued to reiterate in each of their correspondence to the Department that they worked a "minimum of 8 hours each per day." [Def. Ex. A0031-003, ¶ 3 (July6, 2003 letter).]

111.    An itemization of Plaintiffs' damages as alleged in their complaint to the CDOL can be summarized as follows:

| **Schneider** | | **Wymer** | |
|---|---|---|---|
| Regular Hours | 1,092.50 | Regular Hours | 1,057 |
| (at $9.44/hr = $10,313.20) | | (at $9.44/hr = $9,978.08) | |
| Overtime Hours | 24.75 | Overtime Hours | 12 |
| (at $14.16/hr = $350.46) | | (at $14.16/hr = $169.92)) | |
| **Total unpaid wages - $10,663.66** | | **Total unpaid wages = $10,148.00** | |

[Def. Ex. A0021-0001; Def. Ex. A0024-0002.]

112.    Since filing this lawsuit, however, Plaintiffs have expanded their wage claim to include an additional two to three hours every week after 6:00 p.m. preparing end of day, end of week and end of month reports. [Plaintiffs' Initial Rule 26(a)(1) Disclosures, January 30, 2004.]

113.    By the time of trial, Plaintiffs number of hours have grown to 45 to 50 hours per week [Record 117:16-118:10.]

114.    Plaintiffs also now claim that instead of each working four hours on Sunday, they worked from "four to six, seven" hours on Sundays from November 10 until they resigned. [Record 96:2-6.]

115.    An itemization of Plaintiffs' damages as alleged in their disclosures after the filing of this lawsuit can be summarized as follows:

| **Schneider** | | **Wymer** | |
|---|---|---|---|
| Regular Hours | 954 | Regular Hours | 954 |
| (at $9.44/hr = $9005.76) | | (at $9.44/hr = $9005.76) | |
| Overtime Hours | 229.50 | Overtime Hours | 92 |
| (at $17.12/hr = $3,929.04) | | (at $17.12/hr = $1,575.04)) | |
| **Total unpaid wages - $12,934.80** | | **Total unpaid wages = $10,580.80**[11] | |

[Plaintiffs' Supplemental Rule 26(e) Disclosures, March 15, 2004.]

116.    Other than Plaintiffs' complaint made to the CDOL, David Mason, Vice President of Landvest, was not aware of any other manger complaining of not being paid for all hours worked or complained about an adjustment of hours made either by a regional manager or by the area manager.

117.    Plaintiffs were instructed, agreed and understood to write down all hours worked. [Cramer Depo. p. 31:24-32:21; 53:15-54:3; 72:25-73:7; 75:7-13.]

118.    They recorded the hours that they worked, which varied from week to week, and submitted a weekly timesheet every two weeks. Plaintiffs were paid according to the time that they submitted on their timesheets. [*See generally*, Def. Ex. A0001 and A0002.]

119.    Other than Plaintiffs' timekeeping records of work performed, Landvest had no knowledge that Plaintiffs' were not properly recording the hours that they were working. Plaintiff never indicated, anyhow, any way, to Mason that they were not being able to record all hours worked. [Record 532:5-8 (Mason).]

---

[11] Plaintiffs also claim liquidated damages in the amount of $3,929 for Schneider and $1,575.04 for Wymer for a grand total of $16,863.80 in claimed damages for Schneider and $12,155.84 in claimed damages for Wymer.

120.    Although Plaintiff Schneider testified at trial that she was "instructed by Mr. Cramer to destroy" her written record of actual hours worked on her second pay period, this was the first time that Schneider made this accusation.  Prior to trial, Schneider did not make this allegation to the Department of Labor, nor did she raise it in her deposition or discovery responses. [Record 47:2-13 (Schneider).]

121.    Plaintiffs were largely unsupervised and entrusted with performing their duties under the agreed hours of operation.  [Record 521:16-522:5 (Mason testified that the Plaintiffs and the current resident managers have reported similar hours but that he isn't there to observe how much time they spend because they are unsupervised.).]

122.    Landvest had no reason to suspect that the regular operation of Plaintiffs' facility required them to work more than the hours that they were recording, let alone more than 40 hours in a single workweek.  [Record 449:10-21 (Mason testified that he believed the Plaintiffs' when they submitted their timesheets showing 22 regular hours of work and he did not have any reason to think they'd really worked more hours.).]

123.    In fact, it was the experience of prior and current managers of that facility that under normal circumstances for any day's work, four hours a day per person, between them, was sufficient to operate the facility.  [Cramer Depo. 24:20-25:9; Record 586:1-6 (Murray testified that based on his experience as a resident manager and a regional manager, that it is possible to do the tasks that are required of a resident manager in 20 to 35 hours, "easily".  *See also*, Record 521:15-23 (Mason testifies that current resident managers at the Iliff facility are averaging 26 or 27 hours per week).]

**G.    Plaintiffs' Resignation from Employment**

124.    On March 21, 2003, Plaintiff Wymer sent a hand-written letter of resignation by facsimile to Neil Murray and David Mason.  [Def. Ex. A0020-0002.]

125.     Plaintiff Wymer informed Murray and Mason that he was giving his two-weeks notice that he was leaving his position as an Area and Resident Manager, effective Friday, April 4, 2003. [Def. Ex. A0020-0002.]

126.     Wymer indicated in his resignation letter that one of the reasons for his resignation was that "David Mason treats all of his 'managers' with cruelty, suspicion, and disrespect.  Even though his 'managers' are good, hard-working, devoted and responsible people - he leaves their site only after making them feel that their work is never good enough - no matter how wonderful a job they are doing." [Def. Ex. A0020-0002.]

127.     When Murray contacted Wymer to discuss the letter, Wymer was very confrontational and said that he had been "abused and mistreated as a child and would be damned if he was going to put up with it as a grown man." [Def. Ex. A0020-0001.]

128.     From this conversation, Murray felt that Wymer "may have serious anger problems that have the potential for physical confrontation," and indicated he would try to take someone with him as a witness when he went to the site the following day to collect the keys to the office. [Def. Ex. A0020-0001.]

129.     In speaking with Wymer, Murray had also discovered that he had faxed his resignation letter to all resident managers in the Denver area. [Def. Ex. A0020-0001.]

130.     Wymer continued publicizing his anger in a public protest of the facility after he left Landvest. [Def. Ex. A0041-001, Def. Ex. A0041-002.]

131.     Wymer's sudden hostility towards Mason and his attempt to engage other resident managers in his coup resulted from Landvest's refusal to restructure Plaintiffs' compensation in a way that could violate the Fair Labor Standards Act.

132.     This was evident by Plaintiffs' sudden lack of devotion to their work when they began

to let the site run down. [Record 589:17-25 (Murray).]

133.     In October of that year, Schneider had made a written request to Murray and Mason

that the annual salary of $21,600 not be divided equally among both of them while making no offer to

reduce her hours worked.  [Def. Ex. A0017-0001; Record 120:25-121:8 (Schneider).]

134.     Schneider explained that the reason for the request was because:

> I receive Social Security Disability and Medicare Benefits for a congenital condition
> called Charcot-Marie-Tooth (a form of Muscular Dystrophy).  There is no known cure
> for this disease and should I have a severe enough relapse of my condition in the
> future, I would need to depend solely on the Medicare and Disability Benefits.  I have
> checked into several private insurance companies and most will not even consider me
> a policyholder and all but one would not cover any Preexisting Conditions.  Once
> Medicare or Social Security Disability has dropped you, it is almost impossible to go
> back on the program.

[Def. Ex. A0017-001.]

135.     Schneider admitted that she had been receiving Social Security disability benefits since

she was 18 years of age and she made the request in order to continue to receive her social security

benefits without going over the limit of substantial gainful activity. [Record 228:12-229:4; 230:3-8

(Schneider).]

136.     Schneider claimed that previous employers had "legally divided [their] pay unevenly"

and that there would be "no legal problems with the situation" as long as she was paid enough "to be

covered by Workers' Compensation."  [Def. Ex. A0017-0001; Record 229:23-230:2.]

137.     Schneider stressed the urgency of her request and indicated that she needed to "make

a decision within the next 2 months based on the decision you make."  She explained that she is

"allowed one period of nine months where I am able to make any amount above $700.00 per month

before I am dropped by Social Security." According to Schneider, her nine-month period was to end on December 31, 2002. [Def. Ex. A0017-0001.]

138. Schneider did not receive a response to her request and followed up with a memo to Mason and Murray that was faxed on December 2, 2002 asking if a decision had been made for her "pay to be lowered and the difference to be given in Dean's name." [Def. Ex. A0018-0001.]

139. On December 17, 2002, Mason, on behalf of Landvest, responded to Schneider's request. Mason apologized for not responding sooner and denied Schneider's request. Mason indicated that, at the advice of counsel, "slanting one Manager's duties would compromise the minimum wage structure without having to include the value of the apartment as income." [Def. Ex. A0019-0001.]

140. In other words, without decreasing the agreed upon fixed workweek of 35 hours per manager or 70 hours total, the salary rate could not be reduced. A reduction in the salary without a reduction in the hours worked would bring Schneider's regular rate below minimum wage and in violation of the Fair Labor Standards Act. [Record 456:2-457:5. (Mason).]

141. Mason apologized for not being able to accommodate Schneider's request. [Def. Ex. A0019-001.]

142. This was basically the same response that the plaintiffs received from their Regional Manager at the time, Neil Murray, who told them that:

> Landvest would be willing to try to work within the legal structure of paying Schneider properly under the laws but Landvest could not indicate that Dean had worked eight, ten hours, whatever he was going to claim, and we knew for a fact that he had not and she had worked four or five hours or whatever, for the day.

[Record 589:7-25 (Murray).]

143.     Shortly thereafter Schneider began making arrangements to move off-site and terminate her employment.  This was evident after receiving a request on January 2, 2003 for verification of employment from Fresh Start Mortgage.  [Def. Ex. A0016-0001.]

144.     Given the amount of time to process a mortgage loan and close on a house, the temporal proximity of Wymer's resignation letter in March was clearly motivated by Landvest's refusal in late December to restructure Plaintiffs' pay plan to allow Schneider to undermine the federal wage thresholds set out by the Fair Labor Standards Act, as well as the benefit qualifications under Medicare and Social Security.

## CONCLUSIONS OF LAW

### I.     FAIR LABOR STANDARDS ACT UNPAID WAGES CLAIM

**A.     Plaintiff Schneider deliberately changed her claim of number of hours worked and should be judicially estopped from recovery.**

The Social Security Disability Insurance (SSDI) program provides benefits to a person with a disability so severe that she is "unable to do [her] previous work" and "cannot . . . engage in any ***other kind of substantial gainful work which exists in the national economy***." 42 U.S.C. § 423(d)(2)(A) (emphasis added).  Ms. Schneider, throughout her employment with Landvest, claimed such SSDI benefits and an inability to perform substantial gainful work.

Judicial estoppel is a discretionary remedy courts may invoke "to prevent improper use of judicial machinery." *Johnson v. Lindon City Corp.,* 405 F.3d 1065, 1068 (10th Cir. 2005) (citing *New Hampshire v. Maine,* 532 U.S. 742, 750, 121 S. Ct. 1808 (2001)).  It prevents parties from "deliberately changing positions according to the exigencies of the moment." *New Hampshire,* 532 U.S. at 750.  The doctrine is stated as follows: "[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his

interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *Johnson,* 405 F.3d at 1069 (citing *Davis v. Wakelee,* 156 U.S. 680, 689, 15 S. Ct. 555 (1895)).

"The circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle." *New Hampshire,* 532 U.S, at 750. Nevertheless, *New Hampshire* noted three factors courts should consider when determining whether to employ judicial estoppel:

> i.    A party's later position must be clearly inconsistent with its earlier position;
>
> ii.   Courts should consider whether the party persuaded a court to accept its earlier position, leading to "the perception that either the first or the second court was mislead"; and
>
> iii.  Courts should consider whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*Id.* at 750-51 (referring to this judicial inquiry as "balancing the equities").

> 1.    <u>Ms. Schneider's representation to the SSDI of total disability is clearly inconsistent with the position she takes in this lawsuit.</u>

For SSDI purposes, Ms. Schneider claims she is totally disabled and "cannot . . . engage in any other kind of substantial gainful work which exists in the national economy." *See* 42 U.S.C. § 423(d)(2)(A).  For purposes of this case, Ms. Schneider claims that, simultaneously, she not only engaged in substantial gainful work, but did so at a pace in excess of forty hours per week.  Ms. Schneider's previous position to the SSDI is "clearly inconsistent" with her contentions in the present case.

In *Cleveland v. Policy Management Systems Corp.,* 526 U.S. 795 (1999), the U.S. Supreme Court addressed the meaning of "inconsistent" in the context of an ADA claim.  In the ADA context, a plaintiff must prove as an element of her *prima facie* case that she is a person "who, with or without reasonable accommodation, can perform the essential functions" of her job."  Hence, a claim of total disability for SSDI purposes is at least partly inconsistent with the plaintiff's claim for ADA purposes that she can perform the essential functions of her job.[1]  "When faced with a plaintiff's previous sworn statement asserting 'total disability' or the like, the court should require an explanation of any apparent inconsistency with the necessary elements of the ADA claim" before denying summary judgment.  *Id.*

Ms. Schneider does not bring an ADA claim.  To establish a *prima facie* case of FLSA unpaid wages, Ms. Schneider must prove she performed work in excess of forty hours per week.  *See Murray v. Stuckey's, Inc.,* 939 F.2d 614, 621 (8th Cir. 1991) (a plaintiff must prove defendant had constructive or actual knowledge of *overtime worked* or unpaid wages).  Ms. Schneider claims she worked as such and hence satisfies this element.  However, ***she never requested an accommodation*** to assist her in performing the essential functions of her job at Landvest.  Ms. Schneider's representation to the SSDI that she can engage in no "substantial gainful work which exists in the national economy" is inconsistent with her contention that she worked over forty hours per week for Landvest *without any accommodation* for her total disability.

"[A] person who applied for disability benefits must live with the factual representations made to obtain them."  *Opsteen v. Keller Structures, Inc.,* 408 F.3d 390, 392 (7th Cir. 2005).  *Opsteen* goes further:

---
[1]     It is "partly inconsistent" because courts take reasonable accommodations into account for the ADA inquiry, while the Social Security Administration does not take reasonable accommodations into account in the SSDI inquiry.

> Opsteen wants to have things two ways, depicting himself as mentally incompetent in order to obtain disability benefits but as mentally capable in order to secure employment. He has not informed the Social Security Administration of his new position, nor has he asked the SSA and the ERISA plan to stop paying benefits. Instead he seeks to maintain both gloomy and optimistic medical evaluations at the same time, and to benefit from different sources based on these incompatible positions. *Cleveland* holds that courts need not tolerate this maneuver. Litigants who take one view of the facts, and prevail, are equitably estopped to assert the opposite later.

*Id.* at 392 (internal citations omitted).

Ms. Schneider's representation for SSDI purposes of total disability is clearly inconsistent with her contentions in this lawsuit that she worked over forty hours per week at Landvest without any accommodation for her total disability. Ms. Schneider cannot have both things both ways – she cannot receive SSDI benefits by claiming a total disability and later receive a judgment from this Court that stacks overtime pay on top of her SSDI disability benefits.

2.      If Ms. Schneider prevails, either the SSDI or this Court will have been mislead.

Like Opsteen, Ms. Schneider "wants to have things two ways." *Opsteen,* 408 F.3d at 392. She depicted herself as unable to engage in any "substantial gainful work which exists in the national economy" to obtain SSDI benefits. For purposes of this lawsuit, she contends she not only engaged in substantial gainful work while obtaining the SSDI benefits, but did so at a frequency exceeding forty hours per week.

In the ADA context and in light of the requirement of reasonable accommodation, "[a] declaration of disability in an SSDI benefits application is thus not always equivalent to a factual statement that the applicant cannot perform the essential functions of [her] job." *Kiely v. Heartland Rehab. Services,* 359 F.3d 386, 389 (6th Cir. 2004). However, Ms. Schneider never requested an accommodation from Landvest, and Landvest did not otherwise accommodate her. Ms. Schneider's representation to the SSDI is an admission that she cannot perform an substantial gainful work without

an accommodation.  Ms. Schneider received no accommodation.  Ms. Schneider has already mislead the SSDI.  The U.S. Supreme Court has ruled "courts need not tolerate this maneuver.  Litigants who take one view of the facts, and prevail, are equitably estopped to assert the opposite later." *Opsteen,* 408 F.3d at 392.

> 3.      The third *New Hampshire* consideration - detriment to Landvest is not satisfied.

The third *New Hampshire* element suggests courts should consider whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.  *New Hampshire,* 532 U.S. at 751.  This element does not favor Landvest – Landvest was not itself tangibly damaged when the SSDI distributed disability benefits to Ms. Schneider.

However, the *New Hampshire* considerations are not akin to elements of a *prima facie* case that must be satisfied in order to proceed under a legal theory.  Rather, the Supreme Court described the *New Hampshire* factors as considerations that should enter into a court's determination of whether to apply judicial estoppel: "In this case, we simply observe that the factors above firmly tip the balance of equities in favor of barring New Hampshire's present complaint." *New Hampshire,* 532 U.S. at 751. Ms. Schneider either willfully mislead the SSDI to wrongfully obtain benefits for her alleged total disability or she is misleading this court as to how much work she is capable of doing.  "*Cleveland* holds that courts need not tolerate this maneuver." *Opsteen,* 408 F.3d at 392.  Landvest clearly satisfies two elements of the *New Hampshire* inquiry.  The "balance of equities" in this lawsuit tips in favor of Landvest, and Ms. Schneider's claim for unpaid wages should be denied.

**B.      Plaintiffs cannot establish a *prima facie* case of unpaid wages.**

Plaintiffs do not meet their burden of establishing that Landvest either knew of the hours they worked or actually owed them anything.  They do not make their *prima facie* showing of unpaid wages, and their claim must be dismissed.

The Fair Labor Standards Act prohibits employers from employing:

> any of his employees who in any workweek is engaged in commerce . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1).

The party asserting a wage claim bears the burden of proving by a preponderance of the evidence that he or she performed work for which the employer knew or should have known was performed and he or she was not properly compensated.  *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687, 6 WH Cases 83 (1946).  The burden of production does not shift to the employer unless the claimant first establishes a *prima facie* violation of the FLSA.  *Id.*; *Bowe v. SMC Electrical Products, Inc.*, 916 F. Supp. 1066 (D. Colo. 1996).  Once the burden shifts the employer, the employer must come forward with evidence of precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. *Id.*

To establish a *prima facie* wage claim, Plaintiffs must show the following: (1) they were employed by Landvest; (2) that they performed work sufficiently connected to interstate commerce to establish coverage under the Act; (3) that Landvest had constructive or actual knowledge of overtime worked or unpaid wages in violation of the Act; and (4) that they were not properly compensated under the Act in some amount of capable of supporting a just and reasonable inference. *Murray v. Stuckey's Inc.*, 939 f.2d 614, 621, 30 WH cases 705 (8th Cir. 1991), *cert. denied*, 502 U.S. 1073

(1992)(plaintiff in falsified records case must present *prima facie* case of unpaid overtime before burden of production shifts to defendant). *See generally, Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687, 6 WH Cases 83 (1946).    Because plaintiffs have not established that (1) that they worked the hours that they claim; or that (2) Landvest either had knowledge of overtime hours being worked or else had the opportunity, through reasonable diligence, to acquire knowledge.    Accordingly, Plaintiffs they cannot meet their *prima facie* burden under the FLSA and their claims for unpaid wages must fail.

      1.    <u>The preponderance of the evidence shows Plaintiffs worked the hours that they reported to Landvest</u>

The preponderance of the evidence establishes that Plaintiffs worked the hours that they recorded and submitted to Landvest.    Summarized:

    1.    Plaintiffs were instructed and trained to record all actual hours worked. [Def. Prop. FOF, ¶ 52-71.]

    2.    Plaintiffs certified on each one of their timesheets that "the above ia correct record of my time worked for the period indicated." [Def. Prop. FOF, ¶ 48.]

    3.    Despite Plaintiffs claim that they were instructed to only record four hours a day, out of the 52 workweeks that they worked, 22 of those weeks Schneider recorded more than 22 hours.  [Def. Prop. FOF, ¶ 92-93.]

    4.    Plaintiff Schneider claims that the only reason that she does not have contemporaneous timesheets is because John Cramer told her to destroy them her second week of employment.    However, Schneider made no attempt the remaining 50 weeks that she worked to keep accurate time sheets.    Schneider also did not provide this explanation for "lack of contemporaneous accurate

records," to Landvest, the Colorado Department of Labor, in her deposition or in her discovery responses.  It was not until trial that Schneider gave this explanation. [Def. Prop. FOF, ¶ 120.]

5.      Assuming Schneider did not falsely report her engagement of substantial gainful activity to the Social Security Administration, the amount of earned wages that she reported accurately reflected the number of hours that she certified that she worked on her timesheets. [Def. Prop. FOF,  ¶ 135.]

6.      The current managers, the O'Dell's, reported an average of 26 or 27 hours per week each.  This is consistent with Plaintiffs' reporting of 22 to 26 hours on average per week. [Def. Findings of Fact ¶ 123.]

7.      Plaintiffs' "estimation" that they **each** worked 40-50 hours per week does not add up.  Plaintiffs' own testimony, and that of the other resident managers who broke out the amount of time they spent on average for each work task, does not calculate to 40-50 hours per week per manager.  To the contrary, the testimony reveals that, assuming Plaintiffs would take the longest time of all the managers to complete each task, they still should have accomplished their job duties within 43.61 hours per week (combined), or 21.8 hour each.  [Def. Findings of Fact ¶ 13-17.]

Plaintiffs were repeatedly instructed by Landvest to record **all hours worked**.  Plaintiffs were instructed on their first day of work to "keep accurate records of work performed" pursuant to their Employment Contract.  Plaintiffs thereafter submitted time records on a bi-weekly basis and were paid based on the hours they recorded.  Without supervising Plaintiffs daily, Landvest had no choice but to rely upon the timesheets submitted by Plaintiffs.

Plaintiffs rely upon their own testimony to attempt to show they "understood" or "were instructed" to only record 4 hours a day or 22 hours a week.  They would have the Court believe they were good employees following instructions "out of fear for their jobs and home."  However, their timesheets do not reflect this fear.  As previously summarized, for 22 of the 50 weeks she worked, Schneider submitted more than 22 hours per week.  Of 12 of the 50 weeks he worked, Wymer submitted more than 22 hours per week.  Plaintiffs' contention that they were just following instruction is undermined by the fact they did *not* follow the alleged instructions, and still placed themselves within the zone of danger they purport existed.

Plaintiffs also fail to demonstrate they were not properly compensated for hours they worked, and hence fail to establish the fourth element of their *prima facie* case.  Where an employee brings suit under Section 16(b) of the Act for unpaid wages or overtime, he "has the burden of providing that he performed work for which he was not properly compensated." *Anderson v. Clemens Pottery Co.*, 328 U.S. 680, 687, 6 WH Cases 83 (1946).  Plaintiffs claim they under-reported the hours they worked because they were instructed to do so.  An equally plausible explanation is that Plaintiffs reported *exactly* the hours they worked, and contrived these mysterious instructions for purposes of this lawsuit. As noted above, the fact that Plaintiffs often reported more than 22 hours despite alleged instructions not to do so conflicts with their claim that such instructions were ever given. *See McKnight v. Kimberly Clark Corporation*, 149 F.3d 1125 (10th Cir. 1998)(an admission by an employee that he was paid for the overtime hours he included on his time sheet and that the uncompensated time was the result of his failure to adequately record his time precluded the employee from claiming unpaid wages where the company has not reason to be aware of the overtime).

Plaintiffs, whose credibility is undermined by the fact that they now claim they lied on their timesheets, offer no proof besides their own self-serving testimony that they worked any hours for

which Landvest did not compensate them.  They hence fail to sufficiently establish the fourth element of their *prima facie* showing, and their claims must fail.

Schneider's dishonesty in her application for SSDI cannot be overlooked.  Ms. Schneider's representation to the SSDI is an admission that she cannot perform an substantial gainful work without an accommodation.   Ms. Schneider received no accommodation and, if she has not misled the Department, then she has mislead this court in the number of hours that she claims to have worked but was not paid.

Accordingly, Plaintiffs cannot meet their burden of proof and establish that Landvest knew or had reason to believe that the information was inaccurate.  Plaintiffs' claim for unpaid wages should, therefore, be dismissed.  *See McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125 (10th Cir. 1998)(holding that the employee's failure to adequately record claimed overtime is "fatal" to a later claim for that time of the company has no reason to be aware of it).

Assuming Plaintiffs are able to demonstrate a *prima facie* case of an FLSA violation, Landvest satisfies its burden of production.  Landvest did not pay Plaintiffs for the work they allegedly performed because Landvest relied on Plaintiffs' timesheets and did not know Plaintiffs were eligible for additional compensation.  For the reasons discussed above, Plaintiffs cannot establish pretext.

**C.     Defendants maintained adequate or accurate time records.**

Should this court determine that Plaintiffs have met their *prima facie* case, the burden of production shifts to the employer to negate inferences that the employer has failed to keep adequate or accurate records.

1.     <u>No Private Right of Action for Violation of FLSA Record-Keeping Provisions</u>

An employer may violate the FLSA by failing to keep records in accordance with the Act's record-keeping provisions.  *See generally, Dunlop v. Gay-goto, Inc.*, 528 F.2d 792, 22 WH Cases 640

(10th Cir. 1976)(in action by Secretary of Labor to enjoin employer from violating overtime and record-keeping provisions court found employer kept inaccurate payroll records such as to mislead outsider examining them where employer showed overtime compensated to employee but did not record employee's refund part of overtime pay); *Mitchell v. Hertzke*, 234 F.2d 183, 12 WH Cases 877 (10th Cir. 1956)(in action by Secretary of Labor, court issued injunction requiring grower and crew chief to maintain required records where labor was done by family of migrant workers working as unit but only records kept were of head of family who collected pay).

Although the Department of Labor may pursue injunctive relief or criminal sanctions or such violations, a private right of action does not exist to allow an employee to enforce the Act's record-keeping requirements. 29 U.S.C. § 216(a) (criminal sanctions); *East v. Bullock's Inc.*, 34 F. Supp. 2d 1176, 5 WH Cases2d 198 (D. Ariz. 1998). In *Bullock's*, the court reasoned that there was no evidence that Congress intended to create a private right of action under Section 15(a)(5), and given the specification of other private rights of action in the FLSA, Congress apparently did not intend to create a private right to enforce the record-keeping provisions. *Id.*

Instead, in cases brought by employees for back wages, an employer who fails to keep records faces an onerous burden of proof. 29 U.S.C. § 215(a)(5); *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 6 WH Cases 83 (1946)(employer that failed to keep records could not complaint that employees' evidence on damages was inexact or imprecise); *Wirtz v. McClure*, 333 F2d 45, 16 WH Cases 526 (10th Cir. 1964).

Once this inference is established, "the burden shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negate the reasonableness of the inference to be drawn from the employer's evidence." *Id.* at 687-88. If the employee produces

evidence sufficient to establish the inference, and the employer fails to rebut that inference, the employee is entitled to damages, and the employer cannot complain that the damages are speculative, because the impreciseness of the damage claim stems from the employer's deficient records. *Id.* at 688.

Plaintiff Schneider claims that she worked 4 week days per week from 10:00 a.m. until 6:00 p.m. and Saturdays from 9:00 a.m. until 5:00 p.m. In addition, she worked four hours on every Sunday except one from November, 2002 through March, 2003. Finally, since filing this lawsuit, Plaintiff Schneider now claims that she worked between two and three hours every week after 6:00 p.m. performing her job responsibilities. Plaintiff Wymer makes a similar damage claim for unpaid wages but has not broken down his calculation of unpaid overtime.

For each week worked, Plaintiffs filled out a daily timesheet and a bi-weekly summary of the time worked. Plaintiffs certified on each of their daily timesheets that the recorded time was "a correct record of my time worked for the period indicated." Although many of the timesheets reflected four hours each day for each, there were many weeks where one or both Plaintiffs recorded additional hours worked for all types of reasons. There were computer malfunctions, late leases, training and days worked because there was no relief manager. Some of Plaintiffs' explanations on their timesheets included "relief manager had difficulties," "EOM", "sale unit with special circumstances & relief mar. difficulties," "NSF check research," and "problematic tenant – began eviction proceedings." Despite Plaintiffs' claim that it was clear from a "pattern" of time that they were not recording all hours worked, Plaintiffs' timesheets gave the opposite impression. In fact, Plaintiff Schneider's submission of as many as 20 hours in addition to the business office hours worked were a clear indication that she was recording all hours worked. In fact, clear up to the las t week work Schneider was recording additional hours worked. Her last time sheet showed an additional 5.5 hours worked for late leases,

late payers, vacates and preparing forms.  [Def. Ex. A0001-0081.]

Plaintiffs now contend that they were instructed to only write down four hours regardless of the number of hours worked.  If they were in fact instructed this, they clearly did not follow it.  They also claim that they complained of not being paid for all hours worked during their employment. However, Landvest had no knowledge that Plaintiffs were not being compensated for all hours worked. Plaintiffs were unsupervised and entrusted to record all hours worked as instructed in their employment agreement, training and on their timesheets.  Landvest relied upon these timesheets and paid Plaintiffs according to their hours recorded.

**D.**      **Plaintiffs were paid a minimum wage and properly compensated for overtime pursuant to the FLSA.**

1.      Plaintiffs were compensated for all straight and overtime hours worked pursuant to their agreed fixed workweek pay plan as set forth in their contract of employment

The Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201-219, requires, in its simplest form, payment of a minimum wage and an overtime premium.  Currently, the minimum wage for non-exempt employees is $5.15 per hour.  29 U.S.C. § 206(a)(1).  An employer is not required to pay an employee on an hourly basis; rather, the employee's pay, whether based on a salary, piece work or other method of payment, must equal or exceed the required minimum wage for all hours worked.  29 U.S.C. § 206(a)(1); 29 C.F.R. § 778.109.  It is necessary to compute the regular hourly rate of such employees during each workweek.  29 C.F.R. 778.109.  According to Section 778.109 of the Code of Federal Regulations, "the regular hourly rate of pay of an employee is determined by dividing his total

renumeration for employment in any workweek by the total number of hours actually worked by him in that workweek for which such compensation was paid."

Where, as here, an employee is paid a fixed salary for up to 35 hours of work in a workweek, the employee is guaranteed a fixed amount as straight time pay for the number of hours which the salary is intended to compensate. C.F.R. 778.113(a).

The federal regulations provide the following illustration that mirrors the present payment arrangement between Plaintiffs and Landvest:

> If the employee is hired at a salary of $182.70 and if it is understood that this salary is compensation for a regular workweek of 35 hours, the employee's regular rate of pay is $182.70 divided by 35 hours, or $5.22 an hour, and when he works overtime he is entitled to receive $5.22 for each of the first 40 hours and $7.83 (one and one-half times $5.22) for each hour thereafter.

29 C.F.R. 778.113(a).

Applying this formula to Schneider and Wymer's employment, Plaintiffs contracted with Landvest for an annual combined salary of $21,600 or $10,800 each (exclusive of bonuses, lodging and benefits). Pursuant to their employment agreement, they agreed to work approximately 44 hours per week but in no event, "no more than a combined total of 70 hours per week". They could be called upon to work additional hours as needed and agreed to be available during the scheduled office hours.

Thus, based on the plain language of the contract, it was understood that, as of January 20, 2003, they were each earning a salary of $10,800 per year (or $207.69 per week) and that this salary was compensation for a regular workweek of 35 hours. Accordingly, their regular rate of pay is calculated by taking the weekly wage of $207.69 divided by 35 hours, or $5.93 an hour. When either works overtime, they are each entitled to their salary wage plus $5.93 an hour for any straight time hours worked over 35 hours. The overtime rate is then calculated at one and one-half times this

regular rate of $5.93. Therefore, any hours over 40 worked in a workweek would be compensated no less than $8.90.

Despite Plaintiffs' potential for overtime, Schneider only recorded working more than 40 hours in a workweek on **one** occasion. That workweek, ending May 5, 2002, Schneider recorded 22 regular hours and an additional 20 hours in the "OT" column. She received her regular salary of $207.69[2], plus $283.20 of "overtime". This additional pay of $283.20 was premium pay at a flat rate of $14.16 an hour for the entire 20 hours. The $14.16 flat rate was pre-determined as a set amount for all resident managers employed at Landvest during that period regardless of their salary rate. This figure was picked so that it would be high enough to cover the minimum regular and/or overtime rate for all employees, regardless of their salary, as well as any other type of compensation such as the residence. Accordingly, not only was Schneider paid for all hours worked, she received more compensation than she was entitled to under the wage and hour laws.

In most instances in which Plaintiffs worked beyond the office hours, Plaintiffs received a premium rate of $14.16 for those hours. Out of 22 workweeks that Schneider recorded hours in addition to her office hours worked, there were only nine workweeks that she did not receive premium pay for all additional hours recorded. Out of those nine workweeks, Schneider worked more than the contracted 35 hours only <u>one</u> workweek. That week, she recorded a total of 13.5 hours in addition to the 22 business hours worked for a total of 35.5 hours. She received her salary wage, plus 9.5 hours of premium pay at $14.16 an hour ($134.52). Accordingly, Schneider received her salary wage for the agreed upon 35 hours and therefore was only entitled to her regular rate of pay for .5 hours at $5.94

---

[2] Plaintiffs are paid bi-weekly. Accordingly, Plaintiffs' paycheck stub reflects $415.39 as the salaried amount paid for the two-week period.

an hour.  Landvest, however, approved 9.5 hours of premium pay and compensated her an additional $134.52, giving her <u>$128.58 more than</u> she was entitled to under wage and hour laws.

For each of the remaining eight workweeks that Schneider recorded hours in addition to 22 but did not receive premium pay for each hour worked, Schneider worked a total of less than 35 hours for that workweek.  Accordingly, despite being denied premium pay, since she was not entitled to any additional compensation pursuant to her contract she was paid her regular salary for those hours.

Obviously, because Plaintiff did not work more than 40 hours during any of these nine workweeks that she is claiming Landvest "refused" her overtime, she is not entitled to overtime compensation.

Plaintiffs' time records and pay checks clearly establish not only that Plaintiffs were paid for all straight-time and overtime hours worked, but they were paid at a rate which exceeded both their regular and overtime rate as required by the FLSA.

> 2. <u>Plaintiffs were properly compensated under either a fixed or a fluctuating workweek salary pay plan.</u>

Plaintiffs' contract is clear that they agreed to be paid on a salary basis for a minimum of 44 hours or 70 hours per week, combined for both managers.  Even if Plaintiffs were confused as to how their regular rate was calculated for purposes of determining their regular or overtime rate, Plaintiffs' regular rate remains the same under either a fluctuating or a fixed workweek pay plan if they work more than 35 hours.  Anything less than 35 hours Plaintiffs were compensated for in their salary wage.

## II.     BREACH OF CONTRACT

### A.     Kansas law governs Plaintiffs' breach of contract claim.

The governing contract provides it "shall be governed by and constructed in accordance with the laws of the State of Kansas."   "In making choice of law determinations, a federal court sitting in diversity must apply the choice of law provisions of the forum state in which it is sitting.   This is true even when choice of law provisions involve the interpretation of contract provisions."   *Shearson Lehman Brothers v. M & L Investments*, 10 F.3d 1510, 1514 (10th Cir. 1993).   (applying Utah law to determine if Delaware choice of law provision was applicable).   Hence, Colorado law is applied to determine if Kansas law will govern the contract.   Colorado courts apply the law chosen by the contracting parties unless applying such state's law would be contrary to the fundamental policy of the State of Colorado.   *Hansen v. GAB Business Services*, 876 P.2d 112, 113 (Col. App. 1994) (citing *Woods Bros. Homes, Inc. v. Walker Adjustment Bureau*, 198 Colo. 444, 601 P.2d 1369 (1979); *Power Motive Corp. v. Mannesmann Demag Corp.*, 617 F.Supp. 1048 (D. Colo. 1985)).   Kansas contract law is not contrary to the fundamental policy of the State of Colorado, and the choice of law provision is valid.   Kansas law governs the parties' contract.

### B.     The terms of Plaintiffs' employment contract.

On April 10, 2002, plaintiffs entered into an employment contract ("Contract") with Landvest.

Within their proposed findings of fact, plaintiffs allege "Before signing the contract, Mr. Cramer reviewed the contract with them."   They further allege that during and prior to this review, Mr. Cramer made certain representations to them regarding the terms of their employment and compensation.   In any event, they allege no representations regarding compensation that occurred after contract formation.

The Contract contains the following integration clause:

This Agreement contains the entire understanding among the parties and supersedes any prior understandings between them regarding the within subject matter. There are no representations, agreement, or understandings, oral or written, between or among the parties relating to the subject matter hereof which are not fully expressed herein.

If a written instrument is not ambiguous and can be carried out as written, courts should not deviate from its terms or substitute an alternative construction. *Decatur County Feed Yard, Inc. v. Fahey*, 266 Kan. 999, 1005, 974 P.2d 569 (1999); *Butts v. Lawrence*, 22 Kan.App.2d 468, Syl. 10, 919 P.2d 363 (1996). "A contract is ambiguous when the words used to express the intention of the parties may be understood to reach two or more possible meanings." *Butts*, 22 Kan.App.2d at 473.

"The primary rule when interpreting a written contract is to ascertain the intent of the parties." *Marquis v. State Farm Fire & Cas. Co.*, 265 Kan. 317, 324, 961 P.2d 1213 (1998). "An interpretation of a contractual provision should not be reached merely by isolating one particular sentence or provision, but by construing and considering the entire instrument from its four corners. The law favors reasonable interpretations, and results which vitiate the purpose of the terms of the agreement to an absurdity should be avoided." *Saathoff v. Data Systems Intern., Inc.*, 83 P.3d 1270, 2004 WL 292103, **3 (Kan. App.) (Kan. App. 2004) (citing *Johnson County Bank v. Ross*, 28 Kan. App. 2d 8, 10-11, 13 P.3d 351 (2000)).

Plaintiffs allege the following Contract language is ambiguous:

In performance of the duties herein described, Employees shall not work more than a combined total of 70 hours per week. Employees shall work approximately 44 hours per week but may be called upon to work additional hours as needed.

The quoted language is not ambiguous. It is a single paragraph within the Contract. The first sentence refers to an allowable "combined total" number of 70 hours the two plaintiffs could work;

plaintiffs do not allege the first sentence is ambiguous.  Plaintiffs allege the second sentence – "Employees shall work approximately 44 hours per week" – is ambiguous because it is allegedly unclear whether Landvest expected each employee to work 44 hours or 22 hours per week.  If Landvest required each of the plaintiffs to work 44 hours per week, the plaintiffs' "combined total" would be 88 hours.  Eighty-eight hours exceeds 70 hours – the Contract would contradict itself within the short span of consecutive sentences.  There is no ambiguity where, of two possible contractual interpretations, one results in absurdity and one does not.  See *Johnson County Bank v. Ross*, 28 Kan. App. 2d 8, 10-11, 13 P.3d 351 (2000).

Plaintiffs also claim the Contract is ambiguous as to "how hours over 22 would be compensated."

The Contract is an employment contract.  Within that context, employees are commonly – usually – denominated either "salaried" or "hourly."  See 29 C.F.R. § 776.5; 29 C.F.R. § 778.117.  The Contract is clearly one for salaried employment insofar as it provides for an <u>annual</u> salary and states plaintiffs must work <u>approximately</u> 44 hours per week to fulfill their job duties.  The Contract delineates the parties' complete agreement as to compensation – it discusses an annual salary, a rent credit for the Residence, and overtime provisions.  If the parties had contemplated an hourly wage provision for work over 22 hours, such language clearly would have been included in the Contract. There is no such provision because the parties did not intend for plaintiffs to receive additional compensation for work over 22 hours.

Because the Contract is an integrated agreement, contains an integration clause, and is not ambiguous, the Court should not consider parol evidence of prior representations.  The parties' entire agreement regarding employment terms and compensation is captured within the April 10, 2002

Contract.  It provides, in relevant part, the following:

> 1.      Landvest shall pay plaintiffs a collective annual salary of $21,600 in
>
> cash and $4500 in rent credit.
>
> 2.      Plaintiffs shall not work more than 70 hours per week.
>
> 3.      Plaintiffs shall keep accurate time records of work performed.
>
> 4.      Plaintiffs shall only work overtime in the event of emergencies.

**C.      Landvest did not breach the contract with Plaintiffs.**

In Kansas, the essential elements of an action based on a contract are as follows: 1) the existence of a contract between the parties; 2) sufficient consideration to support the contract; 3) the plaintiff's performance or willingness to perform in compliance with the contract; 4) the defendant's breach of the contract; and 5) damages to plaintiff caused by the breach.  *Commercial Credit Corporation v. Harris*, 212 Kan. 310, Syl. ¶ 2, 510 P.2d 1322 (1973).

Landvest did not breach the contract.  It paid plaintiffs their annual salary as promised within the Contract.  When plaintiffs worked in excess of 40 hours, Landvest paid them overtime pursuant to federal law.  Plaintiffs fail on the fourth element of their breach of contract claim.

Even assuming plaintiffs' allegations to be true, they did not perform in compliance with the contract and fail on the third element of their breach of contract claim.  Plaintiffs worked in excess of 70 hours per week in violation of the Contract.  Plaintiffs did not submit accurate time records for work performed.

## III.     CALCULATION OF DAMAGES

### A.     Plaintiffs are not entitled to a regular rate inclusive of the value of their lodging.

Under the FLSA, where an employee is paid under a "fixed workweek" salary pay plan, the employee's overtime rate must be calculated based on the "regular rate."  In establishing the regular rate, the value of lodging is generally included in this rate.  Where, however, the benefit of the lodging is attributed to the employer and not the employee, the cost of lodging shall not be considered part of the employee's wages or regular rate of pay.  Who receives the benefit is a question of fact based on a number of variables, including whether or not the employee is required to live at the provided housing.  Here, because resident managers are required to reside at the storage facilities as a condition of their employment and their residence at the facility directly benefits Landvest, the value of their lodging would not need to be included in their regular rate for purposes of overtime compensation.

### 1.     Value of Plaintiffs' lodging is not included in the computation of the regular rate.

The FLSA defines the regular rate to include all renumeration for employment paid to an employee, except for certain payments that are expressly defined and set forth in the statute. 29 U.S.C. § 207(e).  It has been held that "unless a benefit paid to an employee falls within one of these statutory exclusions, it must be included in determining the employee's regular rate." *See McLaughlin v. Quan*, 1988 WL 62595, *4 (D. Colo., June 17, 1988) (citing to 29 C.F.R. § 778.200(c) (1987); 2 Lab. L. Rep. (CCH) ¶ 25,510, 25,510.40.

"Wages" are defined under 29 U.S.C. 203(m) which provides in pertinent part:

"Wage" paid to any employee includes the reasonable cost, as determined by the Administrator, to the employer of furnishing such employee with board, lodging, or other facilities, if such board, lodging or other facilities are customarily furnished by such employer to his employees.

The Code of Federal Regulations speaks to the calculation of the "reasonable cost" of the

lodging, providing that:

> The term reasonable cost as used in section 3(m) of the Act is hereby determined to be not more than the actual cost to the employer of the board, lodging, or other facilities customarily furnished by him to his employees.

29 C.F.R. 531.3(a) (emphasis added).  It further provides that:

> (d)(1) The cost of furnishing "facilities" found by the Administrator to be primarily for the benefit or convenience of the employer will not be recognized as reasonable and may not therefore be included in computing wages.

> (2) The following is a list of facilities found by the Administrator to be primarily for the benefit of convenience of the employer.  The list is intended to be illustrative rather than exclusive: (i) Tools of the trade and other materials and services incidental to carrying on the employer's business; (ii) the cost of any construction by and for the employer; (iii) the cost of uniforms and of their laundering, where the nature of the business requires the employee to wear a uniform.

29 C.F.R. 531.3(d)(1)-(2).

Interpretive C.F.R. section 531.32 defines "other facilities" to be something like board or

lodging.  Such items might include "housing furnished for dwelling purposes."

Further, C.F.R. sections 531.32 and 531.30 give credence to the argument that "facilities" is

a broad term meant to include lodging.  29 C.F.R. 531.30 provides:

> The reasonable cost of board, lodging or other facilities may be considered as part of the wage paid an employee only where customarily "furnished" to the employee.  Not only must the employee receive the benefits of the facility for which he is charged, but it is essential that his acceptance of the facility be voluntary and uncoerced.  See *Williams v. Atlantic Coast Line Railroad Co.*, (E.D.N.C.). 1 W.H. Cases 289.

29 C.F.R. 531.31 provides:

> The reasonable cost of board, lodging, or other facilities may be considered as part of the wage paid an employee only where "customarily" furnished to the employee. Where such facilities are "furnished" to the employee, it will be considered a sufficient satisfaction of this requirement if the facilities are furnished regularly by the employer to his employees or if the same or similar facilities are customarily furnished by other

employees engaged in the same or similar trade, business, or occupation in the same or similar communities. *See Walling v. Alaska Pacific Consolidated Mining Co.*, 152 F. (2d) 812 (C.A. 9), *cert. denied*, 327 U.S. 803; *Southern Pacific Co. v. Joint Council* (C.A. 9) 7 W.H. Cases 536. Facilities furnished in violation of any Federal, State, or local law, ordinance or prohibition will not be considered facilities "customarily" furnished.

In *Marshall v. Debord*, 1978 WL 1705, *5, 23 Wage & Hour Cas. (BNA) 1188, 84 Lab. Cas. P 33,721 (E.D. Okla., Jul. 27, 1978), the court held that the defendant employer was not entitled to have the cost of furnishing lodging included in computing wages under 29 U.S.C. § 203(m) where the rooms were primarily furnished for the benefit of the defendant employer since the employees were required to live at the premises and since at least one employee had to be available at all times.

Here, Plaintiffs were required, as a condition of their employment as full-time resident managers, to reside at the facility. They did not pay rent to reside at this apartment and their residence at the facility benefitted Landvest. Their residence at the facility added an appearance of added security. It also allowed both Plaintiffs and Landvest more flexibility in maintaining the facility and allowing Plaintiffs time off for slow periods. Accordingly, because Plaintiffs' housing was furnished primarily for the benefit of Landvest, because Plaintiffs they are required to reside at the facility, the value of their lodging should not be included in the computation of their regular rate.

2.      Even if Plaintiffs' lodging is computed in their regular rate, they were paid at an hourly rate that exceeded this amount.

The regular rate is only relevant when Plaintiffs individually work more than the contracted 35 hours in a workweek. Otherwise, Plaintiffs are compensated their salary wage for all hours worked up to 35 hours. For those additional hours, Plaintiffs receive their regular rate per hour for hours between 35 and 40 hours and time and one-half of their regular rate for all hours over 40 hours worked in a workweek. Even if the value of lodging was added to their salary wage, because Landvest paid

a flat premium rate for those additional hours at $14.16 an hour, they are not owed any additional straight or overtime wages.  The value of lodging, estimated by Plaintiffs at $2,250 a year, added to their annual salary of $10,800, comes to $13.050.  This produces a weekly salary of $250.96.  Therefore, based on 35 hours of work, the regular rate would be $7.17 an hour and the overtime rate would be $10.76.  Plaintiffs were paid almost four dollars more than the overtime rate inclusive of lodging.  Accordingly, even assuming the value of lodging should be included, Plaintiffs are not owed unpaid straight or overtime wages.

## CONCLUSION

In April 2002, Ms. Schneider proposed her salary be restructured so she could undermine the benefit qualifications for Medicare and Social Security.   Landvest refused the restructuring because it would have violated the minimum wage requirement of the Fair Labor Standards Act.  As a result, plaintiffs resigned, attacked David Mason in a letter, picketed the storage facility, and filed this lawsuit ironically alleging an FLSA violation.  Almost a year later and for the first time, plaintiffs claim Landvest required them to record less hours on their timesheets than they actually worked.  Plaintiffs' contention is undermined by the fact that they consistently failed to follow the alleged instruction and by the clear weight of the evidence proving each worked approximately 20 hours per week.  Because Landvest paid plaintiffs for all hours they worked, compensated plaintiffs for overtime in an amount well above what the FLSA required, paid plaintiffs an hourly amount above the minimum wage, and fulfilled every obligation owed to plaintiffs contained within the parties' employment Contract, plaintiffs' claims should be, and are hereby, dismissed.

Entered this _____ day of _____, 2005.

By _____
Wiley Y. Daniel, United States District Court Judge

59

Respectfully submitted this 24th day of October,

                              KUTAK ROCK LLP

                    By:  **s/ Stacia G. Boden          10/24/2005**
                         Alan L. Rupe,  KS Bar # 08914
                         Stacia G. Boden,   KS Bar # 20295
                         8301 East 21st Street North, Suite 370
                         Wichita, Kansas  67206-2295
                         Telephone: (316) 609-7900
                         Facsimile:  (316) 630-8021

                         Heather Davis, CO Bar #30056
                         Mark C. Willis, CO Bar #31025
                         1801 California Street, Suite 3100
                         Denver, Colorado  80202
                         Telephone: (303) 297-2400
                         Facsimile:  (303) 292-7799
                         ATTORNEYS FOR DEFENDANTS

### CERTIFICATE OF SERVICE

I hereby certify that on the 24th day of October, 2005, counsel for Defendants' transmitted to the Court and to Plaintiffs' counsel **DEFENDANTS' SECOND REVISED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** and now, on this 24th day of October, 2005, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

        Donna Dell'Olio
        CORNISH AND DELL'OLIO
        431 North Cascade Avenue, Suite 1
        Colorado Springs, CO  80903
        Phone:  (719) 475-1204
        Facsimile:  (719) 475-1264
        ddellolio@cornishanddellolio.com

        Attorney for Plaintiffs

                              **s/ Stacia G. Boden   10/24/2005**
                              Stacia G. Boden
                              KUTAK ROCK LLP
                              stacia.boden@kutakrock.com