**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 03-CV-2474-WYD-PAC

CHARLOTTE SCHNEIDER and
DEAN WYMER,

        Plaintiffs,

v.

LANDVEST CORPORATION, a Kansas corporation,
And DAVID MASON, individually

        Defendants.

---

Plaintiffs' Findings of Fact and Conclusions of Law - Underlined Revised October 24,
2005

---

A trial to the Court of the above captioned matter was held on September 26, 27

and  28, 2005, October 5, 2005 and October 6, 2005.  After considering the testimony

of the witnesses, the credibility of the witnesses, the exhibits submitted, and the

arguments of counsel, the Court enters  the following findings of fact and conclusions of

law:

**Findings of Fact**

1.      The Defendant, Landvest Corporation, (hereafter Landvest) is a Kansas

Corporation which manages over 2 million square feet of self-storage space consisting

of over 20,000 units.  The 50-plus facilities managed by Landvest Corporation are self

storage facilities located in Colorado, Kansas, Louisiana, Missouri, New Mexico, Ohio and Texas.

2.      Landvest's corporate headquarters are located in Wichita, Kansas.  All corporate decision-making with respect to general corporate policies and procedures, procedures concerning operation of facilities, personnel policies and pay practices, including compliance with the federal Fair Labor Standards Act, occurs in Wichita, Kansas where David Mason's office is located.

3.      Substantial interstate activity is engaged in by agents of the corporation at all levels.  Corporate managers frequently travel interstate to supervise facilities, resident managers frequently communicate with corporate headquarters by phone, fax, mail and Internet.  Payroll is processed in Kansas and distributed by mail or direct deposit to employees or banks in other states.  Landvest has annual gross sales in excess of $500,000.00.

4.      At all times relevant to the Complaint, Defendant David Mason was a 50% owner of the company, and an officer of the Defendant Corporation (Vice President). He <u>formulated, or</u> contributed to the formulation of, most corporate personnel and pay policies, including compliance with the federal Fair Labor Standards Act.  He also had <u>final</u> decision-making authority over the management of the business of Landvest, <u>including the payment of overtime to the Plaintiffs</u>.

5.      On December 20, 1998 an employee of Landvest, Don Wooldridge, made a complaint to the United States Department of Labor alleging that Landvest was not keeping accurate records of hours worked by employees; that it required employees to

record 22 hours a week regardless of the number of hours worked; and was not paying overtime.  Ex. 071-004, 005.

6.      Landvest's  attorneys, Husch and Eppenberger, wrote  to the United States Department of Labor by letter on March 11, 1999, apparently in response to the Wooldridge complaint.  Ex. 69-006.  Through its attorneys, Landvest represented to the United States Department of Labor that resident managers never worked more than 40 hours a week and offered to produce time sheets to prove that they only worked 22 hours a week.  Ex. A 30.

7.      Landvest began paying resident managers time and a half for some hours worked in excess of forty in a single work week one month later in April, 1999.  Ex. 011-002.  Prior to April, 1999 it classified resident managers as exempt, salaried employees and did not pay overtime.  *Id.*  Landvest denies that the change in classification from exempt to nonexempt status was the result of any event.  Rather, it claims that the change resulted from a "periodic review" of personnel and pay practices.  Ex. 009-008, 009.

8.      The change in status of Landvest's resident managers from exempt to nonexempt in April, 1999 was not accompanied by any change in the form of contract used by Landvest.  *See* response to Request for Production No. 2 (Exhibit 6-005) and *compare* Exhibit 68-013,14 to Exhibit 68-002.

9.      At trial Landvest's attorney represented to the Court that Landvest's pay plan was a "Department of Labor approved " pay plan.  However, Landvest admitted in response to a request for admission made by the Plaintiffs that "neither David Mason nor Landvest Corporation ever sought or received a written or oral opinion from the

United States Department of Labor approving any of its pay practices."  Request for

Admission No. 3. Exhibit 4-005-006.  No evidence of any approval was offered by

Defendants at trial.

**Plaintiffs' Background and The Application for Employment**

10.     The Plaintiff, Charlotte Schneider, applied for employment with Landvest

on or about March 27, 2002, and began working at the storage facility located at 10601

Iliff, Aurora, Colorado,  on April 10, 2002, as a resident manager.  Testimony of

Charlotte Schneider, Tr. 24, ll 20-24.

11.     The Plaintiff, Dean Wymer, applied for employment with Landvest on or

about March 27, 2002, and also began working at the storage facility located at 10601

Iliff, Aurora, Colorado, on April 10, 2002, as a resident manager.  Testimony of Dean

Wymer, Tr. 267-268.

12.     The Plaintiffs are married to each other.

13.     Prior to their employment with Landvest, the Plaintiffs resided near

Edgemont, South Dakota.  Plaintiff Charlotte Schneider was not working at the time she

applied for employment with Landvest.  She had previously worked as an accounts

receivable clerk, a motel manager, and a manager of an apartment complex.  She had

also worked as an assistant manager in a convenience store.  Ex. A14-0002.

14.     Plaintiff Dean Wymer had previously owned businesses, including  a

pawn shop and a sound business.  He had worked as a musician, a motel manager,

and a manager of an apartment complex.  Ex. A13-0002.

15.     At the time they were hired by Landvest, Plaintiffs owned their home near

Edgemont, South Dakota.

16.     In March, 2002, Charlotte Schneider saw an on-line classified advertisement in the *Denver Post* for a Landvest resident manager.

17.     In response to the advertisement, Plaintiffs called Landvest and spoke to John Cramer, a Landvest regional manager.  Cramer asked them to fax their resumes to him.

18.     <u>During Charlotte Schneider's first telephone conversation with Cramer, he told her the job required two persons to work the site, that managers live on site and that managers worked 4 hours each per day.</u> Testimony of Charlotte Schneider, Tr. 25, ll 16-24.

19.     <u>At John Cramer's request, Plaintiffs traveled to Denver two or three days after the first telephone conversation with John Cramer.  They met John Cramer at a restaurant and spent approximately one hour with him. Testimony of Charlotte Schneider, Tr. 26, ll 20-24.  He again mentioned 4 hours a day of work per person and stated that they would earn $416.00 every two weeks.  Testimony of Charlotte Schneider, Tr. 27, ll 5-9; Testimony of Dean Wymer, Tr. 267, l 19- Tr. 268 l 11.</u>

20.     John Cramer then told them that a final decision would be made in the future concerning their employment and that he would contact them in a day or two.

21.     Plaintiffs returned to South Dakota and were offered employment with Landvest shortly thereafter.  They were asked to begin work on April 1, 2002.

22.     Plaintiffs were later notified by John Cramer that there was a problem with the  apartment they were to occupy and were told to report to duty on April 10, 2002.

23.     In reliance, in part, upon the representations of John Cramer, Plaintiffs moved to Denver with their belongings and listed their South Dakota home for sale. Their home was subsequently sold.  Testimony of Dean Wymer, Tr. 269, ll 4-9.

24.     Plaintiffs were hired by Landvest to manage a self storage facility located at 10601 East Iliff, Aurora, Colorado.  They worked at the Iliff facility until they terminated their employment on April 4, 2003.

**Training**

25.     Plaintiffs received three days of training at the Iliff site (April 10-12, 2002) from Judi French, a resident manager. John Cramer was present for part, but not all, of the training.  At the end of the first day of training Plaintiff Dean Wymer had worked 8 hours (Testimony of Dean Wymer, Tr. 272 ll. 2 ) Charlotte Schneider has worked 9 hours (Testimony of Charlotte Schneider, Tr. 29, ll 15.)  They were instructed by Judi French to record only 4 hours each on their time sheets.  Tr. 273 ll.9-10

26.     The following day they were again instructed to record 4 hours of work although they had each worked a full day.  When questioned by Charlotte Schneider about this practice John Cramer told her that "that was just the way it was."  Testimony of Charlotte Schneider, Tr.46, l. 6.

27.     The Plaintiffs were instructed by John Cramer to only record 4 regular hours of work per day regardless of the number of hours actually worked.   He explained to them that their pay was based on 4 hours a day and that their time sheets had to record 4 hours a day.  He told them that they were salaried.  Testimony of Charlotte Schneider, Tr. 48, l. 18- Tr. 49, l. 17.

28.     The Plaintiffs' testimony was supported by the statement of John Cramer

to the Colorado Department of Labor, dated July 2, 2003. Exhibit A 28-0001.  He wrote:

> Dean and Charlotte were told by me that they should record
> 22 hours of work per person on their time record each week
> and that overtime would only be approved in emergencies.

Ex. A 28-0001 paragraph 1.

29.     At the end of the second pay period Charlotte Schneider attempted to

submit a time sheet reflecting her actual hours worked.  She was told that she was

required to submit hours as she had been trained or that she would not be paid; she

was told to create a new  time sheet.  Testimony of Charlotte Schneider, Tr. 47, ll 6-12.

30.     The Plaintiffs' testimony was also supported by the payroll records of

Landvest which showed that the trainer, Judi French, recorded 9 hours on April 10,

2002, 8 hours on April 11, 2002 and 8 hours on April 12, 2002 (Exhibit 35-051) the days

when Charlotte Schneider testified she was being trained by Judi French.  The

Plaintiffs' time sheets for the same days only record 4 hours each per day.  Exhibits A1-

003 and Exhibit A2-004.

31.     Shortly after beginning work John Cramer told the Plaintiffs that they were

both required to be at the site and available to work, during office hours (10:00 a.m.-

6:00 p.m. Monday through Friday and 9:00 a.m. - 5:00 p.m. on Saturday), unless they

were performing work-related errands.  Testimony of Charlotte Schneider, Tr. 40, I.1-2;

Testimony of Dean Wymer, Tr. 294, l. 8.

32.     Plaintiffs' testimony was supported by John Cramer's first letter to the

Colorado Department of Labor (A29) where he explained:

On several occasions during the years I have worked for Landvest Corp.  I had several managers complain that they were not being allowed by Landvest to record the full amount of hours they worked.  This claim was based on the fact that Landvest work agreement required both managers to devote their full time and attention to the business of the employer.  Their complaint was that they both had to devote 8 hours each or(sic) every day worked but they were only being allowed by Landvest to record 4 hours on every day worked.

It was explained to the Managers that they could spend time in their apartments as long as the manager was available to answer the business phone and greet customers that came in the office.

Exhibit A 29-0001, final paragraph 0001 first paragraph 0002.

**Execution of the Employment Agreement**

33.    On April 10, 2002, John Cramer presented the Plaintiffs with a Managers Employment Agreement.  Ex. A0004 (hereafter MEA).  Plaintiffs read and signed the MEA.  A second MEA, identical to the first in all material respects, was signed by the Plaintiffs at the request of Landvest on July 23, 2002.  Ex. A0005.

34.    Before they signed, John Cramer reviewed the MEA  (Ex. A0004) with the Plaintiffs.  During that conversation John Cramer did not say anything inconsistent with his earlier representations that they would each work 22 hours per week.  Testimony of Charlotte Schneider, Tr. 33, ll 7.  John Cramer told the Plaintiffs that if additional work was required, it would be paid at an overtime rate.  He specifically referred to work on days off, and gave an example of a relief manager not being available to work.  He also said that when circumstances arose after business hours, they would be paid for "overtime."  Testimony of Charlotte Schneider, Tr. 33, l. 12-14.36.

35.     John Cramer could not be located at the time of trial and was not available to testify.  The parties stipulated to the admission of three statements by John Cramer: Exhibit A 29: a hand written letter dated May 21, 2003 addressed to Mr. Joseph Herrera at the Colorado Department of Labor; Exhibit A 28: a hand written letter dated July 2, 2003 addressed to Mr. Joseph Herrera at the Colorado Department of Labor; and Exhibit 26: a letter on Landvest stationary written by the Landvest attorneys for John Cramer's signature.  Exhibit 26 was a document which Mr. Cramer admitted at his deposition he didn't spend very much time reading.  Deposition of John Cramer p. 60 lines 24-, p. 61 line 1.  John Cramer's deposition was also admitted into evidence.

36.     John Cramer's written statements and deposition support Plaintiffs' testimony that they understood that they were hired to work 4 hours a day or 22 hours a week.  Cramer's statements all refer to a job duty of 4 hours a day or 22 hours a week, while he quotes the contract language prohibiting more than a combined total of 70 hours a week, his statements and deposition never mentioned a 35 hour work week. Even the statement written by the Landvest attorney's dated June 5, 2002 (Exhibit A 26) makes no mention of an agreement to work 35 hours a week.

37.     The July 2, 2003 letter (Exhibit A-028) is specific about the expectation of the parties that resident managers work 4 hours a day.  He wrote:

>       The Iliff site is a busy site, it has a lot of turnover in renters and the
>       property itself collects a lot of trash.  During the time I supervised
>       this couple they began stating concerns about the number of hours
>       it was taking them to keep the property clean and complete the
>       paperwork relating to the renters.  They believed that no one could
>       do the work expected by the company if they both only worked 4
>       hours a day . . .

> I know from first hand experience that 4 hours per day per person
> is not always enough time to do the job as expected. . . .Exhibit A
> 28-001,002.

**The Managers Employment Agreement (MEA)**

38.     The form of the MEA used on April 10, 2002 by Landvest (Ex. A4) had

undergone at least four revisions since it was first used by Landvest in 1993. *See* Ex.

68.  The contract was written by the Landvest attorneys, Husch & Eppenberger, LLC.

Testimony of David Mason, Tr. 492, l.11.

39.     Paragraph 5 of the Managers Employment Agreement titled "Hours and

Days of Work" states in part:

> In performance of the duties described herein, Employees shall not work more
> than a combined total of 70 hours per week. The employees shall work
> approximately 44 hours per week but may be called upon to work additional
> hours as needed.

Ex. A4-0001.

40.     The contract is ambiguous as to whether:  (1) 44 hours or 22 or some

other number of hours was expected of each employee; (2) how hours over 22

including overtime hours would be compensated.

41.     The reference to 44 hour per week does not differentiate whether 44 is a

combined total of hours for two employees or a job duty of each employee.

42.     The contract contains a prohibition at paragraph 5 against two employees

working more than "a combined total of 70 hours" per week but does not prohibit an

individual employee from working more than 40 hours a week.  Paragraph 7 only limits

employees to working within scheduled hours.  There were 44 scheduled hours a week.

Ex. A4-0007.

43.     The contract did not require that the employees split the "combined total of 70 hours" evenly.  Testimony of David Mason, Tr. 488, l.4-8; Tr. 499, l. 18- 489, l. 1; Tr. 490, l. 11.  Managers could for example split hours 50/20.  Testimony of David Mason, Tr. 490, l.11.  The payroll records of Landvest demonstrate uneven splits in hours.  See Ex. 29-188-200, time sheets of Neil and Kathy Murray.

44.     The ambiguities contained in the Landvest contract were created, in part by, the decision of Landvest to use one contract for two employees.  For example, the language referring to 44 hours a week was taken from an earlier form of contract used for a single employee.  See Exhibit 68-013, 014.  Thus when originally written the reference to 44 hours a week was intended by Defendant to refer to the duties of a single employee.  No explanation was given by the Defendants at trial for the reference in the contract to "approximately 44 hours per week" rather than a "combined total of 44 hours per week" or "22 hours per week."

45.     David Mason admitted in a memorandum to employees dated April 15, 2003 that the contract was confusing.  Exhibit A9-0001, paragraphs 2,3.  David Mason admitted at trial that the language of the contract was ambiguous.  Testimony of David Mason, Tr. 494, l.4.

46.     Given the contract's vague and ambiguous language on this issue, it does not unambiguously identify how many hours each employee was to work for the biweekly salary of $415.39.

47.     It would have been a simple drafting task to disclose that each employee was "agreeing to work between 22 and 35 hours a week for a fixed salary of $10,800.00," if that had been the intention of the employer, Landvest.

48.     The ambiguous paragraph 5 (Exhibit A4) served the business purposes of Landvest by making the agreed pay of $21,600.00 for two employees appear more generous and by allowing potential employees to believe that they would earn $9.44/hour.  David Mason admitted he never told any resident manager that they would be paid $5.93/hour. Testimony of David Mason, Tr. 492, l. 3.

49.     The MEA was interpreted by Landvest's attorney's Husch & Eppenberger, LLC for the Colorado Department of Labor in May of 2003.  Exhibit 1.  The interpretation of the contract language made by the Landvest attorneys who wrote the employment agreement was that it required 22 hours of work a week.  Exhibit 001-004 (second full paragraph- "She was to work 22 hours a week."). The lawyers who wrote the contract did not discern the unlikely interpretation of the MEA advanced at trial by the Defendants.

50.     Circumstances surrounding the execution of the MEA which are relevant to its interpretation are:

    a.     Cramer's representation to the Plaintiffs that they would work 22 hours a week;

    b.     Cramer's representation that additional work beyond that discussed (22 hours a week) would be required and that the work would be compensated; and

    c.     The illegality of the hourly rate resulting from an interpretation requiring 44 hours per week for $207.70 - an hourly rate below the minimum wage.

-12-

51.     Plaintiffs reasonably interpreted the MEA  to be an agreement to work 22 hours per week each for a salary of $10,800.00 each.

**Record Keeping at Landvest.**

52.     The Plaintiffs were instructed that they could only record and submit 4 regular hours per day and that they could not submit overtime hours for routine work. Testimony of Charlotte Schneider, Tr.51, ll.11,12.  Her testimony was supported by the written statement of John Cramer.  He wrote: ". . . overtime would only be approved in emergencies."  Ex A28-0001, ll. 13,14.  An example given to her by John Cramer was a circumstance where no relief manager was available.  Testimony of Charlotte Schneider, Tr. 51, ll 25- Tr. 52, l. 9.  All recorded overtime had to be approved by a regional manager before being submitted to Landvest for payment.  Testimony of Jeff Etter, Tr.669, l. 14.

53.     Charlotte Schneider did not attempt to submit more than 4 regular hours of time per work day after being instructed not to do so.  However, Charlotte Schneider repeatedly attempted, with her regional manager's approval, to submit additional hours for payment which were worked outside of scheduled hours. She testified, and the business records of Landvest confirmed, that she was repeatedly denied payment for recorded hours which were worked outside of scheduled business hours and which were worked in excess of forty hours per week.  Testimony of Charlotte Schneider, Tr. 58-72; Exhibits A17,A18,A23,A27,A28,A29.

54.     Thereafter and throughout their employment Plaintiffs recorded 22 regular hours of work per week although they regularly worked many more hours "off the clock."

-13-

At times, and when approved by their supervisor, they recorded additional hours as "overtime hours."

55.     The testimony of other witnesses supported Charlotte Schneider's testimony that she was only allowed to record 4 regular hours a day.  Shirley Noe, a former resident manager at the Iliff site, testified that she was instructed by David Mason to only record a total of 8 hours per couple per day.  Testimony of Shirley Noe, Tr 252, l. 11-12.  Louise Adolphson, the resident manager of the Buckley site, testified she was trained to record 4 hours per day.  Testimony of Louise Adolphson, Tr. 166, l.18.  Earl Adolphson testified that he was told to "put down" 4 hours a day.  Testimony of Earl Adolphson, Tr. 337, l.7.

56.     John Cramer as the regional manager for Colorado and the Plaintiffs' direct supervisor was authorized by Landvest to train the Plaintiffs in the record keeping practices of Landvest, to represent the pay plan to them, to instruct them on how to fill out time sheets, he was authorized to approve and deny requests for overtime pay.  Testimony of David Mason, Tr. 438, l. 8 -Tr. 439, l. 4; Deposition of John Cramer, p. 33, l.11-14.

57.     There was overwhelming evidence of a corporate policy of requiring employees to only record 4 hours of work per day, which extended beyond the regional manager, John Cramer.  The first complaint of the practice was from a regional manager, Wooldridge, who worked in Texas in 1998. Ex. 71-0004,0005; John Cramer testified at deposition that he was following a company policy,  "that's basically what was put out by the company. . ."  Deposition of John Cramer, p. 22, l. 2-3; Shirley Noe testified that she was instructed by David Mason to record 8 hours for two employees

(Testimony of Shirley Noe, Tr 252, l. 11-12.); The volume of uniform time sheets filled out by employees prior to September of 2003 which uniformly record exactly 4 hours a day is overwhelming and undeniable evidence of the corporate policy. Ex. 61, 62 (time sheets of Adolphsons); Ex. 25 (time sheets of Cosper); Ex. 29 (time sheets of Murray); Ex. 31 (time sheets of Caires, who complained to John Cramer that they were being required to only record 4 hours of work.  Deposition of John Cramer p. 31 l. 11-p.32, l. 4); Ex. 35 (time sheets of French); Ex 39 (time sheets of Van Kirk); Ex. 43 (time sheets of Davis); Ex. 45 (time sheets of Shooley); Ex. 47 (time sheets of Andrews); Ex. 55 (time sheets of Rix).  When employees recorded more than 22 regular hours a week the time sheets were changed to show 22 hours a week.

58.     Plaintiffs proved by a preponderance of the evidence that throughout their employment they prepared time sheets according to instructions provided by their trainer, Judi French, and according to instructions provided by their supervisor John Cramer and recorded only 22 regular hours a week.  At all times relevant to their employment, Cramer knew that the time sheets were not an accurate representation of their actual hours worked and he admitted as much in a written statement to the Colorado Department of Labor dated May 22, 2003.  Exhibit A0029.

59.     David Mason knew or should have known that the Plaintiffs' time sheets did not record actual hours worked.  Notations on time sheets indicate that David Mason was personally involved in granting or denying requests for overtime compensation which included review of resident manager's time sheets.  *See* Ex. A1-0080; Ex 25-081. Ex.39-028.  He personally authorized payment of, or denial of, individual resident manager's requests for overtime compensation.  The uniformity of

the time sheets submitted by all resident managers in the Colorado and New Mexico region prior to June, 2003 provided notice to anyone reviewing the time sheets that they did not reflect actual hours worked.  Additionally, It is not plausible that employees working under different regional managers would consistently record exactly 4 hours per day of work or 22 regular hours unless they were instructed to do so by supervisors.  It is not plausible that a uniform company wide practice of recording only 4 hours per day of work would exist unless regional managers had been told by management to instruct resident managers to record their time in this manner.

60.    Landvest never recorded in any payroll record a regular hourly rate or an overtime rate for any resident managers during the time that Plaintiffs were employed by Landvest.  Landvest never disclosed in writing a regular hourly rate to resident managers during the time that Plaintiffs were employed by Landvest.  Landvest never disclosed to resident managers the number of regular hours they were being compensated for or the number of overtime hours they were being paid for or the overtime rate being used or the calculation of the overtime rate.

61.    The record keeping practices of Landvest made it impossible to determine based on an examination of the payroll records at what rate employees were paid, how many hours they were paid for or whether time and a half was paid for recorded hours worked over 40 in a single work week.  An example are the payroll records of Judi French for the week ending April 14, 2002.  Ex. 35-051,35-052, 39-021.  The employee recorded 43 + 22 hours in a single work week (Ex. 35-051,35-052).  The employee was paid $311.50 in hourly wages plus her salary of $415.39.  There is no indication that she was paid at a premium rate for hours over 35.  It appears by deduction that she

was paid at $7.00/hr for 40 hours and $10.50 for 3 hours, a formula which bears no relationship to the requirements of the Act or Jeff Etter's claim that his regular rate was $5.93/hr.  Testimony of Jeff Etter, Tr. 722,l.10.

62.     Landvest's record keeping practice of failing to record all hours worked allowed it to claim at trial that when it disallowed payment of recorded overtime hours of employees such as Charlotte Schneider that the overtime hours were actually non-overtime hours.

63.     All indications from the payroll records of Landvest are that Landvest was paying a fixed compensation for 22 hours a week.  Hours recorded in addition to 22, when allowed were paid at hourly rates which ranged from $7.75 to $14.16 an hour.

64.     No mutual understanding existed that the fixed compensation was a salary for up to 35 hours of work a week because the same was never communicated to the Plaintiffs.

65.     Landvest's record keeping practice of failing to record a regular rate for employees allowed it to claim at trial that it paid more than time and a half for recorded overtime hours based on an artificially deflated regular rate.

66.     There was no evidence in any pay record from before June, 2003 that any resident manager was actually paid at a $5.93 hourly rate as Landvest claims.  There is no pay record where an employee recorded 35 hours per week and was paid $415.39 for two weeks nor is there a payroll record where an employee's recorded hours worked was multiplied by $5.93.

**The Landvest Pay Plan**

-17-

67.    The Landvest pay plan was created by the Landvest attorneys. Testimony of Jeff Etter, Tr. 674, ll.13,14.  The plan was referred to at trial as a "fixed work week salary pay plan."  The plan was never recorded in any written manual, written payroll procedure, memoranda to payroll clerks or others.  *See* response to document request No. 10 Ex. 7-007.  No memoranda  to employees was produced at trial explaining the plan to employees. The only place where the pay plan existed in writing was in the MEA.  Testimony of David Mason, Tr. 420. Ll. 14-16.

68.    A pay plan providing for payment of $415.39 for as many as 35 hours of work and premium pay for hours worked over 35 is not described in the MEA.  The MEA describes  "overtime" as work that cannot be performed within the scheduled hours" A4-0002, paragraph 7.  To the extent the MEA provides for the payment of overtime, it ties the payment of overtime pay to work performed outside scheduled hours not work in excess of 35 hours per week.

69.    Defendants did not offer any evidence at trial that the Landvest "fixed work week salary pay plan" was ever communicated to the Plaintiffs.  Neil Murray testified that he explained the pay plan at a meeting of resident managers.  However, Louise Adolphson testified that the  meeting where the pay plan was discussed occurred after the Plaintiffs left employment with Landvest.  Testimony of Louise Adolphson, Tr. 197, l. 5.

70.    At trial Jeff Etter testified that he is a certified public accountant and the CFO of Landvest.  He testified that he oversees the payment of overtime at Landvest. (Testimony of Jeff Etter, Tr. 645, ll.9,10) and is responsible for compliance with the Fair Labor Standards Act.  Testimony of Jeff Etter, Tr. 689, l.5.  At trial he demonstrated

surprisingly little working knowledge of the Fair Labor Standards Act, for example he was unable to calculate a regular hourly rate which included lodging. (Testimony of Jeff Etter, Tr. 651)  This was surprising for the CFO of a corporation which provides housing to hourly workers.  He appeared ignorant of the record keeping requirements of the Act, testifying unbelievably that Landvest had selected payroll software that didn't allow it to record a regular hourly rate.

71.     At trial David Mason and Jeff Etter testified that a "fixed work week salary pay plan" existed at Landvest which compensated resident managers for up to 35 hours at a  biweekly salary of $415.39.  Testimony of Jeff Etter, Tr. 647, ll. 8,9.  They were not consistent in describing the "fixed work week salary plan" which they claimed existed between April 10, 2002 and April 3, 2003.  At times Jeff Etter testified that "basically a premium rate" was paid for any hours over 22 and "in some occasions 22 and in you know over 35 hours."  Testimony of Jeff Etter, Tr. 646, l. 18.  At times Jeff Etter testified that employees received premium pay for hours worked over 22 in a work week. Testimony of Jeff Etter, Tr. 662, l. 17.  At other times he testified that Landvest used "35 hours to calculate overtime."  Testimony of Jeff Etter, Tr. 660, l. 21-23.  He testified that in some circumstances where employees worked between 22 and 35 hours they received premium pay.  Testimony of Jeff Etter, Tr. 678, ll. 22-24.  He testified that those circumstances were "training emergencies, no relief manager." Testimony of Jeff Etter, Tr. 679, l.1.

72.     Although there were thousands of pages of payroll records admitted into evidence which included time sheets and payroll records for over 40 employees there was no pay record showing payment to resident managers at an overtime or premium

rate only after they exceeded 35 hours.  Most records show hours over 22 recorded in the "overtime" column of the time sheet and payment of those hours at $14.16/hr. Because Landvest instructed resident managers to only record 22 regular hours per week there are very few pay records from before April, 2003 which record 36 or more hours.

73.   When asked about the few time records which did exist where employees did record more than 35 hours in a single work week Etter could not apply the pay plan he claimed existed to show how the employee's pay was calculated.  When asked to calculate LaRue Van Kirk's pay from her time sheet (Ex. 39-030), he declined to calculate the pay. Testimony of Jeff Etter, Tr. 701-711.  When asked to apply the pay plan to Esla Cooper's time sheet (Ex 25-083), he declined claiming that the Cospers were operating under a different agreement.  When asked to apply the pay plan to Judi French's time sheet for April, 2002 (Ex. 35-051), he declined.  Testimony of Jeff Etter, Tr. 719-721.

74.   The first pay record in evidence where resident managers appear to be paid at a premium rate for hours over 35 are the pay records of the Fishers beginning in June of 2003.  Ex. 65.

75.   There is no evidence in the record other than the testimony of Jeff Etter and David Mason that the "fixed work week salary pay plan" as described by them was used by Landvest before June, 2003 when it was first applied to calculate the pay of Warren and Diane Fisher.

76.   Some employees, such as Charlotte Schneider, and Louise Adolphson, staffed the site office during all regular business hours, which were either 40 or 44

depending on site occupancy.  This work was performed without knowledge of a "fixed work week salary pay plan," which if it existed as described by David Mason, would have paid them additional compensation for all hours worked over 35.

77.    Landvest's failure to communicate its fixed work week pay plan to the resident managers, if it existed, served Landvest's purposes by allowing Landvest to avoid paying compensation for hours worked between 35 and 40 and for all hours worked over 40 in a single work week.

78.    It served Landvest's purposes to not record all hours worked by employees, and to instead require employees to only record 22 hours. The practice allowed Landvest to represent to the Colorado Department of Labor that Plaintiffs only worked 22 hours per week and were therefore not entitled to overtime.  The practice also allowed David Mason to disallow overtime hours recorded by employees and claim that they had not worked over 35 hours and were therefore not entitled to any additional pay.

79.    The practice of paying fixed compensation– "a salary"– for fluctuating hours, as employed by Landvest, created confusion in the minds of employees who were unclear as to whether they were hourly employees and as to whether they were entitled to overtime compensation.

80.    As applied to Plaintiffs, Landvest's pay plan did not provide Plaintiffs with compensation at one and one half times their regular hourly rate for all hours worked over 40.

81.   As applied to Plaintiffs, the Landvest Pay Plan provided compensation at a rate of $4.65 per hour for work weeks when Plaintiffs worked 44 hours a week during scheduled business hours.

**Credibility of the Witness- Jeff Etter**

82.   Jeff Etter made many assertions during his testimony which denied the obvious weight of the evidence.  As a result, his testimony was unpersuasive.  He refused or was unable to answer many questions which should have been easy for a person with his background and training who was motivated to provide forthright testimony.

83.   He denied that there was any pattern to the payroll records of the resident managers of Landvest before June of 2003 when thousands of pages of time sheets which were in evidence demonstrated an obvious pattern of 4 recorded regular hours per day per employee.

84.   He refused to admit that he had seen many time sheets by 2003, although he had been supervising the payroll department for three years at that time. Testimony of Jeff Etter, Tr. 694, l.6.

85.   He claimed that the hourly rate of resident managers was disclosed to them in the MEA.  A4.

86.   He appeared unfamiliar with the payroll records of Landvest.  For example, he claimed that he didn't know what the code "e" referred to when printed next to a dollar amount of compensation. Tr. 687, l.13.  He refused to calculate pay from an employee time sheet (Tr. 702) and insisted on seeing the "recap" sheet which contained notes of a payroll clerk.

87.   He claimed the payroll software used by Landvest could not print an hourly rate.

88.   He claimed that he did not remember any change to the pay practices of Landvest in 2003, when the payroll records show employees began recording actual time and Landvest began paying for hours over 35 (beginning with the Fishers and the O'Dells) in June of 2003 and including all employees after September, 2003. Testimony of Jeff Etter, Tr. 693. Ll. 18-20

89.   He claimed that he did not know that Landvest began paying for hours over 35 at a reduced premium rate ($8.90/hour) when it began recording actual hours worked in 2003.  Testimony of Jeff Etter,Tr. 692.

90.   He claimed that the value of lodging was included in the premium rate for resident managers but did not know what amount was allocated for lodging.  Testimony of Jeff Etter, Tr. 648, ll.9-12.  He also claimed that he "tested" the rate.  Tr. 691, l.4.

91.   He refused to admit that the overtime rate of $14.16 an hour which was paid to the Plaintiffs was calculated by multiplying $9.44 times 1.5.

**The Iliff Site**

92.   Plaintiffs were assigned to the largest and oldest site operated by Landvest in Colorado, which was referred to at trial as the Iliff site.  The site consisted of 456 units and covered more than 2 acres.  Ex. A52.  The description of the site provided by the Plaintiffs' supervisor was of a busy site with a high turnover of tenants which collected lots of trash. Exhibit A 28-001,002.  Shirley Noe testified that it was a "very busy" site.

93.     Defendant's attempts to compare the Iliff site and the amount of time required to operate it to sites in Colorado Springs, particularly the Wood Avenue site operated by Derald Beck and the Old Broadmoor Road site operated by the Shaws was not persuasive.  The Wood Avenue site by comparison had 294 units and the Old Broadmoor Road site in Colorado Springs was admittedly a newer site located in a quiet neighborhood.  Additionally, the operators of the Colorado Springs sites testified that almost no time was required to perform work related errands such as banking and trips to the post office.  Additionally, the Court had no information as to whether these sites were maintained to the same standards as the Iliff site.

94.     Dean Wymer testified that the site was located on a busy street and across the street from a casino.  He testified that tickets and other trash were blown on to the Iliff site from the casino.

**Work Performed By Dean Wymer**

95.     Dean Wymer performed the outdoor maintenance required to maintain the Iliff site to the standards of Landvest.  Site inspections, which were conducted without notice by regional managers, praised his work with comments such as "great job," "very fine job" and "site looks good!"

96.     Landvest's standards for site maintenance were high according to the operations manual and site inspection reports.  According to Dean Wymer's testimony and the Landvest Manual he was expected to and did perform all maintenance and repairs required to keep the site "market ready" at all times.  Ex. A40-012  Landvest Manual.  The Manual describes in detail the types of repairs expected of a resident

manager which included: minor electrical, plumbing and mechanical, caulking and painting, and snow and ice removal. Ex. 40-013.

97.　　Dean Wymer testified that he had a regular daily maintenance routine which he described as beginning at 10:00 a.m.  He performed a walking security check of the entire facility.  He then returned to the office to retrieve a golf cart, which he used to pick up trash from the site.  He then walked the front of the property picking up any trash that had accumulated during the night and swept the driveway and entry to the facility.  In between the performance of these tasks, Dean would return to the office to check in with Charlotte to see if she needed him to show units or assist tenants.  If needed, Dean would interrupt his routine to provide whatever assistance was necessary.  After completing the morning clean-up, Dean would drive to the bank to make the daily deposit, and at least three times per week he would go to the Post Office as well.  After returning from the bank and/or Post Office, Dean would check in with Charlotte in the office for any vacates or units that needed cleaning.  If there were none at that time, he would then perform another security check.

98.　　He used his afternoons to perform tasks that were not required on a daily basis such as: painting buildings, trim, bollards, and striping, fixing and repairing door latches, seals, and bolts that had pulled out of the drywall, cleaning vacated units, performing maintenance on the golf cart and the fences, and seasonal maintenance, such as pulling weeds, shoveling snow/de-icing, or sweeping and blowing leaves.  He made trips to the hardware store and assisted at other sites.  Testimony of Dean Wymer, Tr. 303, l. 21-25.  His work day in the afternoons was not predictable.  Any of

his maintenance tasks would be interrupted if Charlotte or any tenants needed assistance. Testimony of Dean Wymer, Tr. 278-281

99.     The evidence was that Dean also answered the phone in the office when Charlotte required breaks, accepted payments from tenants, performed "tracing" on delinquent tenants, monitored the certified mail that was required on "lock outs" and performed marketing for the site. Testimony of Charlotte Schneider, Tr. 40, l. 24-41, l. 3.

100.     Dean Wymer testified that he also had contact with tenants either to assist tenants or resolve tenant complaints about once a day after business hours.  Testimony of Dean Wymer, Tr. 284, l.13,14.

101.     He performed at least one security check each day before he went to bed and sometimes performed two outside of business hours.  Testimony of Dean Wymer, Tr. 287.  He performed security checks on Sundays and on his days off.  Testimony of Dean Wymer, Tr. 288, l. 15-20.  Security checks usually took him 30 minutes to perform.  Testimony of Dean Wymer, Tr. 287, l. 8.

102.     He assisted the relief manager on his days off with tasks she could not perform such as repair of doors.  Testimony of Dean Wymer, Tr. 289, l. 15.  On Sundays he performed cleaning and security checks and worked 4 to 5 hours. Testimony of Dean Wymer, Tr. 301, l. 1.  He performed other duties requested by the employer after business hours such as watering the lawn during the night.  He testified that he turned on a sprinkler system to water the lawn but stayed outside while the sprinklers were running to watch for the water police.  Testimony of Dean Wymer, Tr. 286, l. 9

103.   He testified that he was able to go to the apartment and not work approximately twice a week for periods of up to two hours during scheduled business hours, otherwise he was occupied with work.  Testimony of Dean Wymer, Tr. 283, l. 21-23.  The job duties of resident manager at the Iliff site required a minimum of 8 hours a day, at times he worked 9 to 91/2 hours a day, for example when there were leaves on the ground.  Testimony of Dean Wymer, Tr. 278, l.12-13.  He testified that during the blizzard of March, 2003, he worked as many as 12 hours a day for three days.

104.   Dean Wymer's testimony was supported by the business records of the employer.  The site inspection reports demonstrated that the site was maintained to the employer's high standards.  Exhibit 65.  All site inspection reports, including one performed six weeks before he terminated his employment are positive and even enthusiastic.  Exhibit 65.  The manager's job description attached to the MEA is comprehensive and describes a full time job, requiring for example security checks of the "entire complex" six times a day as well as marketing to outside businesses and "helping tenants solve problems; taking care of complaints" in addition to maintenance duties." A4-0006.  The Landvest Manual describe Landvest's expectations that managers will take full responsibility for the property including painting and snow shoveling.  Ex. 40 -0012-0016.  Exhibit A50 describes Landvest's expectations that individual bollards would be repainted when scraped, that tree trimming and tree removal as well as fence post replacement would be performed by the resident manager.  Ex. 50-001.

105.   Dean Wymer's testimony was supported by the testimony of other witnesses.  Shirley Noe testified that when he husband, John Cramer, managed the Iliff

site he worked at least 8 hours a day.  Testimony of Shirley Noe, Tr. 251, l. 25.

Charlotte Schneider testified that Dean Wymer worked 6 to 8 hours a day not including

work performed after business hours and work on Sundays.  Testimony of Charlotte

Schneider, Tr. 223. l.9; Tr. 239, l. 11-15.  Earl Adolphson testified that the job of

resident manager was a full time job requiring more than 40 hours a week. Testimony of

Earl Adolphson, Tr. 340 l. 13-14.  Earl Adolphson frequently recorded more than 40

hours on his time sheets, when first instructed to record actual time, even though his

site was smaller, was closed on Sundays and he did not record trips to the bank and

security checks performed outside business hours. Tr. 364,l. 7-9, Tr. 363, l. 13; Ex.

A61- 0109, 0111, 0114, 0117.  He was subsequently told to "keep his hours down."

Testimony of Earl Adolphson, Tr. 354, l. 10.  Louise Adolphson testified that very rarely

did Earl perform his job in less that 8 hours.  Testimony of Louise Adolphson, Tr. 182, l.

20, 21.  Warren Fisher consistently recorded 40+ hours of work for the first 3 months of

his employment.  Ex. 65-0005-015.  Charles Van Kirk recorded 8 hours a day

throughout his employment, but only submitted 22 hours on the recap sheet for

payment.  Ex. 39.

106.    Dean Wymer proved by a preponderance of the evidence that he

performed work for which he was not properly compensated.  He produced sufficient

evidence to show the amount and extent of the work performed as a matter of just and

reasonable inference.

107.    His testimony supports a reasonable inference that he worked at least 36

hours a week during business hours.  On Sundays he worked an additional 4-5 hours

performing trash detail, security checks, cleaning the office and assisting tenants.

Throughout his employment, Wymer regularly performed work outside regular hours, such as security checks and assisting tenants.  While the amount of work performed cannot be established with precision, allowing 4 ½ hours per week for security work, and one hour per week for other work, such as dealing with tenants and monitoring the facility, is fair to the employee and employer.

**Credibility of Witness- Neil Murray**

108.    Neil Murray's testimony was directly contradicted by his own deposition, the testimony of other witnesses and the records of Landvest.  Neil Murray so grossly understated the time it took to perform tasks required by Landvest that one could reasonably conclude that he intentionally misrepresented the job of resident manager to the Court.  For example, he testified that the "end of month" report only required half an hour to complete.  Testimony of Neil Murray, Tr. 569, l. 4.  Shirley Noe testified that it took 2 ½ to 3 hours.  Testimony of Shirley Noe,  Tr. 259, l. 7-10.  Louise Adolphson testified it took more than 2 hours to prepare.  Testimony of Louise Adolphson,  Tr. 188, l. 25.  He testified that all daily maintenance including sweeping, trash pick up, weed removal and cleaning units could be completed in one hour a day.  Testimony of Neil Murray, Tr. 582, l. 11-12, Tr. 576, l. 21.  He testified that he could go to the bank, conduct business and return to the site in 10 or 15 minutes.  Testimony of Neil Murray, Tr. 575, l. 24.  He could remove a stain from concrete in 5 minutes.  Testimony of Neil Murray, Tr. 577, l.5.

109.    He volunteered on direct examination that he encouraged resident managers to go to their apartments during their "four hour shift."  Testimony of Neil Murray, Tr. 583, l. 6-11.  But when asked at deposition about Landvest's requirement

for staffing the office he stated that the office had to be open and that the manager had to "be there."  When asked what "be there" meant at deposition he said managers had to be "physically" in the office.  Testimony of Neil Murray, Tr. 599, ll. 16-19.

110.   He testified on direct examination that the job could easily be done in 22-35 hours.  Tr. 586.  At deposition he testified that the job could "easily" be done in 22 hours.  Tr. 598.  And adopted that testimony at trial.  Yet as regional manager he was supervising the Adolphsons, the Van Kirks and Charlotte Schneider and Dean Wymer all couples who had the wife perform full time duties in the office.  He couldn't possibly have believed that the job could be performed in 22 hours since that would require the husband to spend 22 hours in the office and leave him no time to perform maintenance work.

111.   He claimed that he worked full time at the Iliff site for 30 days after the Plaintiffs resigned but his time sheets record no time at the Iliff site and show him working at the Austin Bluffs site in Colorado Springs at the time, working 10:00 a.m. to 2:00 p.m.  Ex. 29-135-144

112.   He testified at deposition that he had no recollection of anyone ever telling him that he was supervising salaried employees.  Testimony of Neil Murray. Tr. 595, l. 15-16.  He admitted that at deposition he testified that he was supervising hourly employees.  Testimony of Neil Murray, Tr. 596, l. 1.  At trial he testified that he explained to everyone he supervised that they were salaried and that their pay was for between 22 and 35 hours and that his testimony was "absolutely consistent." Testimony of Neil Murray, Tr. 597. L. 8.

113.   He testified that Dean Wymer's job performance declined after Landvest denied Charlotte's request to lower her salary in early December 2002 yet the only documentation he created after December, 2002 states "office and site look good!" Ex. 65-008.

114.   He testified at trial that he accurately recorded his hours worked, yet every time sheet he submitted for a 2 year period records exactly 4 hours of work.  Ex. 29. He claimed he rarely had to help a customer after 5:00 p.m.  Testimony of Neil Murray, Tr. 603, l. 14-17.  He refused to answer whether he performed all required security checks during his 4 hour shift.  Testimony of Neil Murray, Tr. 602-603.

115.   He testified that hand shoveling of snow was not the responsibility of resident managers.  Testimony of Neil Murray, Tr. 605, ll. 17-18.  He testified that resident managers were not required to perform hand shoveling to prevent flooding of units,  Testimony of Neil Murray, Tr 606, l. 3.  Yet the Landvest Manual states: "Hand shoveling should be done to avoid snow melting and running into small units."  Ex. 40-015,  para. 3.

116.   He denied that he told Louise and Earl Adolphson that he was recording 35 hours on his time sheets and that they could do the same.  Testimony of Neil Murray, Tr. 608, l. 22-609, l. 10.  They both testified that he did. Testimony of Earl Adolphson,Tr. 359, l. 1; Testimony of Louise Adolphson, Tr. 178, l.5.

**Work Performed by Charlotte Schneider**

117.   The evidence was that Charlotte Schneider was a conscientious and serious worker who carefully followed Landvest's detailed procedures.  She testified

credibly that she remained in the office working, except for short breaks during scheduled business hours.

118.   Some of the tasks Plaintiff, Charlotte Schneider performed for Landvest included: staffing the office 40 or 44 hours a week; direct leasing to new tenants; contact with potential tenants; answering phones; helping tenants "solve problems"; resolving complaints; handling "local books"; recording information about tenants and units; accepting rental payments; reminding tenants to make payments by phone and written correspondence; helping to maintaining the complex in "good condition and good order"; collecting payments from locked out tenants; reopening locked units; monitoring tenants activities; monitoring gates and computerized security systems; representing the company to the public; preparing days-end, week-end and month-end and other reports; and transmitting them to the home office.  Ex. 068-018, 019.

119.   It was Landvest's management's policy that one person be in the office during office hours.  Testimony of Charlotte Schneider, Tr. 42, l. 8-10.  This requirement was also evidenced by:

    a.    The site inspection report form which asks whether the manager was in the office;

    b.    Landvest managers' expectation that the telephone be answered during office hours.  Cordless phones were not provided prior to April, 2003, and the phone could not be answered from inside the apartment.  Testimony of Charlotte Schneider, Tr. 42, l. 11;

    c.    Landvest residents were to remove bells from their desks. Testimony of Charlotte Schneider, Tr. 42, l. 20-21; and

     d.    Landvest managers requested that doors between offices and apartments be closed.  Testimony of Charlotte Schneider, Tr. 43, l. 7.

120.   Plaintiffs fulfilled their duty by having Charlotte staff the office during regular business hours.  She remained in the office working during business hours and spent less than 30 minutes a day in the apartment.  Testimony of Charlotte Schneider, Tr. 44, l. 10.

121.   She testified that she was kept busy answering telephone calls, making collection and other calls, (Tr. 103, l.1-6) leasing units, accepting payments preparing reports for Landvest, processing "vacates," making bank deposits, filing and performing numerous other duties and procedures as described in the Landvest Manual. Ex. 40.

122.   In addition from November 2002- March 2003 she worked a four hours on every Sunday staffing the office.  Ex. A1.  In addition she cleaned the office on Sundays and worked as many as 6 hours on Sundays when the office was open.  Two to three hours on Sundays when the office was closed.  Tr. 96.l. 6.  Charlotte Schneider worked between two and three hours every week after 6:00 p.m. preparing end-of-day, end-of-week, and end-of-month reports.  Testimony of Charlotte Schneider, Tr. 38, l. 25- 39, l. 1.  She devoted time after office hours to dealing with tenants who had been locked out of their units, potential tenants who were seeking to lease units, (Tr. 100, l. 24) and she spent 1 to 1 and ½ hours twice a month preparing late notices after hours.  Tr. 110, l. 16-17.

123.   Charlotte Schneider's testimony was supported by the testimony of other witnesses.  Shirley Noe testified that she worked 9 to 9 ½ hour days managing the Iliff

site and did not take lunch breaks.  Testimony of Shirley Noe, Tr. 247, l. 16.  Louise

Adolphson testified that it was difficult to manage a smaller site, the Buckley site, in

fewer than 40 hours a week.  Testimony of Louise Adolphson. Tr. 184, l. 14-15.

**Knowledge of Management of Work Performed By the Plaintiffs**

**_____David Mason**

124.   Charlotte Schneider complained directly to David Mason that she was not

being paid for all hours worked.  Testimony of Charlotte Schneider, Tr. 86, l. 11-16.

His response, which was to the effect that those who liked Landvest stayed and those

who didn't left, demonstrated a prior knowledge of or a lack of interest in paying her for

all hours worked.  John Cramer also told David Mason that Charlotte Schneider was

complaining about not being paid for all hours worked.  Deposition of John Cramer, p.

49, l. 15 to p.51, l. 7.

125.   The evidence was that David Mason had authority over the pay practices

at Landvest (Testimony of David Mason, Tr. 382, l. 7.) and was involved in the

implementation of the overtime policies of Landvest, including intervening in pay

matters involving compensation to individuals for hours recorded on their time sheets.

He personally authorized payroll clerks to alter time sheets to delete overtime hours

submitted by resident managers that did not conform to Landvest's overtime policy.

See Ex. A1-0080; Ex. 25-081.

126.   David Mason knew or should have known that the Plaintiffs' time sheets

did not record actual hours worked.  Records of Landvest indicate that David Mason

personally reviewed at least some resident manager's time sheets which recorded

overtime.  *See* Ex. A1-0080; Ex. 25-081; Ex. 39-028; Ex. A36 (memo disallowing

payment for attending a sales meeting).  The evidence was that he personally authorized payment of, or denial of, individual resident manager's requests for overtime compensation.  While he claimed at trial that time sheets recording overtime were brought to him on an ad hoc basis by clerks, the evidence was that he was zealously involved in denying requests for pay.  For example, disallowing a single hour's pay for a manager's snow shoveling.  Ex. 39-28.

127.    The uniformity of the time sheets submitted by all resident managers in the Colorado and New Mexico region prior to June, 2003 provided notice to anyone reviewing the time sheets that they did not reflect actual hours worked.  Additionally, it is not plausible that employees working under different regional managers would consistently record exactly 4 hours per day of work or 22 regular hours unless they were instructed to do so by supervisors.  It is not plausible that a uniform company wide practice of recording only 4 hours per day of work would exist unless regional managers had been told by management to instruct resident managers to record their time in this manner.

128.    David Mason acted directly in the interests of the employer in relation to the Plaintiffs by formulating record keeping and overtime policies which insured that actual hours worked would not be recorded and by disallowing recorded overtime hours worked.  Considering the level of interest David Mason showed in controlling overtime costs by denying payment for recorded overtime, it is not credible that someone other than Mason was responsible for formulating record keeping and overtime polices at Landvest which insured that employees, including the Plaintiffs, would not be paid for all hours worked.

129.     Shirley Noe testified credibly that David Mason was personally involved in implementing the policy of having employees falsely record hours worked.  Testimony of Shirley Noe, Tr. 252, ll. 11-12.

130.     David Mason wrote a letter on December 17, 2002 to Charlotte Schneider (Ex. A19) where he wrote:

>           Slanting one manager's duties would compromise the
>           minimum wage structure without having to include to value
>           of the apartment as income.

Ex. A19.

131.     David Mason knew on December 17, 2002 that the Landvest pay plan was based on payment of minimum wage for hours worked under 40 in a work week. It is not believable that the salary chosen by Landvest was coincidentally one dollar above minimum wage.  (Biweekly salary = 415.39 /2 weeks = 207.70.  40 hours x $5.15 minimum wage = $206.00).  If David Mason believed Charlotte Schneider was only working 22 regular hours a week as reported on her time sheets he could have lowered her salary, as he had done for others, without compromising "the minimum wage structure."

**Mason Credibility**

132.     David Mason maintained at trial that the payroll records of Landvest which were admitted into evidence accurately recorded the hours worked by resident managers.  Testimony of David Mason, Tr. 395, l. 14.  No one who compares the time sheets made by resident managers after they were instructed to record "actual" hours worked (Ex. 59 memo to resident managers) with the 4 hour a day time sheets

-36-

could believe that the earlier time sheets accurately record hours worked.  *Compare* Ex. A61-001-103 *with* Ex. A61- 104-118; *compare* Ex. A-65 (Fisher, hired June, 03) *with* Ex. A-67 (French); *compare* Ex. 51 (Paccione) *with* Ex. A63, A64 (Beck).  David Mason was also aware that the job duties of resident manager required more than the 4 hour shift recorded on almost all time sheets created at Landvest before June, 2003.  He knew all six required security checks (Ex. A4-006 para. 8) could  not  performed during the recorded 4 hour window.  He knew that if a husband was working in the office 4 hours a day he would have no time for maintenance and repair duties.  He knew that a manager couldn't perform maintenance and staff the office at the same time.  David Mason testified falsely when he testified that the Landvest records produced at trial were accurate records of hours worked (Testimony of David Mason, Tr. 395, l. 14) and that Landvest always kept accurate records of hours worked by employees.  Testimony of David Mason, Tr. 415, l. 18.

133.    David Mason also testified falsely when he claimed that he had been deceived by the Plaintiffs' time sheets which recorded 22 regular hours and that no one had any reason to believe that they worked more than 22 hours.  Testimony of David Mason. Tr. 449, l. 12-13, Tr. 449, l. 21.  Charlotte Schneider told him that she wasn't being paid for all hours worked.  Testimony of Charlotte Schneider, Tr. 86, l. 11-16. John Cramer also told David Mason that Charlotte Schneider was complaining about not being paid for all hours worked.  Deposition of John Cramer, p. 49, l. 15 - p. 51, l. 7.

134.    David Mason testified falsely when he denied that the September 30, 2003 memorandum (Ex. 59) instructing employees to record actual hours worked was a change in the record keeping practices at Landvest.  Testimony of David Mason, Tr.

470, ll. 22-23 and that recording actual hours worked had been the policy of Landvest "all along." Testimony of David Mason, Tr. 473, l. 8. The change in record keeping at Landvest in 2003 was accompanied by a lowering of the overtime rate to $8.90/hour. (*See* Ex. A65-005) It is only reasonable to believe, based on David Mason's direct involvement in the overtime policies at Landvest that the decision to lower the overtime rate was either made by him or that he was informed of the change.

**John Cramer**

135.   John Cramer was authorized by Landvest to train the Plaintiffs (Testimony of David Mason, Tr. 438, l. 8) to represent the pay plan to the Plaintiffs (Testimony of David Mason, Tr. 438, l. 15) to supervise Plaintiffs and to review time sheets and disallow or approve hours submitted for payment (Testimony of David Mason, Tr. 439, l. 24; Testimony of Jeff Etter, Tr. 669, l. 14; Deposition of John Cramer, p. 33, l. 11- 14).

136.   Charlotte Schneider told John Cramer that she and Dean were working more than the hours recorded on their time sheets. Testimony of Charlotte Schneider, Tr. 45, l. 20- 46, l. 2. Deposition of John Cramer, p. 25, l. 25- p. 26, l. 5.

**Plaintiffs' Regular Rate of Pay**

137.   Plaintiffs' have demonstrated by a preponderance of the evidence that their regular rate of pay was $9.44 per hour.

138.   The letter dated May 22, 2003 written by Michael Gillespie, Landvest's lawyer at Husch and Eppenberger, LLC. , in an analysis of the MEA for the Colorado Department of Labor admits that the regular hourly rate of pay was $9.44/hour. Ex. 001-004, para. 3. David Mason admitted that he read this letter before it was sent to the Colorado Department of Labor. Testimony of David Mason, Tr. 432, l.11.

139.      Plaintiffs' pay for a two week period was $415.39. 415.39 divided by 44 (the number of regular hours  recorded on the time sheets for a two week period)  is $9.44.

140.      Defendants have taken inconsistent positions in this litigation concerning the regular rate of pay of the Plaintiffs. At times the Defendants have claimed  that the time sheets are accurate and that the Plaintiffs only worked 22 hours a week. In the *Final Pretrial Order Id*. at 4. and at trial  Defendants claimed they believed the time sheets submitted accurately recorded the number of hours worked by the Plaintiffs. Testimony of David Mason, Tr. 395, l.14.  At other times, Defendants have argued that the Plaintiffs' regular hourly rate fluctuated from week to week.  Ex. 006-004.  At other times, they have claimed that Plaintiffs' hourly rate was $5.94 per hour. Testimony of Jeff Etter, Tr. 649, l. 6,7.

141.    .  Landvest's records do not record a fluctuating regular rate, the payroll records record fixed compensation for the Plaintiffs ($415.39 biweekly) and a fixed number of regular hours worked, 22 hours per week.

142.      As represented by John Cramer to the Plaintiffs the salary was intended to compensate for 22 hours a week. Testimony of Charlotte Schneider, Tr. 49, l. 12-17. If the Defendants had an intention that the salary was to compensate for 35 hours that intention was not clearly communicated to the Plaintiffs and was  not communicated to John Cramer.  If John Cramer understood that the agreement between the parties was for 35 hours of work per week for a salary, as advocated  by the Defendants, the Plaintiffs' inability to complete the work required by Landvest in 4 hours a day would not have been the subject of John Cramer's  correspondence with

the Colorado Department of Labor. If the Plaintiffs had agreed to work 35 hours a week, as Defendants' claimed at trial, the subject of the Cramer correspondence would have been whether six + (6+) hours a day was a sufficient amount of time to complete the work required by Landvest. John Cramer's statements consistently refer to 4 hours a day. Ex. A28, Ex. A29.

143.    There was no mutual understanding that the salary was intended to compensate for 35 hours of work.

**Estoppel**

144.    The Defendants were never misled by the Plaintiffs' time sheets which recorded 22 regular hours of work per week, nor were they misled by Plaintiffs' failure to record all overtime hours worked on their time sheets.

145.    The plan to record 22 regular hours of work per week rather than actual hours worked originated with the Defendants and was not a plan of the Plaintiffs.

146.    Plaintiffs were following the instructions of the Defendants' agents, John Cramer and Judi French, when they recorded 4 regular hours of work rather than actual hours worked.

147.    Landvest through its agents and Defendant David Mason knew Plaintiffs were working more than 22 hours a week each.

148.    It was Defendants' overtime policy to deny overtime compensation for routine work (Deposition of John Cramer, p.35, l. 15-19) It was Defendants' policy to only pay for overtime worked in emergencies or on the manager's day off. Deposition of John Cramer, p.33, l.15-p.34, l.10

149.     Early in her employment, Schneider recorded more than 22 hours on her time sheets for work she had performed outside regular office hours.  Even when the extra hours were approved by her regional manager they were crossed off by a payroll clerk of Landvest and not paid.  Ex. A0001-0005, 0016, 0018, 0022, 0027.

150.     The Plaintiffs complied with instructions of Landvest to only record 4 hours per day of work, for all work performed during regular working hours (10:00 a.m. Monday- Friday and 9:00 a.m. to 5:00 p.m. on Saturday).  Initially, they recorded time spent working after closing on paperwork or for a late customer.  Payment for this time was denied. Exs. A0001-0023, A0001-0021.  Time recorded and submitted by the Plaintiff for training a relief manager was denied.  Ex. A0001-0029.  Time spent working in place of a resident manager was paid.  *Id.*  Plaintiffs stopped recording overtime worked on their time sheets which they believed would not be paid by Landvest because they believed submitting the time would be futile.

**Ultimate Findings of Fact on Work Performed**

151.     Plaintiffs proved through their own testimony and as a matter of just and reasonable inference that they worked at least as many hours as are described below:  Defendants' offered no direct evidence of the amount of work performed by the Plaintiffs and offered no precise evidence of the amount of work performed by the Plaintiffs.

152.     Charlotte Schneider worked 4 week days per week from 10:00 a.m. until 6:00 p.m. and Saturdays from 9:00 a.m. until 5:00 p.m.  In addition, from November 2002- March 2003, she worked four hours on every Sunday except one.  Schneider worked between two and three hours every week after 6:00 p.m. preparing end-of-day,

end-of-week, and end-of-month reports.  She devoted time after office hours to dealing

with tenants who had been locked out of their units, potential tenants who were seeking

to lease units, preparing late notices to be mailed to tenants, and performing other

tasks for the employer. While the amount of work performed cannot be established with

precision, allowing  2 ½ hours per week for preparation of end-of-day, end-of-week, and

end-of-month reports is fair to the employee and employer.  Allowing one hour per week

to the employee for other tasks as described above is fair to the employee and

employer.   Schneider was paid at her regular rate of $9.44/ hour for 22 hours per

week. She should  have been paid for an additional 18 hours per week at her regular

rate of $9.44  per hour ($8,496.00).  For 32 weeks she should have been paid for an

additional 5 ½  hours of work at $15.78 per hour ($2,777.28) and for 18 weeks she

should have been paid for an additional 9 ½ hours of work at $15.78 per hour,an

overtime rate that includes the value of lodging ($2,698.38)(Total $13,971.66)


153.    Dean Wymer  worked approximately 36 hours per week during during

scheduled business hours, which were week days  from 10:00 a.m. until 6:00 p.m. and

Saturdays from 9:00 a.m. until 5:00 p.m.  In addition on Sundays he worked between 4-

5 hours conducting security checks. picking up trash, cleaning the office and assisting

Charlotte with customers.  Dean Wymer  devoted at least 3 ½ hours per week to

security checks performed after business hours. In addition, he spent time on his day

off assisting the relief manager and time after office hours dealing with tenants who had

been locked out of their units, potential tenants who were seeking to lease units,  and

performing other tasks for the employer. While the amount of work performed cannot

be established with precision, allowing 4 hours per week for Sunday work, 3 ½ hours per week for security checks and 1 hour per week for time spent assisting the relief manager and assisting customers after hours  is fair to the employee and employer.  Wymer  was paid at his regular rate of $9.44/ hour for 22 hours per week. He should have been paid for an additional 18 hours per week at his  regular rate of $9.44  per hour ($8,496.00).  He should have been paid for an additional 4 ½ per week at an overtime rate  for 50 weeks( $3,550.50).($12,046.50)

154.    The Defendant used a regular rate to calculate an overtime rate which did not include $2,250.00 per year for lodging.  Including the value of lodging in the regular rate  yields a correct overtime rate of $15.78  per hour.  In 2002, Plaintiff Schneider was paid for 80.5 hours of overtime at the incorrect rate.  In 2003 she was paid for 7 hours of overtime at the incorrect rate.($141.75)  In 2002 Plaintiff Dean Wymer was paid for 26 hours of overtime at the incorrect rate.  In 2003 he was paid for 9 hours at the incorrect rate.($56.70)  Ex. A0003.

## Conclusions of Law

1.      At all times relevant to the Complaint the Defendant corporation was an "enterprise engaged in commerce" within the meaning of the federal Fair Labor Standards Act. 29 U.S.C. §§ 203(b) & (s).

2.      As a covered enterprise Landvest was required to comply with the minimum wage, overtime and record keeping requirements of the federal Fair Labor Standards Act of 1938. 29 U.S.C. §§ 201-219.

3.      David Mason acted directly or indirectly in the interest of the employer in relation to the Plaintiffs by formulating or implementing the overtime policies of

Landvest including the record keeping policies of Landvest and was therefore an employer within the meaning of the Act. 29 U.S.C. § 203(d).

4.    The Plaintiffs were nonexempt employees under the Act.  Admitted Response to Interrogatory No. 1 Exhibit 0007-0009.

5.    An employer must pay a nonexempt employee for all hours worked over forty in a single work week at a rate of not less than one and one half times the employee's regular rate of pay. 29 U.S.C. § 207. Work not requested but suffered or permitted is work time. If the employer knows or has reason to believe that he is continuing to work, the time is working time.  *Handler v. Thrasher,* 191 F. 2d 120 (10th Cir. 1951);29 C.F.R. 785.11. As the Eleventh Circuit has explained:

> The FLSA mandates that "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours . . . specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). The term "employ" is defined as "to suffer or permit to work." 29 U.S.C. § 203(g). The regulations caution that "work not requested but suffered or permitted is work time."  29 C.F.R. § 785.11. The reason an employee continues to work beyond his shift is immaterial; if the employer knows or has reason to believe that the employee continues to work, the additional hours must be counted.

*Reich v. United States Dept. of Labor v. Dept. of Conservation and Natural Resources*, 28 F.3d 1076, 1081-82 (11th Cir. 1994)(citations omitted).

6.    The legislative purpose in enacting the Fair Labor Standards Act was to eliminate working conditions "detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202. The Fair Labor Standards Act is remedial legislation which should be broadly interpreted to advance its humanitarian purposes. *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493, 89 L. Ed. 1095, 65 S. Ct. 807 (1945); *Schoenhals v. Cockrum,* 647 F.2d

1080, 1081 (10th Cir. 1981); *Welding v. Bios Corp.,* 353 F.3d 1214,1218 (10th Cir.

2004); *Shultz v. Mistletoe Express Service, Inc.*, 434 F.2d 1267, 1270 (10th Cir. 1970).

The Act should be interpreted "broadly with reference to underlying economic realities"

*Pierce v. Coleman Trucking, Inc.*, 2005 U.S. Dist. LEXIS 20942 (N.D. Ohio, Sept. 23,

2005)

7.     The interpretive regulations of the United States Department of Labor are

entitled to deference when Congress has not directly addressed the interpretation of the

Act. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837,

843, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984).

8.     The Act requires employers to make and preserve records of "wages,

hours and other conditions" of the employment. 29 U.S.C. § 211(c).  The specific

records to be maintained include records of the employee's regular hourly rate of pay

for any workweek in which any overtime is due, hours worked each workday, and total

hours worked each work week.  29 C.F.R. 516.2.  The record keeping requirements are

integral to the Act.  Without accurate records of hours worked and the regular hourly

rate of pay, the premium pay requirements for hours over 40 can be easily avoided.

9.     Landvest violated the record keeping requirements of the Act by failing to

accurately record all hours worked and by failing to record the regular hourly rate of

pay.   In *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 90 L. Ed. 1515, 66 S. Ct.

1187 (1946), the United States Supreme Court set forth the procedure to be followed

when accurate records do not exist of work performed:

> An employee who brings suit . . . for unpaid minimum wages or unpaid  overtime
> compensation, together with liquidated damages, has the burden of proving that
> he performed work for which he was not properly compensated. The remedial

nature of this statute and the great public policy which it embodies, however, militate against making that burden an impossible hurdle for the employee. Due regard must be given to the fact that it is the employer who has the duty . . . to keep proper records of wages, hours and other conditions and practices of employment and who is in position to know and to produce the most probative facts concerning the nature and amount of work performed. Employees seldom keep such records themselves; even if they do, the records may be and frequently are untrustworthy. It is in this setting that a proper and fair standard must be erected for the employee to meet in carrying out his burden of proof.

When the employer has kept proper and accurate records the employee may easily discharge his burden by securing the production of those records. But where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes a more difficult problem arises. The solution, however, is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work. Such a result would place a premium on an employer's failure to keep proper records in conformity with his statutory duty; it would allow the employer to keep the benefits of an employee's labors without paying due compensation as contemplated by the Fair Labor Standards Act. In such a situation *we hold that an employee has carried out his burden if he proves that he has in fact performed work* for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of *just and reasonable inference*. The burden then shifts to the employer to come forward with evidence of the *precise amount of work performed* or with evidence to *negative the reasonableness of the inference to be drawn from the employee's evidence*. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

The employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with the requirements of [the FLSA ]. And even where the lack of accurate records grows out of a bona fide mistake as to whether certain activities or non-activities constitute work, the employer, having received the benefits of such work, cannot object to the payment for the work on the most accurate basis possible under the circumstances. Nor is such a result to be condemned by the rule that precludes the recovery of uncertain and speculative damages. That rule applies only to situations where the fact of damage is itself uncertain. But here we are assuming that the employee has proved that he has performed work and has not been paid in accordance with the statute. The damage is therefore certain. The uncertainty lies only in the amount of damages arising from the statutory violation by the employer. In such a

case it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any
amend for his acts. *It is enough under these circumstances if there is a basis for a reasonable inference as to the extent of the damages.*

*Id.* at 686-88 (internal quotation marks and citations omitted)(emphasis supplied).

 In the present case, where the employer has failed to keep accurate time records, the following rules as described in Anderson should apply:

1.   The employee must first prove by a preponderance of the evidence that s/he worked more than 40 hours in a given work week, and was not paid at time-and a-half for some time over 40 hours.


2.   For each such work week, the *number of hours* worked may be proven by a reasonable inference from the evidence presented at trial.


3.   Once the evidence supports a reasonable inference of the *amount of hours worked*,  those hours will stand unless the employer either produces reasonable "evidence of the precise amount of work performed," showing it was lower than the reasonable inference; or by convincing the fact-finder that the inference as to the amount of time worked is unreasonable.[1]

---

[1]  In *Handler v. Thrasher*, 191 F.2d 120 (10th Cir. 1951), the Tenth Circuit explained:

It is incumbent upon the employee to show by a fair preponderance of the evidence not only that he worked in excess of the statutory work

10.     In this case the Plaintiffs met their burden of proof by testifying to tasks they performed outside of usual office hours, how often they performed the task and how long it usually took to perform the task.  The employer presented no evidence precise enough to meet its burden of proof.

11.     Landvest cannot accept the benefit of its employees' work and avoid liability in this case by claiming it did not know work was being performed. First, because in this case David Mason had notice that Plaintiffs were not being paid for all hours worked . Second, management had the opportunity through reasonable diligence to acquire information about all hours worked.

> ... "an employer's knowledge is measured in accordance with his 'duty . . . to inquire into the conditions prevailing in his business.'" An employer "'does not rid himself of that duty because the extent of the business may preclude his personal supervision, and compel reliance on subordinates. . . . The cases must be rare where prohibited work can be done . . . and knowledge or the consequences of knowledge avoided.'"In reviewing the extent of an employer's awareness, a court "need only inquire whether the circumstances . . . were such that the employer either had knowledge [of overtime hours being worked] or else had 'the opportunity through reasonable diligence to acquire knowledge.'"

*Reich v. United States Dept. of Labor v. Dept. of Conservation and Natural Resources*, 28 F.3d 1076, 1081-82 (11th Cir. 1994)(citations omitted).

---

> week, but the actual number of hours worked in excess thereof.  But, where he proves that he has in fact performed work for which he has not been compensated, and produces evidence to show the amount and extent of that work, the burden then shifts to the employer to come forward with evidence of the precise amount of work performed, or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence.  If the employer fails to produce such evidence, the court may then award compensation to the appellee, even though the result be only approximate.

*Id.* at 122.  *See also Wirz v. McClure*, 333 F.2d 45, 47 (10th Cir. 1964)(same).

12.     In the 1940's employers drafted employment agreements similar to the MEA here, and when the employee brought a claim for unpaid overtime, they sought shelter under the term of such fixed term agreements, and other provisions similar to the present case.  Yet none of them were successful.  *See e.g. Handler v. Thrasher*, 191 F.2d 120 (10th Cir. 1951);*Wilson Oil Co. v. Hardy*, 164 P.2d 209, (N.M. 1945)(under similar facts as here, "Contracts covered by the Federal Act, and in violation of or 'inconsistent' with its provisions, are illegal, and not binding upon the employees.")(internal quotation marks omitted).

13.     In this case the MEA was deliberately  ambiguous and was designed to circumvent the employer's compensation obligations under the FLSA.  That the contract was ambiguous has at least two distinct consequences.  First, it opens up parol evidence regarding the negotiations between the parties, upon which the ambiguity may be disposed.  Second, if the ambiguity cannot be resolved through normal rules of contract construction, the doctrine of *contra proferentem* ("against the profferer") directs the Court to deny the drafter's interpretation in favor of a reasonable alternative interpretation.  *Dillard Dept. Stores, Inc. v. State of Kansas*, 13 P.3d 358, ___ & ___(Ks. App. 2000)(internal quotation marks and all but one citation omitted)("There is an elementary rule of law that where one party to a  contract is  privileged to set down in writing the terms to which another party is to give assent, and a controversy arises as to their meaning, the contract  should be construed strictly against the writer and liberally toward to other party. . . ").[2]  "The purpose for this rule "is to protect the party who did

---

[2]  See also II, E. Allan Farnsworth, FARNSWORTH ON CONTRACTS § 7.11, p. 300 (3d ed. 2004)."if language supplied by one party is reasonably susceptible to two interpretations, one of which favors each party, the one that is less favorable to the

not choose the language from an unintended or unfair result." Id. (Citation omitted).
This default rule is justified on the basis that "the party against whom it operates had
the possibility of drafting the language so as to avoid the dispute."  II, E. Allan
Farnsworth, FARNSWORTH ON CONTRACTS § 7.11, p. 301 (3d ed. 2004).  Since the
drafter could have avoided the ambiguity, he should not be allowed later (when it is
most beneficial to him) to "claim the benefit of the doubt." *Mastrobuono v. Shearson
Lehman Hutton, Inc.,* 514 U.S. 52, 62 (1995).[3]  This rule is especially applicable when
lawyers for a party drafted the agreement.   *See* Farnsworth, *supra* at p. 303 (and cases
cited therein).   *See also Micorbiological Reserach Corp. v. Muna*, 625 P.2d 690, ___
(Utah 1981)("contract drafted by lawyer "should be strictly construed" against the
employer).

14.    The Plaintiffs' regular hourly rate was $9.44, the parol evidence was that
the salary was intended to compensate for 22 hours of work . 29 C.F.R. 778.113.  That
is the rate at which they were told they would be paid during their preliminary

---

party that supplied the language is preferred");  RESTATEMENT (SECOND) OF CONTRACTS
§206 (1977)("In choosing among the reasonable meanings of a promise or agreement or
a term thereof, that meaning is generally preferred which operates against the party
who supplies the words or from whom a writing proceeds.").  RESTATEMENT (SECOND) OF
CONTRACTS §206 (1977)("In choosing among the reasonable meanings of a promise or
agreement or a term thereof, that meaning is generally preferred which operates
against the party who supplies the words or from whom a writing proceeds.").

   [3]  *See also* RESTATEMENT (SECOND) OF CONTRACTS §206, com. a (1977)("Where one
party chooses the terms of a contract, he is likely to provide more carefully for the
protection of his own interests than for those of the other party.  He is also more likely
than the other party to have reason to know of uncertainties of meaning.  Indeed, he
may leave meaning deliberately obscure, intending to decide at a later date what
meaning to assert. . . . The rule os often invoked in cases of standardized contract and
in cases where the drafting party has the stronger bargaining  position . . . ").
Employees are usually in an unfair bargaining position. _____

negotiations with Defendant. The only direct evidence presented as to an hourly rate was the testimony of Plaintiffs who stated they were told before signing the contract they would be paid at the rate of $415.39 for 4 hours of work, per person per day. This rate  is also derived from the time sheets plaintiffs submitted every week of employment, at the direction of the Defendant.

15.     Because the Act does not directly address the issue of non payment for non overtime hours and because the Secretary's interpretation is reasonable and furthers the legislative intent, the Court in this case will follow the interpretive regulations requiring payment at the regular hourly rate for all non overtime hours. 29 C.F.R. 778.315. In addition, and alternatively, the Court finds that MEA provided for payment of wages up to 22 per week at $9.44 per hour and that the Plaintiffs interpretation of the contract  requiring payment of all regular hours at $9.44 hour is the correct interpretation of the MEA for  reasons stated below.

16.     Landvest's MEA was an illegal agreement under the FLSA for several reasons.  The MEA  as applied by Landvest to the Plaintiffs, resulted in payment to hourly workers of less than minimum wage. Overtime as described in the (MEA, paragraph 7, A4-0002) was work performed "outside scheduled hours." As interpreted by Landvest only work outside scheduled hours was compensable. Only work on days off and emergency work after hours was paid. Deposition of John Cramer, p. 33, l. 15 - p. 34, l. 10.  As a result, the plan only paid $207.70 for 44 hours of work, payment of less than minimum wage.

Additionally,  there was no mutual understanding of which hours were paid by the fixed compensation and which hours were beyond the fixed compensation.

The pay plan did not therefore meet the requirements of 29 C.F.R. 778.114 *Fixed Salary for Fluctuating Hours.*

The MEA had other deficiencies, it was not an agreement for a bona fide salary. Landvest managers were required to work no fewer than 22 hours per week but received no additional compensation for hours over 22. The MEA was an agreement to pay nothing for hours worked between 22 and 44 in violation of 29 C.F.R. 778.317. Additionally, because the MEA is predicated on fixed pay to an abstract "couple," rather than to an individual employee, it is by definition incapable of providing a regular hourly rate for an individual employee.[4] Nor does the salary pay schedule in ¶ 5 even peg pay to any employee's actual hours worked. It provides for compensation to an abstract and "couple" or "pair," rather than to an individual employee. Therefore, it is impossible to derive a regular hourly rate per employee based on hours worked from the MEA.

Like the arrangement in *Overnight Mtr. Transp. Co. v. Missel*, 316 U.S. 572, 580 (1942) which the Court described as "deficient in complying with the [FLSA]," Defendant's Agreement placed "no contractual limit upon the hours which [the employer] could have required [the employees] to work for the agreed wage, had [it] seen fit to do so, and no provision for additional pay in the event the hours worked required minimum compensation greater than the fixed wage."[5] In this case there was nothing in the MEA to provide for minimum wage and overtime compensation to the employee who worked

---

[4] Agreement is not between an employer and an employer; it is between an employer and two "Employees." *See* ¶ 1.

[5] *See* Agreement at ¶ 5 (employees "may be called upon to work additional hours as needed"); ¶ 7 ("except in emergencies , Employees shall not perform work outside the scheduled hours as set forth in Exhibit "B".

44 hours a week during scheduled business hours. "FLSA rights cannot be abridged by contract or otherwise waived because this would 'nullify the purposes' of the statute and thwart the legislative policies it was designed to effectuate." *Barrentine v. Arkansas-Best Freight System, Inc.*, 450 U.S. 728, 740 (1981).

17.   Defendant wrote  the MEA  and the plaintiffs did not participate in the negotiation of its terms.  Defendant foresaw the potential for overtime disputes.  It was free to draft an employment agreement that would clearly define the employee's regular hourly rate. It was a *sui generis* form contract, though not a standard form for an employment agreement.  By retaining the law firm of Husch & Eppenberger, LLC., Defendant had the ability and know-how to write a contract where the terms of compensation were clear.  It chose not to do that.

As the Kansas Court of Appeals aptly noted:

> Dillard's chose the language and chose poorly. Giving Dillard's the benefit of its own interpretation would subject Cook to an unfair result. Cook would lose his vacation pay, which under the policy he fully expected to receive, after being terminated by Dillard's without cause.

*Dillard Dept. Stores, Inc. v. State of Kansas*, 13 P.3d 358, 364 (Ks. App. 2000).

18.

As a matter of law equitable estoppel should  not apply to this FLSA claim.  The Supreme Court has "often indicated the inappropriateness of invoking broad common-law barriers to relief where a private suit serves important public purposes."[6]  The Court has been wary of incorporating equitable doctrines into federal statutes, especially

---

[6] *Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 138-39 (1968)(refusing to bar treble damages under the Anti-Trust Acts on the basis that plaintiffs were *in pari delicto* ("of equal fault").

where "text and structure of [the statute] evince[s] Congress' intent to preclude judicial implication of [such a] rule."[7]  The text and structure of the FLSA

overtime provision is clear and mandatory:  employees are to be paid overtime for all hours worked over 40 in a given week.  As presented here by Defendant, incorporation of an affirmative defense of equitable estoppel would allow employers to circumvent their obligations under the Act and would be inconsistent with legislative intent.  " Federal courts have repeatedly rejected equitable estoppel as an affirmative defense to an FLSA action, even where an employee is required, but fails to, record overtime hours worked."  "The duty to pay overtime in conformity with the FLSA is a reflection of Congressional policy by which employees are protected in spite of agreements and/or other actions that would normally be a defense to such payment. "[8] *Id.* at 123 (10th Cir. 1951).[9]

---

[7]  *TRW, Inc. v. Andrews*, 534 U.S. 19, 27 (2001)(refusing to import the discovery rule into the statute of limitations under the Fair Credit Reporting Act); Oubre v. Energy Operations, 522 U.S. 422, 427-28 (1988)(refusing to enforce an ADEA release which did not comply with the Older Workers Benefits Protection Act, on the grounds that the employee ratified the release by failing to tender back the consideration she received for the release; holding that the "statute governs the effect of the release on ADEA claims, and the employer cannot invoke the employee's failure to tender back as a way of excusing its own failure to comply.")

[8]  *Duncan v. Brockway Standard, Inc.*, 1992 U.S. Dist. LEXIS 21165 *10 (N. D. Ga. 1992).

[9]  *See also Wilson Oil Co. v. Hardy*, 164 P.2d 209 (N.M. 1945)(under similar facts as here, "Contracts covered by the Federal Act, and in violation of or 'inconsistent' with its provisions, are illegal, and not binding upon the employees.")(internal quotation marks omitted).  *Cf. Bowens v. Aftermath Entertainment*, 254 F. Supp.2d 629, 641-42 (E.D. Mich. 2003)(refusing to apply equitable estoppel to consent defense under the Electronic Communications Privacy Act).

As Judge Fred Friendly explained long ago:

> The obligation is the employer's and it is absolute.  He cannot discharge it by attempting to transfer his statutory burdens of accurate record keeping, 29 U.S.C.A. 211(c), and of appropriate payment, to the employee.  The employer 'at its peril, . . .  had to keep track of the amount of overtime worked by those of its employees in fact within the Act.'

> Appellant's argument of estoppel ignores that this case lies in an area where agreements and other acts that would normally have controlling legal significance are *overcome by Congressional policy*.  An agreement by [the employee] not to claim overtime pay for the work here in question would be no defense to his later demanding it.  Similarly, an express release by the employee is invalid, and this even though the release is limited to the claims for liquidated damages and was made in settlement of a bona fide dispute. Surely acts by an employee leading the employer to believe he is satisfied with the payments being made to him, even if we could find these here, could not have greater effect than a contract to that end.

*Caserta v. Home Lines Agency, Inc.*, 273 F.2d 943, 946-47 (2d Cir. 1959)(citations omitted)(italics added).

19.      Additionally, and as an alternative basis for the conclusion that estoppel does not apply in this case, the facts of this case do not support the defense. The outcome of a FLSA case does not turn on the hours recorded by the employee when, as here, the employer knew or should have known that overtime was being worked. *See Hallemeier v. Schnuck Mkts.*,1994 U.S. Dist. LEXIS 5751(D. Kan. 1994).  Where, as here, the employee has not concealed the work performed from the employer the doctrine of estoppel should not be applied in an overtime case to bar recovery.  *Abel v. Department of Corrections,* 1995 U.S. Dist. LEXIS 13565 (D. Kan. 1995).  "Estoppel arises where one party, by its words or actions, misrepresents a fact, and the other party reasonably relies upon such representations to its detriment." *United Services*

*Automobile Association v. Royal-Globe Insurance Co.,* 511 F.2d 1094, 1097 (10th Cir.1975). The doctrine has no application here because there was no misrepresentation. The employer's agents directed the employees to record 4 hours a day instead of actual hours worked. The employer was not misled by the false records and the employer cannot be rewarded for its failure to comply with the record keeping requirements of the FLSA..

20.     Similarly an agreement, or employer policy in this case, to refuse to pay for overtime which hasn't been pre-authorized was illegal and of no effect when the employee is suffered or permitted to work.  29 C.F.R. 778.316. The rule that only emergency work would be paid was similarly illegal and ineffective. The employer knew or should have known that the employees were performing overtime work, such as completing reports and performing security checks. The employer permitted and required that the work be performed. The employer cannot avoid liability for overtime compensation by "prohibiting" the work or classifying it as non-emergency work.

21.     Under 29 U.S.C. § 216(b), an employer who violates the FLSA *shall be*

> liable to the employee for overtime compensation and an additional equal
> amount as liquidated damages.  The purpose for the award of liquidated
> damages is "the reality that the retention of a workman's pay may well
> result in damages too obscure and difficult of proof for estimate other than
> by liquidated damages."

*Renfrow v. City of Emporia*, 948 F.2d 1529, 1540 (10th Cir. 1991)(italics added)(citations omitted)

Where an employee is entitled to overtime, liquidated damages are mandatory,[10]

unless the employer "shows to the satisfaction of the court that the act or omission

giving rise to such action was in good faith and that he had reasonable grounds for

believing that his act or omission was not a violation of the FLSA," *Id.* In this case

good faith was never pled as a defense to liquidated damages nor was it raised in the

final pretrial order. Therefore, liqudated damages must be awarded to the Plaintiffs.


Entered this _____day of October, 2005.


By_____

    Wiley Y. Daniel

    United States District Court Judge

---