IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Wiley Y. Daniel**

Civil Action No.  03-cv-02474-WYD-PAC

CHARLOTTE SCHNEIDER and
DEAN WYMER,

      Plaintiffs,

v.

LANDVEST CORPORATION, a Kansas corporation, and
DAVID MASON, individually,

      Defendants.
_____

## FINDINGS OF FACT AND CONCLUSIONS OF LAW
_____

THIS MATTER came before the Court on a trial to the Court held September 26, 27 and 28 and October 5 and 6, 2005.  The parties submitted proposed findings of facts and conclusions of law on October 26, 2005, and thereafter submitted certain supplements  After considering the testimony of the witnesses, the credibility of the witnesses, the exhibits submitted, the arguments of counsel, and the parties' proposed findings of fact and conclusions of law, the Court enters the following Findings of Fact and Conclusions of Law.

## I.    FINDINGS OF FACT

### The Parties

1.    Defendant Landvest Corporation ["Landvest"] is a Kansas corporation which manages self storage space. The 50-plus facilities managed by Landvest

Corporation are located in Colorado, Kansas, Louisiana, Missouri, New Mexico, Ohio and Texas.  Doc. 67, Approving Final PTO; PTO: p. 5, ¶ 6.

2.      At all times relevant to this action Landvest was doing business in Colorado.  *Id.*, ¶ 7.

3.      Plaintiffs Charlotte Schneider ["Schneider"] and Dean Wymer ["Wymer"] are natural persons who reside in El Paso County, Colorado.  *Id.*, ¶ 1, 3.

4.      Schneider and Wymer were employed by Landvest as resident managers of a storage facility located at 10601 Iliff, Aurora, Colorado from April10, 2002 until April 4, 2003.  *Id.*, ¶ 4.

.       <u>Plaintiffs' Background and the Application for Employment</u>

5.      Schneider applied for employment with Landvest on or about March 27, 2002, and began working at the storage facility located at 10601 Iliff, Aurora, Colorado, on April 10, 2002, as a resident manager.  Testimony of Schneider, Trial Transcript ["Tr."] at 24, lines ["ll."] 20-24.

6.      Wymer applied for employment with Landvest on or about March 27, 2002, and also began working at the storage facility located at 10601 Iliff, Aurora, Colorado, on April 10, 2002, as a resident manager.  Testimony of Wymer, Tr. at 267-268.

7.      Plaintiffs are married to each other.

8.      Prior to their employment with Landvest, Plaintiffs resided near Edgemont, South Dakota.  Schneider was not working at the time she applied for employment with Landvest.  She had previously worked as an accounts receivable

clerk, a motel manager, and a manager of an apartment complex.  She had also worked as an assistant manager in a convenience store.  Exhibit ["Ex."] A14-0002.

9.     Wymer had previously owned businesses, including a pawn shop and a sound business.  He had worked as a musician, a motel manager, and a manager of an apartment complex.  Ex. A13-0002.

10.     At the time they were hired by Landvest, Plaintiffs owned their home near Edgemont, South Dakota.

11.     In March, 2002, Schneider saw an on-line classified advertisement in the Denver Post for a Landvest resident manager.

12.     In response to the advertisement, Plaintiffs called Landvest and spoke to John Cramer ["Cramer"], a Landvest regional manager.  Cramer asked them to fax their resumes to him.

13.     During Schneider's first telephone conversation with Cramer, he told her the job required two persons to work the site, that managers live on site and that managers worked 4 hours each per day.  Testimony of Schneider, Tr. at 25, ll. 16-24.

14.     At Cramer's request, Plaintiffs traveled to Denver two or three days after the first telephone conversation with Cramer.  They met Cramer at a restaurant and spent approximately one hour with him.  Testimony of Schneider, Tr. at 26, ll. 20-24.  He again mentioned 4 hours a day of work per person and stated that they would earn $416.00 every two weeks.  Testimony of Schneider, Tr. at 27, ll. 5-9; Testimony of Wymer, Tr. at 267, l. 19 - 268, l. 11.

15.     Cramer then told them that a final decision would be made in the future concerning their employment and that he would contact them in a day or two.

16.     Plaintiffs returned to South Dakota and were offered employment with Landvest shortly thereafter. After accepting their positions, they were asked to begin work on April 1, 2002.

17.     Plaintiffs were later notified by Cramer that there was a problem with the apartment they were to occupy and were told to report to duty on April 10, 2002.

18.     Plaintiffs physically arrived in Denver on April 9 and reported to work at 10:00 a.m. on April 10, 2002. Tr. at 28, ll. 2-8.

19.     Plaintiffs were hired by Landvest to manage a self storage facility located at 10601 East Iliff, Aurora, Colorado. They worked at the Iliff facility until they terminated their employment on April 4, 2003.

20.     Plaintiffs received three days of training at the Iliff site (April 10-12, 2002) from Judi French ["French"], a resident manager. Cramer was present for part, but not all, of the training. At the end of the first day of training Wymer had worked approximately 8 hours. Testimony of Wymer, Tr. at 272, l. 2 . Schneider had worked approximately 9 hours. Testimony of Schneider, Tr. at 29, l. 15. They were instructed by French to record only 4 hours each on their time sheets. Tr. at 273, ll. 9-10.

21.     The following day they were again instructed to record 4 hours of work although they had each worked anywhere from "8 to 12 hours a day, depending on what was going on." When questioned by Schneider about this practice, Cramer told her that "that was just the way it was." Testimony of Schneider, Tr. at 46, ll. 2-6.

22.     Plaintiffs were instructed by Cramer to only record 4 regular hours of work per day regardless of the number of hours actually worked. Cramer explained to them that their pay was based on 4 hours a day and that their time sheets had to record 4

hours a day.  He told them that they were salaried.  Testimony of Schneider, Tr. at 48, l. 18 - 49, l. 17.

23.     Plaintiffs' testimony was supported by the statement of Cramer to the Colorado Department of Labor, dated July 2, 2003.  Ex. A 28-0001.  Cramer wrote:

> Dean and Charlotte were told by me that they should record
> 22 hours of work per person on their time record each week
> and that overtime would only be approved in emergencies.

*Id.*, paragraph 1.

24.     At the end of the second pay period Schneider attempted to submit a time sheet reflecting her actual hours worked.  She was told that she was required to submit hours as she had been trained or that she would not be paid; she was told to create a new time sheet.  Testimony of Schneider, Tr. at 47, ll. 6-12.

25.     Plaintiffs' testimony was also supported by the payroll records of Landvest which showed that trainer French recorded 9 hours on April 10, 2002, 8 hours on April 11, 2002 and 8 hours on April 12, 2002 (Exhibit 35-051), the days when Schneider testified she was being trained by French.  Plaintiffs' time sheets for the same days only record 4 hours each per day.  Exhibits A1-003 and Exhibit A2-004.

26.     Shortly after beginning work, Cramer told  Plaintiffs that they were both required to be at the site and available to work, during office hours (10:00 a.m.- 6:00 p.m. Monday through Friday and 9:00 a.m. - 5:00 p.m. on Saturday), unless they were performing work-related errands.  Testimony of Schneider, Tr. at 40, ll. 1-2; Testimony of Wymer, Tr. at 294, l. 8.

27.     Plaintiffs' testimony was supported by Cramer's first letter to the Colorado Department of Labor where he explained:

On several occasions during the years I have worked for Landvest Corp. I had several managers complain that they were not being allowed by Landvest to record the full amount of hours they worked. This claim was based on the fact that Landvest work agreement required both managers to devote their full time and attention to the business of the employer. Their complaint was that they both had to devote 8 hours each or(sic) every day worked but they were only being allowed by Landvest to record 4 hours on every day worked.

It was explained to the Managers that they could spend time in their apartments as long as the manager was available to answer the business phone and greet customers that came in the office.

Ex. A 29-0001, final paragraph 0001- first paragraph 0002.

Execution of the Employment Agreement

28.    On April 10, 2002, Cramer presented Plaintiffs with a Managers Employment Agreement.  Ex. A0004 [hereafter "MEA"].  Plaintiffs read and signed the MEA.  A second MEA, identical to the first in all material respects, was signed by Plaintiffs at the request of Landvest on July 23, 2002.  Ex. A0005.

29.    Before they signed, Cramer reviewed the MEA (Ex. A0004) with Plaintiffs. During that conversation Schneider did not perceive anything in the MEA to be inconsistent with Cramer's earlier representations.  When they had gone over the contract, Cramer told Plaintiffs as to compensation that "anything over the 22 hours [worked per week] is compensated."  Testimony of Schneider, Tr. at 33, ll. 5-14.

30.    Cramer could not be located at the time of trial and was not available to testify.  The parties stipulated to the admission of three statements by Cramer: Exhibit A 29 -- a hand written letter dated May 21, 2003 addressed to Joseph Herrera at the Colorado Department of Labor; Exhibit A 28 -- a hand written letter dated July 2,

2003 addressed to Joseph Herrera at the Colorado Department of Labor; and

Exhibit 26 -- a letter on Landvest stationary written by Landvest's attorneys for

Cramer's signature.  Exhibit 26 was a document which Cramer admitted at his

deposition he did not spend very much time reading.  Deposition of Cramer, p. 60, l. 24

- p. 61, l. 1.  Cramer's deposition was also admitted into evidence at trial.

      31.    Cramer's written statements and deposition support Plaintiffs' testimony

that they understood that they were hired to work 4 hours a day or 22 hours a week.

Cramer's statements all refer to a job duty of 4 hours a day or 22 hours a week.  While

he quotes the contract language that prohibits more than a combined total of 70

hours a week, his statements and deposition never mentioned a 35 hour work week.

Even the statement written by Landvest's attorneys dated June 5, 2002 (Ex. A-026)

makes no mention of an agreement to work 35 hours a week.

      32.    The July 2, 2003 letter (Ex. A-028) is specific about the expectation of

the parties that resident managers work 4 hours a day.  Cramer wrote:

> The Iliff site is a busy site, it has a lot of turnover in renters
> and the property itself collects a lot of trash. During the time
> I supervised this couple they began stating concerns about
> the number of hours it was taking them to keep the property
> clean and complete the paperwork relating to the renters.
> They believed that no one could do the work expected by
> the company if they both only worked 4 hours a day . . . .
>
> I had worked that same site as a manager when it first
> opened in 1995 and I know from [first] hand experience that
> 4 hours per day per person is not always enough time to do
> the job as expected  . . . .

Ex. A28-001,002.

33.     The form of the MEA used on April 10, 2002 by Landvest (Ex. A4) had undergone at least four revisions since it was first used by Landvest in 1993.  See Ex. 68.  The contract was written by Landvest attorneys, Husch & Eppenberger, LLC. Testimony of David Mason ["Mason"], Tr. at 492, l. 11.

34.     Paragraph 5 of the MEA titled "Hours and Days of Work" states in part:

> In performance of the duties described herein, Employees shall not work more than a combined total of 70 hours per week. Employees shall work approximately 44 hours per week but may be called upon to work additional hours as needed.

Ex. A4-0001.

35.     The contract does not specifically state whether: (1) 44, 22, 35 or some other number of hours was expected of each employee; and (2) how hours over 22, including overtime hours, would be compensated.  Further, the reference to 44 hours per week does not differentiate whether 44 hours is a combined total of hours for two employees or a job duty of each employee.

36.     The contract contains a prohibition at ¶ 5 against two employees working more than "a combined total of 70 hours" per week but does not prohibit an individual employee from working more than 40 hours a week.  ¶ 7 only limits employees to working within scheduled hours.  There were 44 scheduled hours a week.  Ex. A4-0007.

37.     The contract did not require that the employees split the "combined total of 70 hours" evenly.  Testimony of Mason, Tr. at 488, ll. 4-18 - 489, l. 1; 490, l. 11. Managers could, for example, split hours 50/20.  *Id.* at 490, l. 11.  The payroll records

of Landvest demonstrate uneven splits in hours.  See Ex. 29-188-200, time sheets of Neil and Kathy Murray.

38.     The ambiguities contained in the Landvest contract were created, in part, by the decision of Landvest to use one contract for two employees.  For example, the language referring to 44 hours a week was taken from an earlier form of contract used for a single employee.  See Ex. 68-013, 014.  Thus, when originally written the reference to 44 hours a week was intended by Landvest to refer to the duties of a single employee.  No explanation was given by Defendants at trial for the reference in the contract to "approximately 44 hours per week" rather than a "combined total of 44 hours per week" or "22 hours per week."

39.     Mason admitted in a memorandum to employees dated April 15, 2003 that the contract was confusing.  Ex. A9-0001, ¶¶ 2, 3.  Mason admitted at trial that the language of the contract was ambiguous.  Testimony of Mason, Tr. at 494, l. 4.

40.     The form contract signed by employees does not unambiguously identify how many hours each employee was to work for the biweekly salary of $415.39.

41.     The contract could have used words to state and disclose that each employee was "agreeing to work between 22 and 35 hours a week for a fixed salary of $10,800.00", if that had been the intention of Landvest.

42.     The ambiguous paragraph 5 (Ex. A4) served the business purposes of Landvest by making the agreed pay of $21,600.00 for two employees appear more generous and by allowing potential employees to believe that they would earn $9.44/hour.  Mason admitted he never told any resident manager that they would be paid $5.93 or $5.94/hour.  Testimony of Mason, Tr. at 492, l. 3.

43.     The MEA was interpreted by the law firm of Husch & Eppenberger, LLC , Landvest's attorney, for the Colorado Department of Labor in May of 2003.  Ex. 1.  The interpretation of the contract language made by the Landvest attorneys who wrote the employment agreement was that it required 22 hours of work a week.  Ex. 001-004 (second full paragraph - "She was to work 22 hours per week; accordingly, her base rate of pay was $9.44 per hour; her overtime rate was $14.16 per hour").  The lawyers who wrote the contract did not discern the interpretation of the MEA advanced at trial by Defendants.

44.     Circumstances surrounding the execution of the MEA which are relevant to its interpretation are:

a.      Cramer's representation to Plaintiffs that they would work 22 hours a week; and

b.      Cramer's representation that additional work beyond that discussed (22 hours a week) might be required and that the work would be compensated.

45.     Plaintiffs reasonably interpreted the MEA to be an agreement to work 22 hours per week each for a salary of $10,800.00 each.

Record Keeping at Landvest

46.     Plaintiffs were instructed that they could only record and submit 4 regular hours per day and that they could not submit overtime hours for routine work.  Testimony of Schneider, Tr. at 51, ll. 11, 12.  Her testimony was supported by the written statement of Cramer, wherein he wrote ". . . overtime would only be approved in emergencies."  Ex A28-0001, ll. 13,14.  An example of when overtime work would be

approved given to Schneider by Cramer was a circumstance where no relief manager was available.  Testimony of Schneider, Tr. at 51, l. 25 - Tr. at 52, l. 9.  All recorded overtime had to be approved by a regional manager before being submitted to Landvest for payment.  Testimony of Jeff Etter ["Etter"], Tr. at 669, l. 14.

47.     Schneider did not attempt to submit more than 4 regular hours of time per work day after being instructed not to do so.  However, Schneider repeatedly attempted, with her regional manager's approval, to submit additional hours for payment which were worked outside of scheduled hours.  She testified, and the business records of Landvest confirmed, that she was repeatedly denied payment for recorded hours which were worked outside of scheduled business hours and which were worked in excess of forty hours per week.  Testimony of Schneider, Tr. at 58-72; Exs. A17, A18, A23, A27, A28, A29.

48.     Thereafter and throughout their employment Plaintiffs recorded 22 regular hours of work per week although they regularly worked many more hours "off the clock."  At times, and when approved by their supervisor, they recorded additional hours as "overtime hours".

49.     The testimony of other witnesses supported Schneider's testimony that she was only allowed to record 4 regular hours a day.  Shirley Noe ["Noe"], a former resident manager at the Iliff site, testified that she was instructed by Mason to only record a total of 8 hours per couple per day.  Testimony of Noe, Tr. at 252, ll. 11- 12.  Louise Adolphson, the resident manager of the Buckley site, testified she was trained to record 4 hours per day. Testimony of Louise Adolphson, Tr. at 166, l. 18.  Earl

Adolphson testified that he was told to "put down" 4 hours a day.  Testimony of Earl

Adolphson, Tr. at 337, l. 7.

        50.     As the regional manager for Colorado and Plaintiffs' direct supervisor,

Cramer was authorized by Landvest to train Plaintiffs in the record keeping practices of

Landvest, to represent the pay plan to them, and to instruct them on how to fill out time

sheets.  He was also authorized to approve and deny requests for overtime pay.

Testimony of Mason, Tr.  at 438, l. 8 - Tr.  at 439, l. 4; Deposition of Cramer, p. 33,

l. 11-14.

        51.     At trial, there was substantial evidence of a corporate policy of requiring

employees to only record 4 hours of work per day, which extended beyond the regional

manager, John Cramer.  The first complaint of the practice was from a regional

manager, Don Wooldridge, who worked in Texas in 1998.  Ex. 71-004.  Cramer testified

at his deposition that he was following a company policy -- "that's basically what

was put out by the company. . ."  Deposition of Cramer, p. 22, ll. 2-3.  Noe testified that

she was instructed by Mason to record 8 hours for two employees.  Testimony of Noe,

Tr. at 252, ll. 11-12.  The volume of uniform time sheets filled out by employees prior to

September of 2003 which uniformly record exactly 4 hours a day is substantial

evidence of the corporate policy.  See Ex. 25 (time sheets of B.F. and Esla Cosper); Ex.

29 (time sheets of Kathleen and Neil Murray); Ex. 31 (time sheets of Leo and Betty

Caire, who complained to John Cramer that they were being required to only record 4

hours of work) (Deposition of Cramer, p. 31, l. 11- p. 32, l. 4); Ex. 35 (time sheets of

Judi and Stan French); Ex. 39 (time sheets of Van Kirk); Ex. 43 (time sheets of Barbara

and Ross Davis); Ex. 45 (time sheets of Linda and Bill Shooley); Ex. 47 (time sheets of

Glenda and Bill Andrews); Ex. 55 (time sheets of David Rix, Leslie Schump).  When employees recorded more than 22 regular hours a week, there is evidence that time sheets were changed to show 22 hours a week.  See Ex. 29, 35, 55.

52.  Plaintiffs proved by a preponderance of the evidence that throughout their employment they prepared time sheets according to instructions provided by their trainer, Judi French, and according to instructions provided by their supervisor John Cramer, and recorded only 22 regular hours a week.

53.  At all times relevant to their employment, Cramer knew or should have known that the time sheets were not an accurate representation of Plaintiffs' actual hours worked.  He admitted as much in a written statement to the Colorado Department of Labor dated May 22, 2003.  Ex. A0029.

54.  Mason knew or should have known that Plaintiffs' time sheets did not record actual hours worked.  Notations on time sheets indicate that Mason was personally involved in granting or denying requests for overtime compensation which included review of resident manager's time sheets.  See Ex. A1-0080; Ex 25-081. Ex. 39-028.  He personally authorized payment of, or denial of, individual resident manager's requests for overtime compensation. The uniformity of the time sheets submitted by all resident managers in the Colorado and New Mexico region prior to June, 2003 should have provided notice to anyone reviewing the time sheets that they did not reflect actual hours worked.  Additionally, it is not plausible that employees working under different regional managers would consistently record exactly 4 hours per day of work or 22 regular hours unless they were instructed to do so by supervisors.  It also is not plausible that a uniform company wide practice of recording

only 4 hours per day of work would exist unless regional managers had been told by management to instruct resident managers to record their time in this manner.

55.    Landvest never recorded in any payroll record a regular hourly rate or an overtime rate for any resident managers during the time that Plaintiffs were employed by Landvest.  Landvest never disclosed in writing a regular hourly rate to resident managers during the time that Plaintiffs were employed by Landvest.  Landvest never disclosed to resident managers the number of regular hours they were being compensated for, the number of overtime hours they were being paid for, the overtime rate being used, or the calculation of the overtime rate.

56.    The record keeping practices of Landvest made it impossible to determine based on an examination of the payroll records at what rate employees were paid, how many hours they were paid for, or whether time and a half was paid for recorded hours worked over 40 in a single work week.  An example are the payroll records of Judi French for the week ending April 14, 2002.  Exs. 35-051, 35-052, 39-021.  The employee recorded 43 + 22 hours in a single work week (Exs. 35-051, 35-052).  The employee was paid $311.50 in hourly wages plus her salary of $415.39.  There is no indication that she was paid at a premium rate for hours over 35.  It appears by deduction that she was paid at $7.00/hr for 40 hours and $10.50 for 3 hours, a formula which bears no relationship to the requirements of the Fair Labor Standards Act or Etter's claim that the regular rate was $5.93/hr.  Testimony of Etter, Tr. at 722, l. 10.

57.    Landvest's practice of failing to record all hours worked allowed it to claim at trial that when it disallowed payment of recorded overtime hours of employees such as Schneider that the overtime hours were actually non-overtime hours.

58.     All indications from the payroll records of Landvest are that Landvest was paying a fixed compensation for 22 hours a week.  Hours recorded in addition to 22, when allowed, were paid at hourly rates which ranged from $7.75 to $14.16 an hour.

59.     No mutual understanding existed that the fixed compensation was a salary for up to 35 hours of work a week because this was never communicated to Plaintiffs.

60.     Landvest's record keeping practice of failing to record a regular rate for employees allowed it to claim at trial that it paid more that it paid more than time and a half for recorded overtime hours based on an artificially deflated regular rate.

61.     There was no evidence in any pay record from before June, 2003 that any resident manager was actually paid at a $5.93 hourly rate as Landvest claims.  There is no pay record where an employee recorded 35 hours per week and was paid $415.39 for two weeks nor is there a payroll record where an employee's recorded hours worked was multiplied by $5.93.

The Landvest Pay Plan

62.     Landvest attorneys were involved in the creation of the Landvest pay plan.  Testimony of Etter, Tr. at 674, ll. 13, 14.  The plan was referred to at trial as a "fixed work week salary pay plan."  The plan was never recorded in any written manual, written payroll procedure, memoranda to payroll clerks, or other document.  See response to document request No. 10, Ex. 7-007.  No memoranda to employees was produced at trial explaining the plan to employees.  The only place where the pay plan existed in writing was in the MEA.  Testimony of Mason, Tr. at 420, ll. 14-16.

63.     A pay plan providing for payment of $415.39 for as many as 35 hours of work and premium pay for hours worked over 35 is not described in the MEA.  The MEA describes "overtime" as work that cannot be performed within the scheduled hours" except in the case of emergencies.  A4-0002, ¶ 7.  To the extent the MEA provides for the payment of overtime, it ties the payment of overtime pay to work performed outside scheduled hours, not work in excess of 35 hours per week.  A4-002, ¶ 7 and Exhibit "B" to A4.

64.     Defendants did not offer any evidence at trial that the Landvest "fixed work week salary pay plan" was ever communicated to Plaintiffs.  Neil Murray testified that he explained the pay plan at a meeting of resident managers.  However, Louise Adolphson testified that the meeting where the pay plan was discussed occurred after Plaintiffs left employment with Landvest.  Testimony of Louise Adolphson, Tr. at 197, l. 5.

65.     At trial Etter testified that he is a certified public accountant and the CFO of Landvest.  He testified that he oversees the payment of overtime at Landvest (Testimony of Etter, Tr. at 645, ll. 9,10) and is responsible for compliance with the Fair Labor Standards Act.  Id. at 689, l. 5.  At trial he demonstrated little working knowledge of the Fair Labor Standards Act.  As an example, he was unable to calculate a regular hourly rate which included lodging.  Id. at 651.  Etter also appeared ignorant of the record keeping requirements of the Act, and testified that Landvest had selected payroll software that did not allow it to record a regular hourly rate.

66.     At trial Mason and Etter testified that a "fixed work week salary pay plan" existed at Landvest which compensated resident managers for up to 35 hours at a

biweekly salary of $415.39.  Testimony of Etter, Tr. at 647, ll. 8, 9.  They were not consistent in describing the "fixed work week salary plan" which they claimed existed between April 10, 2002 and April 3, 2003.  At times Etter testified that "basically a premium rate" was paid for any hours over 22 and "in some occasions 22, and in, you know, over 35 hours."  *Id.* at 646, l. 18.  At times Etter testified that employees received premium pay for hours worked over 22 in a work week.  *Id.* at 662, l. 17.  At other times he testified that Landvest used "35 hours to calculate overtime."  *Id.* at 660, ll. 21-23.  He testified that in some circumstances where employees worked between 22 and 35 hours they received premium pay.  *Id.* at 678, ll. 22-24.   He testified that those circumstances were "training emergencies, no relief manager."  *Id.* at 679, l. 1.

67.   Although there were thousands of pages of payroll records admitted into evidence (including time sheets and payroll records for over 40 employees), there was no pay record showing payment to resident managers at an overtime or premium rate only after they exceeded 35 hours.  Most records show hours over 22 recorded in the "overtime" column of the time sheet and payment of those hours at $14.16/hr.  Because Landvest instructed resident managers to only record 22 regular hours per week, there are very few pay records from before April, 2003 which record 36 or more hours.

68.   When asked about the few time records which did exist where employees recorded more than 35 hours in a single work week, Etter could not apply the pay plan he claimed existed to show how the employee's pay was calculated.  When asked to calculate LaRue Van Kirk's pay from her time sheet (Ex. 39-030), he declined to calculate the pay. Testimony of Etter, Tr. at 701-711.  When asked to apply the pay

plan to Esla Cosper's time sheet (Ex 25-083), he declined claiming that the Cospers were operating under a different agreement.  When asked to apply the pay plan to Judi French's time sheet for April, 2002 (Ex. 35-051), he declined.  Testimony of Etter, Tr. at 719-721.

69.     The first pay record in evidence where resident managers appear to be paid at a premium rate for hours over 35 are the pay records of the Fishers beginning in June of 2003.  Ex. 65.

70.     There is no evidence in the record other than the testimony of Etter and Mason that the "fixed work week salary pay plan" as described by them was used by Landvest before June, 2003 when it was first applied to calculate the pay of Warren and Diane Fisher.

71.     Some employees, such as Plaintiff Schneider and Louise Adolphson, staffed the site office during all regular business hours, which were either 40 or 44 hours depending on site occupancy.  This work was performed without knowledge of a "fixed work week salary pay plan" which, if it existed as described by Mason, would have paid them additional compensation for all hours worked over 35.

72.     Landvest's failure to communicate its fixed work week pay plan to the resident managers, if it existed, served Landvest's purposes by allowing Landvest to avoid paying compensation for hours worked between 22 and 40 and for all hours worked over 40 in a single work week.

73.     It also served Landvest's purposes to not record all hours worked by employees, and to instead require employees to only record 22 hours.  The practice allowed Landvest to represent to the Colorado Department of Labor that Plaintiffs only

worked 22 hours per week and were therefore not entitled to overtime.  The practice

also allowed Mason to disallow overtime hours recorded by employees, and claim that

they had not worked over 35 hours and therefore were not entitled to additional pay.

74.    The practice of paying fixed compensation– "a salary"– for fluctuating

hours, as employed by Landvest, created confusion in the minds of Plaintiffs and other

employees who were unclear as to whether they were hourly employees and as to

whether they were entitled to overtime compensation.

75.    As applied to Plaintiffs, Landvest's pay plan did not provide Plaintiffs with

compensation at one and one half times their regular hourly rate for all hours worked

over 40.

76.    Also as applied to Plaintiffs, Landvest's pay plan provided compensation

at a rate of $4.65 per hour for work weeks when Plaintiffs worked 44 hours a week

during scheduled business hours.

Credibility of Witness Jeff Etter

77.    Etter made many assertions during his testimony which were inconsistent

with the weight of the evidence.  As a result, I find that his testimony was unpersuasive.

For example, he refused or was unable to answer many questions which should have

been easy for a person with his background and training.

78.    He denied that there was any pattern to the payroll records of the resident

managers of Landvest before June of 2003 when thousands of pages of time sheets

which were in evidence demonstrated an obvious pattern of 4 recorded regular hours

per day per employee.

79.     He admitted that he had only seen some time sheets by 2003, although he had been supervising the payroll department for three years at that time.  Testimony of Etter, Tr. at 694, l. 6.

80.     He claimed that the hourly rate of resident managers was disclosed to them in the MEA.  Ex. A4.

81.     He claimed the payroll software used by Landvest could not print an hourly rate.

82.     He claimed that he did not remember any change to the pay practices of Landvest in 2003, when the payroll records show employees began recording actual time and Landvest began paying for hours over 35 (beginning with the Fishers and the O'Dells in June of 2003 and including all employees after September, 2003).  Testimony of Etter, Tr. at 693, ll. 18-20.

83.     He claimed that the value of lodging was included in the premium rate for resident managers but did not know what amount was allocated for lodging.  *Id.*, Tr. at 648, ll. 3-12.  He also claimed that he "tested" the rate.  *Id.* at 691, l. 4.

The Iliff Site

84.     Plaintiffs were assigned to a large site operated by Landvest in Colorado, which was referred to at trial as the Iliff site.  The site consisted of 456 units and covered more than 2 acres.  Ex. A52.  The description of the site provided by Plaintiffs' supervisor was of a busy site with a high turnover of tenants which collected lots of trash.  Ex. A 28-001, 002.

85.     Wymer testified that the site was located on a busy street and across from a casino.  He testified that tickets and trash were blown on to the site from the casino.

Work Performed By Dean Wymer

86.     Wymer performed the outdoor maintenance required to maintain the Iliff site to the standards of Landvest.  Regional managers who conducted site inspections, which were conducted without notice, praised his work with comments such as "great job," "very fine job" and "site looks good!"

87.     Landvest's standards for site maintenance were high according to the operations manual and site inspection reports.  According to Wymer's testimony and the Landvest Manual he was expected to and did perform all maintenance and repairs required to keep the site "market ready" at all times.  Ex. A40-012, Landvest Manual. The Manual describes in detail the types of repairs expected of a resident manager which included:  minor electrical, plumbing and mechanical, caulking and painting, and snow and ice removal.  Ex. 40-013.

88.     Wymer testified that he had a regular daily maintenance routine which he described as beginning at 10:00 a.m.  He performed a walking security check of the entire facility.  He then returned to the office to retrieve a golf cart, which he used to pick up trash from the site.  He then walked the front of the property picking up any trash that had accumulated during the night and swept the driveway and entry to the facility.  In between the performance of these tasks, Wymer would return to the office to check in with Schneider to see if she needed him to show units or assist tenants.  If needed, Wymer would interrupt his routine to provide whatever assistance was necessary.  After completing the morning clean-up, Wymer would drive to the bank to make the daily deposit, and at least three times per week he would go to the Post Office as well.  After returning from the bank and/or Post Office, Wymer would check in

with Schneider in the office for any vacates or units that needed cleaning.  If there were

none at that time, he would then perform another security check.

89.     Wymer used his afternoons to perform tasks that were not required on a

daily basis such as:  painting buildings, trim, bollards, and striping, fixing and repairing

door latches, seals, and bolts that had pulled out of the drywall, cleaning vacated units,

performing maintenance on the golf cart and the fences, and seasonal maintenance,

such as pulling weeds, shoveling snow/de-icing, or sweeping and blowing leaves.

Wymer made trips to the hardware store and assisted at other sites.  Testimony of

Wymer, Tr. at 303, ll. 21-25.  His work day in the afternoons was not predictable.  Any

of his maintenance tasks would be interrupted if Schneider or any tenants needed

assistance.  *Id.* at 278-281.

90.     The evidence was that Wymer also answered the phone in the office

when Schneider required breaks, accepted payments from tenants, performed "tracing"

on delinquent tenants, monitored the certified mail that was required on "lock outs" and

performed marketing for the site.  Testimony of Schneider, Tr. at 40, l. 24 - 41, l. 3.

91.     Wymer testified that he also had contact with tenants either to assist

tenants or resolve tenant complaints about once a day after business hours.  Testimony

of Wymer, Tr. at 284, ll. 13, 14.

92.     Wymer performed at least one security check each day before he went to

bed and sometimes performed two outside of business hours.  *Id.* at 287.  He

performed security checks on Sundays and on his days off.  *Id.* at 288, ll. 15-20.

Security checks usually took him 30 minutes to perform.  *Id.* at 287, l. 8.

93.     He assisted the relief manager on his days off with tasks she could not perform such as repair of doors.  *Id*. at 289, l. 15.  On Sundays he performed cleaning and security checks and worked 4 to 5 hours.  *Id*. at 301, l. 1.  He performed other duties requested by Landvest after business hours such as watering the lawn during the night.  He testified that he turned on a sprinkler system to water the lawn but stayed outside while the sprinklers were running to watch for the water police.  *Id*. at 286, l. 9.

94.     Wymer testified that he was able to go to the apartment and not work approximately twice a week for periods of up to two hours during scheduled business hours, otherwise he was occupied with work.  Testimony of Wymer, Tr. at 283, ll. 21-23.  The job duties of resident manager at the Iliff site required a minimum of 8 hours a day, at times he worked 9 to 91/2 hours a day, for example when there were leaves on the ground.  *Id*. at 278, ll. 12-13.  He testified that during the blizzard of March 2003, he worked as many as 12 hours a day for three days.

95.     Wymer's testimony was supported in part by the business records of the employer.  The site inspection reports demonstrated that the site was maintained to the employer's high standards.  Ex. 65.  All site inspection reports, including one performed six weeks before Wymer terminated his employment, are positive.  *Id*.  The manager's job description attached to the MEA is comprehensive.  The job description requires, for example, security checks of the "entire complex" six times a day as well as marketing to outside businesses and "helping tenants solve problems; taking care of complaints" in addition to maintenance duties."  A4-0006.  The Landvest Manual describes Landvest's expectations that managers will take full responsibility for the property including painting and snow shoveling.  Ex. 40-0012- 0016.  Exhibit A50 describes Landvest's

expectations that individual bollards would be repainted when scraped, and that tree

trimming and tree removal as well as fence post replacement would be performed by

the resident manager.  Ex. 50-001.

96.     Wymer's testimony was also supported, at least in part, by the testimony

of other witnesses.  Shirley Noe testified that when her husband, John Cramer,

managed the Iliff site he worked at least 8 hours a day.  Testimony of Noe, Tr. at 251,

l. 25.  Schneider testified that Wymer worked 6 to 8 hours a day not including work

performed after business hours and work on Sundays.  Testimony of Schneider, Tr. at

223. l. 9; Tr. at 239, ll. 11-15.  Earl Adolphson testified that the job of resident manager

was a full time job requiring more than 40 hours a week.  Testimony of Earl Adolphson,

Tr. at 340, ll. 13-14.  Earl Adolphson frequently recorded more than 40 hours on his

time sheets when first instructed to record actual time, even though his site was

smaller, was closed on Sundays and he did not record trips to the bank and security

checks performed outside business hours.  *Id.* at 364, ll. 7-9, 363, l. 13; Ex. A61- 0109,

0111, 0114, 0117. He was subsequently told to "keep his hours down."  Testimony of

Earl Adolphson, Tr. at 354, l. 10.  Louise Adolphson testified that very rarely did Earl

perform his job in less that 8 hours.  Testimony of Louise Adolphson, Tr. at 182, ll. 20,

21.  Warren Fisher consistently recorded 40+ hours of work for the first 3 months of his

employment.  Ex. 65-0005-015.  Charles Van Kirk recorded 8 hours a day throughout

his employment, but only submitted 22 hours on the recap sheet for payment.  Ex. 39.

97.     Wymer proved by a preponderance of the evidence that he performed

work for which he was not properly compensated.  He produced evidence to show the

amount and extent of the work performed as a matter of just and reasonable inference.

98.     His testimony supports a reasonable inference that he worked at least 36 hours a week during business hours.  On Sundays he worked an additional 4-5 hours performing trash detail, security checks, cleaning the office and assisting tenants.  The evidence supports the inference that Wymer worked 40 hours a week total.  Further, throughout his employment, the evidence shows that Wymer regularly performed work outside regular hours, such as security checks and assisting tenants. While the amount of overtime work performed cannot be established with precision, I find that allowing 2 hours per week for security work and for work dealing with tenants and monitoring the facility is fair and supported by the evidence.

Credibility of Witness Neil Murray ["Murray"]

99.     Murray's testimony was contradicted by the testimony of other witnesses. Murray testified that the "end of month" report only required half an hour to complete. Testimony of Murray, Tr. at 569, l. 4.   Noe testified that it took 2 ½ to 3 hours. Testimony of Noe, Tr.  at 259, ll. 7-10.  Louise Adolphson testified it took more than 2 hours to prepare.  Testimony of Louise Adolphson, Tr. at 188, l. 25.  Murray testified that all daily maintenance including sweeping, trash pick up, weed removal and cleaning units, could be completed in one hour a day.  Testimony of Murray, Tr. at 582, ll. 11-12, Tr. at 576, l. 21.  He testified that he could go to the bank, conduct business and return to the site in 10 or 15 minutes.  *Id.* at 575, l. 24.  He could remove a stain from concrete in 5 minutes.  *Id.* at 577, l. 5.

100.     Murray volunteered on direct examination that he encouraged resident managers to go to their apartments during their "four hour shift."  *Id.* at 583, ll. 6-11. But when asked at deposition about Landvest's requirement for staffing the office, he

stated that the office had to be open and that the manager had to "be there."  When

asked what "be there" meant at deposition he said managers had to be "physically" in

the office.  *Id.* at 599, ll. 16-19.

101.    Murray testified on direct examination that the job could easily be done in

22-35 hours.  *Id.* at 586.  At deposition he testified that the job could "easily" be done

in 22 hours.  *Id.* at 598.  He adopted that testimony at trial.  *Id.*  Yet as regional

manager he was supervising the Adolphsons, the Van Kirks and Schneider and

Wymer, all couples who had the wife perform full time duties in the office.  Murray's

testimony that the job could be performed in 22 hours is not credible since that would

require the husband to spend 22 hours in the office and leave him no time to perform

maintenance work.

102.    Murray claimed that he worked full time at the Iliff site for 30 days after

Plaintiffs resigned but his time sheets record no time at the Iliff site.  Instead, the time

sheets show him working at the Austin Bluffs site in Colorado Springs at the time,

working 10:00 a.m. to 2:00 p.m.  Ex. 29-135-144.

103.    Murray testified at deposition that he had no recollection of anyone ever

telling him that he was supervising salaried employees.  Testimony of Murray. Tr. at

595, ll. 15-16.  He admitted, however, at his deposition that he was supervising hourly

employees.  *Id.* at 596, l. 1.  At trial he testified that he explained to everyone he

supervised that they were salaried and that their pay was for between 22 and 35 hours

and that his testimony was "absolutely consistent."  *Id.* at 597, l. 8.

104.    Murray testified that Wymer's job performance declined after Landvest

denied Schneider's request to lower her salary in early December 2002.  Yet the only

documentation he created after December, 2002 states "office and site look good!"  Ex. 65-008.

105.    Murray testified at trial that he accurately recorded his hours worked, yet every time sheet he submitted for a 2 year period records exactly 4 hours of work.  Ex. 29.  He claimed he rarely had to help a customer after 5:00 p.m.  Testimony of Murray, Tr. at 603, ll. 14-17.  He was unable to answer whether he performed all required security checks during his 4 hour shift.  *Id.* at 602-603.

106.    He testified that hand shoveling of snow was not the responsibility of resident managers.  *Id.* at 605, ll. 17-18.  He testified that resident managers were not required to perform hand shoveling to prevent flooding of units.  *Id.* at 606, l. 3.  Yet the Landvest Manual states: "Hand shoveling should be done to avoid snow melting and running into small units."  Ex. 40-015, paragraph 3.

107.    Murray denied that he told Louise and Earl Adolphson that he was recording 35 hours on his time sheets and that they could do the same.  Testimony of Murray, Tr. at 608, l. 22 - 609, l. 10.  They both testified that he did.  Testimony of Earl Adolphson, Tr. at 359, l. 1; Testimony of Louise Adolphson, Tr. at 178, l. 5.

Work Performed by Charlotte Schneider

108.    The evidence was that Schneider was a conscientious and serious worker who carefully followed Landvest's detailed procedures.  She testified credibly that she remained in the office working, except for short breaks during scheduled business hours.

109.    Some of the tasks Schneider performed for Landvest included:  staffing the office 40 or 44 hours a week; direct leasing to new tenants; contact with potential

tenants; answering phones; helping tenants "solve problems"; resolving complaints; handling "local books"; recording information about tenants and units; accepting rental payments; reminding tenants to make payments by phone and written correspondence; helping to maintaining the complex in "good condition and good order"; collecting payments from locked out tenants; reopening locked units; monitoring tenants activities; monitoring gates and computerized security systems; representing the company to the public; preparing days-end, week-end, month-end and other reports; and transmitting them to the home office.  Ex. 068-018, 019.

110.   It was Landvest's management's policy that one person be in the office during office hours.  Testimony of Schneider, Tr. at 42, ll. 8-10.  This requirement was also evidenced by:

a.   The site inspection report form which asks whether the manager was in the office;

b.   Landvest managers' expectation that the telephone be answered during office hours.  Cordless phones were not provided prior to April, 2003, and the phone could not be answered from inside the apartment. Testimony of Schneider, Tr. at 42, l. 11;

c.   Landvest residents were to remove bells from their desks.  *Id.* at 42, l. 20-21; and

d.   Landvest managers requested that doors between offices and apartments be closed.  *Id.* at 43, l. 7.

111.   Plaintiffs fulfilled their duty by having Schneider staff the office during regular business hours.  She remained in the office working during business hours and

spent less than 30 minutes a day in the apartment.  Testimony of Schneider, Tr. at 44,
l. 10.

112.    She testified that she was kept busy answering telephone calls, making
collection and other calls (*Id.* at 103, ll. 1-6), leasing units, accepting payments,
preparing reports for Landvest, processing "vacates," making bank deposits, filing and
performing numerous other duties and procedures as described in the Landvest
Manual.  Ex. 40.

113.    In addition, from November 2002- March 2003 Schneider worked 4 hours
on every Sunday staffing the office.  Ex. A1; see also Pls.' Br. Re Calculation of
Damages filed December 29, 2005.[1]  She also cleaned the office on Sundays.
Testimony of Schneider, Tr. at 96, l. 6.  Schneider worked between two and three hours
every week after 6:00 p.m. preparing end-of-day, end-of-week, and end-of-month
reports.  *Id.* at 38, l. 25 - 39, l. 1.  She devoted time after office hours to dealing with
tenants who had been locked out of their units, potential tenants who were seeking to
lease units (*id.* at 100, l. 24) and spent time twice a month preparing late notices after
hours.  *Id.* at 110, ll. 16-17.  While the amount of work performed cannot be established
with precision, I find that allowing 3 ½ hours per week for overtime work is fair and
supported by the evidence.

114.    Schneider's testimony was supported by the testimony of other witnesses.
Shirley Noe testified that she worked 9 to 9 ½ hour days managing the Iliff site and did
not take lunch breaks.  Testimony of Noe, Tr. at 247, l. 16.  Louise Adolphson testified

---

[1]  While Plaintiff Schneider claims that she worked 4 hours on Sunday for 19 weeks, she seeks
compensation only for 18 weeks.

that it was difficult to manage a smaller site, the Buckley site, in fewer than 40 hours a week.  Testimony of Louise Adolphson, Tr. at 184, ll. 14-15.

Knowledge of Management of Work Performed By the Plaintiffs

A.    David Mason

115.    Schneider complained directly to Mason that she was not being paid for all hours worked.  Testimony of Schneider, Tr. at  86, ll. 11-16.  His response, which was to the effect that those who liked Landvest stayed and those who didn't left, demonstrated a prior knowledge of or a lack of interest in paying her for all hours worked.  Cramer also told Mason that Schneider was complaining about not being paid for all hours worked.  Deposition of Cramer, p. 49, l. 15 to p. 51, l. 7.

116.    The evidence was that Mason had authority over the pay practices at Landvest (Testimony of Mason, Tr. at 382, l. 7) and was involved in the implementation of the overtime policies of Landvest, including intervening in pay matters involving compensation to individuals for hours recorded on their time sheets.  He personally authorized payroll clerks to alter time sheets to delete overtime hours submitted by resident managers that did not conform to Landvest's overtime policy.  See Ex. A1-0080; Ex. 25-081.

117.    Mason knew or should have known that Plaintiffs' time sheets did not record actual hours worked.  Records of Landvest indicate that Mason personally reviewed at least some resident manager's time sheets which recorded overtime.  See Ex. A1-0080; Ex. 25-081; Ex. 39-028; Ex. A36 (memo disallowing payment for attending a sales meeting).  The evidence was that he personally authorized payment of, or denial of, individual resident manager's requests for overtime compensation.  While he

claimed at trial that time sheets recording overtime were brought to him on an ad hoc basis by clerks, the evidence was that he was routinely involved in denying requests for pay. For example, Mason disallowed a single hour's pay for a manager's snow shoveling. Ex. 39-28.

118.   The uniformity of the time sheets submitted by all resident managers in the Colorado and New Mexico region prior to June, 2003 provided or should have provided notice to anyone reviewing the time sheets that they did not reflect actual hours worked. Additionally, it is not plausible that employees working under different regional managers would consistently record exactly 4 hours per day of work or 22 regular hours unless they were instructed to do so by supervisors. It also is not plausible that a uniform company wide practice of recording only 4 hours per day of work would exist unless regional managers had been told by management to instruct resident managers to record their time in this manner.

119.   Mason acted in the interests of Landvest in relation to the Plaintiffs by formulating record keeping and overtime policies which insured that actual hours worked would not be recorded and by disallowing recorded overtime hours worked. Considering the level of interest Mason showed in controlling overtime costs by denying payment for recorded overtime, it is not credible that someone other than Mason was responsible for formulating record keeping and overtime polices at Landvest. These policies insured that employees, including Plaintiffs, would not be paid for all hours worked.

120.   Mason wrote a letter on December 17, 2002 to Schneider (Ex. A19) where he wrote:

> Slanting one manager's duties would compromise the
> minimum wage structure without having to include the value
> of the apartment as income.

Ex. A19.

121.   Mason knew on December 17, 2002 that the Landvest pay plan was

based on payment of minimum wage for hours worked under 40 in a work week.

It is not believable that the salary chosen by Landvest was coincidentally just about a

dollar over minimum wage.  (Biweekly salary = 415.39 /2 weeks = 207.70, 40 hours x

$5.15 minimum wage = $206.00).  If Mason believed Schneider was only working 22

regular hours a week as reported on her time sheets he could have lowered her salary,

as he had done for others, without compromising "the minimum wage structure."

122.   Mason maintained at trial that the payroll records of Landvest which

were admitted into evidence accurately recorded the hours worked by resident

managers.  Testimony of Mason, Tr. at 395, l. 14.  This testimony is not credible when

the time sheets made by resident managers after they were instructed to record "actual"

hours worked (Ex. 59) are compared with the 4 hour a day time sheets.  Compare Ex.

A61-001-103 with Ex. A61-104-118; compare Ex. A-65 (Fisher, hired June, 2003) with

Ex. A-67 (French); compare Ex. 51 (Paccione) with Ex. A63, A64 (Beck).

123.   I also find that Mason was aware or should have been aware that the job

duties of resident manager required more than the 4 hour shift recorded on almost all

time sheets created at Landvest before June 2003.  He knew or should have known

that all six required security checks (Ex. A4-006 para. 8) could not be performed during

the recorded 4 hour window.  He knew or should have known that if one of the two

coworkers was working in the office 4 hours a day he or she would have no time for

maintenance and repair duties.  He knew or should have known that a manager could not perform maintenance and staff the office at the same time.  I thus do not find credible Mason's testimony that the Landvest records produced at trial were accurate records of hours worked (Testimony of Mason, Tr. at 395, l. 14) and that Landvest always kept accurate records of hours worked by employees.  *Id*. at 415, l. 18.

124.   I also do not find credible Mason's testimony that he had been deceived by Plaintiffs' time sheets which recorded 22 regular hours and that no one had any reason to believe that they worked more than 22 hours.  *Id*. at  449, ll. 12-13, 21.  Schneider told him that she was not being paid for all hours worked.  Testimony of Schneider, Tr. at 86, ll. 11-16.  Cramer also told Mason that Schneider was complaining about not being paid for all hours worked.  Cramer Deposition, pp. 49-51.

125.   Also, I do not find credible Mason's testimony that denied that the September 30, 2003 memorandum instructing employees to record actual hours worked (Ex. 59) was a change in the record keeping practices at Landvest (Testimony of Mason, Tr. at 470, ll. 22-23), and that recording actual hours worked had been the policy of Landvest "all along."  *Id*. at 473, l. 8.  It appears that the change in record keeping at Landvest in 2003 was accompanied by a lowering of the overtime rate to $8.90/hour.  See Ex. A65-005.  It is reasonable to believe, based on Mason's direct involvement in the overtime policies at Landvest, that the decision to lower the overtime rate was either made by him or that he was informed of the change.

B.   <u>John Cramer</u>

126.   Cramer was authorized by Landvest to train Plaintiffs, to represent the pay plan to Plaintiffs, to supervise Plaintiffs, and to review time sheets and disallow or

approve hours submitted for payment.  Testimony of Mason, Tr. at 438-439; Deposition

of Cramer, p. 33, l. 11- 14; see also Testimony of Etter, Tr. at 669, l. 14.

127.   Schneider told Cramer that she and Wymer were working more than the

hours recorded on their time sheets.  Testimony of Schneider, Tr. at 45, l. 20 - 46, l. 2.

Deposition of Cramer, p. 25, l. 25- p. 26, l. 5.

Plaintiffs' Regular Rate of Pay

128.   The evidence supports Plaintiffs' argument that their regular rate of pay

was $9.44 per hour.

129.   This is supported by a letter dated May 22, 2003 written by Michael

Gillespie, Landvest's lawyer at Husch and Eppenberger, LLC.  That letter, analyzing

the MEA for the Colorado Department of Labor, states that the regular hourly rate of

pay was $9.44/hour.  Ex. 001-004, paragraph 3.  Mason admitted that he read this

letter before it was sent to the Colorado Department of Labor.  Testimony of Mason, Tr.

at 432, l. 11.

130.   Further, Plaintiffs' pay for a two week period was $415.39.  $415.39

divided by 44 (the number of regular hours recorded on the time sheets for a two week

period) is $9.44.

131.   Defendants have taken inconsistent positions in this litigation concerning

the regular rate of pay of Plaintiffs.  At times Defendants claimed that the time sheets

are accurate and that Plaintiffs only worked 22 hours a week.  See Final Pretrial Order

at 4; Testimony of Mason, Tr. at 395, l. 14.  At other times, Defendants argued that

Plaintiffs' regular hourly rate fluctuated from week to week.  Ex. 006-004.  Defendants

have also claimed that Plaintiffs' hourly rate was $5.94 per hour.  Testimony of Etter, Tr. at 649, ll. 6, 7.

132.    Landvest's records do not record a fluctuating regular rate.  The payroll records show fixed compensation for Plaintiffs ($415.39 biweekly) and a fixed number of regular hours worked (22 hours per week).

133.    As represented by Cramer to Plaintiffs, the salary was intended to compensate for 22 hours a week.  Testimony of Schneider, Tr. at 49, ll. 12-17.  If Defendants had an intention that the salary was to compensate for 35 hours, that intention was not clearly communicated to Plaintiffs and was not communicated to Cramer.  If Cramer understood that the agreement between the parties was for 35 hours of work per week for a salary, as advocated by Defendants, Plaintiffs' inability to complete the work required by Landvest in 4 hours a day would not have been the subject of Cramer's correspondence with the Colorado Department of Labor.  If the Plaintiffs had agreed to work 35 hours a week, as Defendants claimed at trial, the subject of the Cramer correspondence would have been whether 6+ hours a day was a sufficient amount of time to complete the work required by Landvest.  Cramer's statements instead consistently refer to 4 hours a day.  Ex. A28, Ex. A29.

134.    There was not a mutual understanding that the salary was intended to compensate for 35 hours of work per week.

Estoppel

135.    Landvest knew or should have known, through its agents Cramer and Mason, of the fact that Plaintiffs were working more than 22 hours per week.  *See* ¶¶ 53-54, 115, 117-118, 123-125, 127, *supra.*  Accordingly, I find that Defendants were

not misled by Plaintiffs' time sheets which recorded 22 regular hours of work per week. Defendants also were not misled by Plaintiffs' failure to record all overtime hours worked on their time sheets.

136.   The plan to record 22 regular hours of work per week rather than actual hours worked originated with the Defendants and was not a plan of the Plaintiffs.

137.   Plaintiffs were following the instructions of Defendants' agents, John Cramer and Judi French, when they recorded 4 regular hours of work rather than actual hours worked.

138.   It was Defendants' overtime policy to deny overtime compensation for routine work.  Deposition of Cramer, p. 35, ll. 15-19.  It was Defendants' policy to only pay for overtime worked in emergencies or on the manager's day off.  *Id*, p. 33, l. 15 - p. 34, l. 10.

139.   Early in her employment, Schneider recorded more than 22 hours on her time sheets for work she had performed outside regular office hours.  Even when the extra hours were approved by her regional manager, they were crossed off by a payroll clerk of Landvest and not paid.  Ex. A0001-0005, 0016, 0018, 0022, 0027.

140.   Plaintiffs complied with instructions of Landvest to only record 4 hours per day of work, for all work performed during regular working hours (10:00 a.m. Monday - Friday and 9:00 a.m. to 5:00 p.m. on Saturday).  Initially, they recorded time spent working after closing on paperwork or for a late customer.  Payment for this time was denied.  Exs. A0001-0023, A0001-0021.  Time recorded and submitted by Plaintiffs for training a relief manager was denied.  Ex. A0001-0029.  Time spent working in place of a resident manager was paid.  *Id*.  Plaintiffs stopped recording overtime worked on their

time sheets which they believed would not be paid by Landvest because they believed

submitting the time would be futile.

Findings of Fact on Work Performed

141.    Plaintiffs proved through their own testimony and as a matter of just and

reasonable inference that they worked at least as many hours as are described below.

Defendants offered no direct evidence of the amount of work performed by

Plaintiffs and offered no precise evidence of the amount of work performed by

Plaintiffs.

142.    Schneider worked 4 week days per week from 10:00 a.m. until 6:00 p.m.

and Saturdays from 9:00 a.m. until 5:00 p.m. for 50 weeks.[2]   Plaintiff thus worked 40

hours a week but was only compensated 22 hours.  Plaintiff Schneider is entitled to 18

additional hours of compensation at $9.44 an hour ($169.92) for 50 weeks of work,

totaling $8,496.00.  In addition, Schneider worked between 2 and 3 hours every week

after 6:00 p.m. preparing end-of-day, end-of-week, and end-of-month reports.  She

devoted time after office hours to dealing with tenants who had been locked out of their

units, potential tenants who were seeking to lease units, preparing late notices to be

mailed to tenants, and performing other tasks for the employer.  While the amount of

work performed after 6:00 p.m. cannot be established with precision, allowing 2 ½

hours per week for preparation of end-of-day, end-of-week, and end-of-month reports is

fair and consistent with the evidence.  Allowing 1 hour per week for other work

performed after 6:00 p.m. for other tasks as described above is fair and supported by

---

[2]  Plaintiff Schneider actually claims to have worked 52 weeks, but only seeks compensation for 50 weeks so as not to overstate her claim.

the evidence. The total for overtime work that I find is supported by the evidence is 3 1/2 hours a week.[3] Finally, for 18 weeks between November 2002 - March 2003, Schneider worked an additional 4 hours on every Sunday.

143.    Wymer worked approximately 36 hours per week during scheduled business hours, which were week days from 10:00 a.m. until 6:00 p.m. and Saturdays from 9:00 a.m. until 5:00 p.m.  In addition, on Sundays he worked between 4-5 hours conducting security checks, picking up trash, cleaning the office and assisting Schneider with customers.  I find that Wymer thus has shown that he worked 40 hours a week on average during the 50 weeks he claims compensation.  I further find that Wymer has shown that he spent time at work each week after hours, including security checks performed after business hours, assisting the relief manager, dealing with tenants who had been locked out of their units and potential tenants who were seeking to lease units, and performing other tasks for the employer.  While the amount of work performed cannot be established with precision, allowing 2 hours of overtime for the 50 weeks Wymer worked is fair and supported by the evidence.[4]

    Findings of Fact as to Judicial Estoppel

144.    Plaintiff Schneider admitted at trial that she has been receiving disability benefits since she was 18 years of age.  *See* Testimony of Schneider, Tr. at 228, l. 12 - 229, l. 4, 230, ll. 3-8.  Schneider also requested in a letter to Landvest in October 2002 that the total pay for the position not be divided equally between her and Wymer so that

---

[3]  While Plaintiff Schneider claims overtime of 5 1/2 hours for all 50 weeks of work, I find this is excessive.  I find the evidence supports overtime in the amount of 3 1/2 hours.

[4]  Wymer seeks compensation for 4 1/2 hours of overtime a week.  I find this is excessive and not supported by the evidence.

her pay would not continue to be above $700 per month.  See Ex. A0017-0001.

Schneider stated in that letter that she was "allowed one period of nine months where I

am able to make any amount above $700.00 per month before I am dropped by Social

Security" and that her 9 month period ends December 31, 2002.  The purpose of this

request was so that Schneider could continue to receive social security benefits.  Tr. at

230, ll. 3-8.  This request was denied by Landvest.  Ex. A0019.

145.   Schneider testified that her experience with social security was that you

could work for a period of time where SSA does not look at or review your benefits.  Tr.

at 230, ll. 9-15.  She believed that time frame was 11 months.  *Id.*

146.   In response to a question whether Schneider represented to the Social

Security Administration ["SSA"] that she was not able to engage in substantial gainful

activity, Plaintiff Schneider testified that she "filled out their papers and put in the

amount that I was earning."  *Id.* at 228, l. 22 - 229, l. 1.  At times, this was an amount

less than substantial gainful activity.  *Id.* at 229, ll. 2-4.

II.   CONCLUSIONS OF LAW

A.   Whether Plaintiffs Have Established a Violation of the Fair Labor
Standards Act for Unpaid Wages

1.   The Fair Labor Standards Act ["FLSA"] generally requires that nonexempt

employees be paid their regular rate of pay and overtime at "one and-one-half times the

regular rate" at which they are employed for hours worked in excess of forty hours per

week.  29 U.S.C. § 207(a).  In this case, it is undisputed that Plaintiffs are nonexempt

employees entitled to any compensation for which they were not paid.

2.      "An employee who brings suit . . .  for unpaid minimum wages or unpaid overtime compensation . . . has the burden of proving that he performed work for which he was not properly compensated."  *Anderson v. Mt. Clemons Pottery Co.*, 328 U.S. 680, 686-87 (1946).  In determining the proper standard for the employee to meet in carrying out his burden of proof, the Supreme Court noted:

> The remedial nature of this statute and the great public policy which it embodies, however, militate against making that burden an impossible hurdle for the employee. Due regard must be given to the fact that it is the employer who has the duty under s 11(c) of the  Act to keep proper records of wages, hours and other conditions and practices of employment and who is in position to know and to produce the most probative facts concerning the nature and amount of work performed. Employees seldom keep such records themselves; even if they do, the records may be and frequently are untrustworthy.

*Id.* at 687.

3.      Thus, "[w]hen the employer has kept proper and accurate records the employee may easily discharge his burden by securing the production of those records."  *Id.*  "But where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes a more difficult problem arises."  *Id.*  The Supreme Court explained that in that situation,

> [t]he solution . . . is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work. Such a result would place a premium on an employer's failure to keep proper records in conformity with his statutory duty; it would allow the employer to keep the benefits of an employee's labors without paying due compensation as contemplated by the Fair Labor Standards Act.

*Id.*

4.      The Supreme Court concluded that "an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Id.*; *see also Handler v. Thrasher*, 191 F.2d 120, 122 (10th Cir. 1951).  This burden is met even when the employee kept time records that were not accurate, if the employer knew or should have known that the employee was not reporting all hours worked.  *See Murray v. Stuckeys, Inc.*, 939 F.2d 614, 617, 621 (8th Cir. 1991) (finding employer liable for overtime where it had discouraged plaintiffs from reporting overtime hours), *cert. denied*, 502 U.S. 1073 (1992).  Further, work for which an employee is to be compensated includes any work, even beyond the employee's normal shift, that the employee knows or has reason to know about.  *Reich v. Dept. of Conservation and Natural Resources, State of Alabama*, 28 F.3d 1076, 1082 (11th Cir. 1994).  "In reviewing the extent of an employer's awareness, a court 'need only inquire whether the *circumstances* . . . were such that the employer either had knowledge [of overtime hours being worked] or else had the opportunity through reasonable diligence to acquire knowledge.'" *Id.* (quotation and internal quotation marks omitted).

5.      "The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Anderson*, 328 U.S. at 687-88.  "If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate." *Id.* at 688; *see also Handler*, 191 F.2d at 122.  The Supreme Court explained as to such damages:

> The employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with the requirements of s 11 (c) . . . . Nor is such a result to be condemned by the rule that precludes the recovery of uncertain and speculative damages. That rule applies only to situations where the fact of damage is itself uncertain. But here we are assuming that the employee has proved that he has performed work and has not been paid in accordance with the statute. The damage is therefore certain. The uncertainty lies only in the amount of damages arising from the statutory violation by the employer. In such a case 'it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts.'  It is enough under these circumstances if there is a basis for a reasonable inference as to the extent of the damages.

*Id.* (quotation omitted).

6.     Thus, to establish a *prima facie* wage claim, Plaintiffs must establish by a preponderance of the evidence that (1) they worked overtime hours without compensation, (2) the "amount and extent" of the work "as a matter of just and reasonable inference," and (3) that Landvest knew of the uncompensated overtime. *See Talton v. I.H. Caffey Distributing Co., Inc.*, No. 04-1652, 124 Fed. Appx. 760 (4th Cir. 2005) (quoting *Anderson*, 328 U.S. at 687).  Plaintiffs must also show that Landvest was an enterprise engaged in interstate commerce.  *Id.* (citing 29 U.S.C. § 207(a)(1)).

7.     In this case, it is undisputed that Landvest was an enterprise engaged in interstate commerce and that Plaintiffs were employed by Landvest.  As such, Landvest was required to comply with the minimum wage, overtime and record keeping requirements of the FLSA.

8.     As to Defendant David Mason individually, 29 U.S.C. § 203(d) defines an "Employer" for purposes of the FLSA as "any person acting directly or indirectly in the interest of an employer in relation to an employee . . . . "  Courts have consistently held

that a corporate officer with operational control who is directly responsible for a failure

to pay statutorily required wages is an "employer" along with the corporation, and is

jointly and severally liable for the payment of wages.  *See Leddy v. Standard Drywall,*

*Inc.*, 875 F.2d 383, 387 (2nd Cir. 1989); *Donovan v. Agnew*, 712 F.2d 1509, 1511 (1st

Cir. 1983) (citing cases).  In the case at hand, I find that Plaintiffs proved by a

preponderance of the evidence that Mason was an employer for purposes of the FLSA.

Plaintiffs showed that Mason had authority over the pay practices at Landvest, and was

involved in the implementation of the overtime policies of Landvest.  He also was

personally involved in granting or denying requests for overtime compensation and

intervened in pay matters involving compensation to individuals for hours recorded on

their time sheets.  Mason also formulated the record keeping and overtime policies

which resulted in Landvest's failure to pay Plaintiffs the compensation due them.  *See*

Findings of Fact, ¶¶ 54, 116-117, 119, *supra.*

     9.     I further find that Plaintiffs have established that Defendants did not keep

accurate records, as it is undisputed that Landvest's records did not show the hourly

rate of pay, whether the hourly rate of pay included overtime, or the actual hours

worked by Plaintiffs.  See 29 C.F.R. § 516.2.[5]  I also find that Plaintiffs have shown that

they worked hours that they were not compensated for, including overtime hours.  *See*

Findings of Fact ¶¶ 141-143, *supra.*  As to the amount and extent of the work as a

matter of just and reasonable inference, I find that Plaintiffs have shown by a

---

     [5] To the extent that Plaintiffs' complaint may be deemed to assert a claim for violation of the
record keeping requirements of the FLSA, I find no evidence of Congressional intent to allow a private
right of action.  *See East v. Bullock's Inc.*, 34 F. Supp. 2d 1176, 1182-83 (D. Ariz. 1998) (and cases cited
therein).  The failure to keep adequate records does, however, impact the prima facie case regarding
unpaid wages and the parties' burdens in connection with same.  *See Anderson*, 328 U.S. at 686-88.

preponderance of the evidence that they worked the hours described in the above-
referenced Paragraphs.

10.     Finally, I find that Landvest and Mason had actual or constructive
knowledge that Plaintiffs worked hours in addition to those that they recorded.  Instead
of working 22 hours a week pursuant to their employee agreement, Landvest and
Mason knew or should have known that Plaintiffs worked over that amount of time and
that they worked hours that they claimed entitled them to overtime.  *See* Findings of
Fact,  ¶¶ 54, 115, 117-118, 123-125, 127, *supra*.  I further note that Cramer
represented that he believed it was not possible for an employee to always manage the
storage units within the 22 hour work week prescribed by Landvest.  *Id.*, ¶ 32.   Based
on this knowledge, Landvest's defense that it relied on the employees to keep accurate
time records is not valid.

11.     Further, even if Landvest did not have such actual knowledge, a
reasonable inquiry would have revealed that Plaintiffs (and other employees) were
working more than 22 hours a week such that constructive knowledge would apply.
*See Reich*, 28 F.3d at 1083-84 (holding that employer could have acquired actual
knowledge of employees working overtime even where overtime was prohibited and
that employer was not relieved of its duty to inquire into the conditions prevailing in the
business); *Brennan v. General Motors Acceptance Corp.*, 482 F.2d 825, 827-28 (5th
Cir. 1973) (holding that employer had constructive knowledge of unreported overtime in
situation where employees were "required by the nature of their jobs to work long and
irregular hours in the field" and to "work independently", upper management

encouraged accurate overtime reporting "but the employees understated their hours due to pressure brought to bear by their immediate supervisors").

12.     To the extent Defendants claim that Plaintiffs breached their employment agreement by working more than 70 hours, this argument is rejected.  As stated earlier, an employer is obligated to pay an employee for all hours worked, even those in addition to his or her prescribed schedule, if the employer knows or has reason to know that the employee is working additional hours.  *Handler*, 191 F.2d at 123; *see also* 29 C.F.R. § 785.11 ("[w]ork not requested but suffered or permitted is work time"); *see also* 29 C.F.R. § 785.13 ("it is the duty of the management to exercise its control and see that the work is not performed if it does not want it to be performed. . . . [i]t cannot sit back and accept the benefits without compensating for them").  Since I found that Defendants knew or should have known that Plaintiffs were working additional hours, Defendants' argument in this regard has no merit.

13.     Accordingly, I find that Plaintiffs have established a prima facie case under the FLSA.  The burden thus shifted to Landvest to come forward with evidence of the precise amount of work performed or with evidence to negate the reasonableness of the inference to be drawn from Plaintiffs' evidence.  *Anderson*, 328 U.S. at 687-88.  I find that Landvest did not present evidence of the precise amount of work performed, since I reject Landvest's argument that the time sheets of Plaintiffs accurately reflect the hours worked.  I also find that Landvest did not present evidence to negate the reasonableness of the inference to be drawn from Plaintiffs' evidence.  Since Landvest failed to produce such evidence, I may award damages to Plaintiffs, even though the result is approximate.  *Id.*

14.    The question then becomes how to calculate the damages.  Generally, "the regular hourly rate of pay of an employee is determined by dividing his total remuneration for employment (except statutory exclusions) in any workweek by the total number of hours actually worked by him in that workweek for which such compensation was paid."  29 C.F.R. § 778.109.  However, "[t]he Department of Labor provides to employers various methods for calculating overtime compensation to suit different employment needs . . . ."  *Samson v. Apollo Resources, Inc.*, 242 F.3d 629, 633 (5th Cir.), *cert. denied*, 534 U.S. 825 (2001).  Thus, an employee may be salaried in a fixed workweek or may have a fluctuating work week.  *See* 29 C.F.R. §§ 778.113-116. Where the employee is salaried and has a fixed workweek, generally the regular hourly rate of pay is calculated as set forth in 29 C.F.R. § 778.113.

15.    In this case, in determining the regular rate of pay, I note that Plaintiffs signed a joint MEA on April 10, 2002 and a revised joint MEA on July 23, 2002.  The agreements provided as follows as to compensation:

> In performance of the duties herein described, Employees shall not work more than a combined total of 70 hours per week.  Employees shall work approximately 44 hours per week but may be called upon to work additional hours as needed.

Exs. A-0004 and A-0005.  The agreements provided that "[a]s full compensation for performance of duties hereunder, Employer shall pay Employees the sum of $21,600.00 per year, split evenly between both employees, payable biweekly . . . .  The total yearly compensation paid to the Employees shall consist of (a) $21,600 in cash and (b) rent credit for the Residence of $4500.00. . . . *Id.*  The compensation would amount to $10,800 per Plaintiff in cash.

16.     I find that Plaintiffs' regular rate of pay under the FLSA should be determined under the fixed workweek standard and calculated pursuant to 29 C.F.R. § 778.113.  Thus, Plaintiffs' salary is to be divided by the number of hours which the salary is intended to compensate.  *Id.*

17.     In this case, the contract is not clear as to how many hours that the salary of $10,800 per employee was intended to compensate.  Defendants assert that the hourly rate is calculated by dividing $10,800 by 35 hours, totaling $5.93 an hour.  If that calculation were correct, overtime would be calculated at $8.90.  Defendants further assert that their overtime rate of $14.16 included lodging.  Plaintiffs, on the other hand, assert that since the contract is ambiguous, the hourly rate should be $9.44 (calculated by dividing $10,800 by 22 hours).  Plaintiffs further assert that the overtime rate paid should be $15.78, which includes an additional amount for lodging.

18.     In making the determination as to the rate of pay, I must decide whether the contract is ambiguous.  I first must determine what law applies to this analysis.  The contract provides it "shall be governed by and constructed in accordance with the laws of the State of Kansas."  Exs. A0004, A0005.  "In making choice of law determinations, a federal court sitting in diversity must apply the choice of law provisions of the forum state in which it is sitting.  This is true even when choice of law provisions involve the interpretation of contract provisions."  *Shearson Lehman Brothers v. M &L Investments*, 10 F.3d 1510, 1514 (10th Cir. 1993). (applying Utah law to determine if Delaware choice of law provision was applicable).  Hence, Colorado law is applied to determine if Kansas law will govern the contract.  Colorado courts apply the law chosen by the contracting parties unless applying such state's law would be contrary to the

fundamental policy of the State of Colorado. *Hansen v. GAB Business Servs., Inc.*, 876 P.2d 112, 113 (Colo. App. 1994). I find that Kansas contract law is not contrary to the fundamental policy of the State of Colorado, and the choice of law provision is valid. Kansas law governs the parties' contract. Plaintiffs do not appear to dispute this.

19.     Under Kansas law, "[a] contract is ambiguous when the words used to express the intention of the parties may be understood to reach two or more possible meanings." *Butts v. Lawrence*, 919 P.2d 363, 367 (Kan. App. 1996). I find that the contract is ambiguous as to how many hours the employees were to work (22 hours, 35 hours, 44 hours, or something in between) and what the rate of pay is. An obvious example of the ambiguity is the statement that "Employees shall not work more than a combined total of 70 hours per week" (meaning that the employees each may not work more than 35 hours per week) and on the other hand that "Employees shall work approximately 44 hours per week", meaning that the two employees at a site would work only 22 hours per week. If the $10,800 is meant to apply to a full 35 hour work week, the hourly rate under the contract due Plaintiffs would be $5.93 each (10,800 divided by 52 weeks is $207.69 per week, $207.69 divided by 35 hours is $5.93 an hour). However, if the $10,800 were meant to apply only to a 22 hour work week, the rate of pay would be $9.44 an hour. Since the contract can be read to support either interpretation, I find it is ambiguous.

20.     Since the contract is ambiguous, I can consider parole evidence, *i.e.*, the "'facts and circumstances existing prior to and contemporaneously with its execution . . . to clarify the intent and purpose of the contract . . . .'" *Butts*, 919 P.2d at 367 (quoting *First Nat'l Bank of Olathe v. Clark*, 602 P.2d 1299 (Kan. 1979)). The primary goal in

construing the contract "'is to ascertain the intent of the parties, and such intent may best be determined by looking at the language employed and taking into consideration all the circumstances and conditions which confronted the parties when they made the contract.'" *Id.* (quoting *Galindo v. City of Coffeyville*, 885 P.2d 1246 (Kan. 1994)).

21.     I find that the circumstances surrounding the execution of the contract support an interpretation that the contract was intended to compensate Plaintiffs for 22 hours per week. *See* Findings of Fact ¶¶ 14, 20-22, *supra*. The statement of John Cramer also supports this construction (*id.*, ¶ 31), as does the interpretation of this contract made by Landvest's attorneys to the Colorado Department of Labor. *Id.*, ¶ 43 ("She was to work 22 hours per week; accordingly, her base rate of pay was $9.44 per hour, her overtime rate was $14.16 per hour"). The fact that Plaintiffs only recorded 4 hours per day of work even though the evidence supports the fact that they routinely worked additional hours also supports this.

22.     I also find that this is the most reasonable interpretation of the contract, since the agreement states that the two employees shall work a combined total of approximately 44 hours (22 hours each). Further, this interpretation is supported by the fact that the overtime rate paid by Defendants of $14.16 an hour is the statutory overtime rate due for an hourly rate of $9.44 ($9.44 x 1 1/2 is $14.12). Finally, I note that this interpretation is supported by the law that a contract should be strictly construed against the drafter of the contract, which in this case was Landvest and its attorneys. *See Dillard Dept. Stores, Inc. v. . State, Dept. of Human Resources*, 13 P.3d 358, 363 (Kan. App. 2000). Accordingly, I find that the regular hourly rate due Plaintiffs was $9.44 an hour. The overtime rate due Plaintiffs (1 1/2 x 9.44) is $14.16.

23.     To the extent the contract compensated Plaintiffs only for 22 hours when they worked additional hours, the contract did not meet the requirements of the Fair Labor Standards Act.  The contract was also deficient to the extent it did not compensate for overtime hours worked.  Like the arrangement in *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572 (1942) which the Supreme Court found to be deficient, the agreement placed "no contractual limit upon the hours which [the employer] could have required [the employees] to work for the agreed wage, had [it] seen fit to do so, and no provision for additional pay in the event the hours worked required minimum compensation greater than the fixed wage." *Id*. at 581.  In this case, there was nothing in the MEA to provide for minimum wage and overtime compensation to the employee who worked over 22 hours per week during a scheduled business week.

24.     Finally on the regular rate of pay, Plaintiffs contend that the rate should be increased to include the computation of lodging.  See 29 C.F.R. § 778.116 ("[w]here . . . an employer furnishes lodging to his employees in addition to cash wages the reasonable cost or the fair value of the lodging (per week) must be added to the cash wages before the regular rate is determined").  Plaintiffs request that the overtime rate be increased to $15.78 to reflect this lodging component.  Defendants argue that the rate of pay should not be increased by lodging since the lodging inured to the benefit of Landvest.  I agree with Defendants and find that the regular rate of pay should not be increased to account for lodging.

25.     The FLSA defines the regular rate to include all renumeration for employment paid to an employee, except for certain payments that are expressly

defined and set forth in the statute.  29 U.S.C. § 207(e).  "Wages" are defined under 29

U.S.C. 203(m) which states in pertinent part that a wage "paid to any employee

includes the reasonable cost. . . to the employer of furnishing such employee with

board, lodging, or other facilities, if such board, lodging or  other facilities are

customarily furnished by such employer to his employees."  The Code of Federal

Regulations speaks to the calculation of the "reasonable cost" of the lodging, providing

that "[t]he term reasonable cost as used in section 3(m) of the Act is hereby determined

to be not more than the actual cost to the employer of the board, lodging, or other

facilities customarily furnished by him to his employees."  29 C.F.R. 531.3(a) (emphasis

added). It further provides that:

> (d)(1) The cost of furnishing "facilities"found by the Administrator to be
> primarily for the benefit or convenience of the employer will not be
> recognized as reasonable and may not therefore be included in
> computing wages.
>
> (2) The following is a list of facilities found by the Administrator to be
> primarily for the benefit of convenience of the employer. The list is
> intended to be illustrative rather than exclusive: (i) Tools of the trade and
> other materials and services incidental to carrying on the employer's
> business; (ii) the cost of any construction by and for the employer; (iii) the
> cost of uniforms and of their laundering, where the nature of the business
> requires the employee to wear a uniform.

29 C.F.R. 531.3(d)(1)-(2).  29 C.F.R. § 531.32 defines "other facilities"to be something

like board or lodging.  Such items might include "housing furnished for dwelling

purposes."

26.     29 C.F.R. §§ 531.30 and 531.32 give credence to the argument that

"facilities" is a broad term meant to include lodging.  29 C.F.R. 531.30 provides:

> The reasonable cost of board, lodging or other facilities may be
> considered as part of the wage paid an employee only where customarily

'furnished' to the employee. Not only must the employee receive the
benefits of the facility for which he is charged, but it is essential that his
acceptance of the facility be voluntary and uncoerced. See *Williams v.
Atlantic Coast Line Railroad Co.*, (E.D.N.C.). 1 W.H. Cases 289.

29 C.F.R. 531.31 provides:

The reasonable cost of board, lodging, or other facilities may be
considered as part of the wage paid an employee only where 'customarily'
furnished to the employee. Where such facilities are 'furnished' to the
employee, it will be considered a sufficient satisfaction of this requirement
if the facilities are furnished regularly by the employer to his employees or
if the same or similar facilities are customarily furnished by other
employees engaged in the same or similar trade, business, or occupation
in the same or similar communities. See *Walling v. Alaska Pacific
Consolidated Mining Co.*, 152 F. (2d) 812 (C.A. 9), cert. denied, 327 U.S.
803; *Southern Pacific Co. v. Joint Council* (C.A. 9) 7 W.H. Cases 536.
Facilities furnished in violation of any Federal, State, or local law,
ordinance or prohibition will not be considered facilities 'customarily'
furnished.

Finally, in *Marshall v. Debord*, No. 77-106-C**,** 1978 WL 1705, at *5 (E.D. Okl. 1978), the

court held that the defendant employer was not entitled to have the cost of furnishing

lodging included in computing wages under 29 U.S.C. § 203(m) where the rooms were

primarily furnished for the benefit of the defendant employer since the employees were

required to live at the premises and since at least one employee had to be available at

all times.

27.     Here, Plaintiffs were required, as a condition of their employment as

full-time resident managers, to reside at the facility.  They did not pay rent to reside at

this apartment and their residence at the facility benefitted Landvest.  Their residence

at the facility added an appearance of added security.  It also allowed both Plaintiffs

and Landvest more flexibility in maintaining the facility and allowed Plaintiffs time off for

slow periods.  Accordingly, because Plaintiffs' housing was furnished primarily for the

benefit of Landvest and because Plaintiffs were required to reside at the facility, I find that the value of their lodging should not be included in the computation of their regular rate.

28.      In conclusion, I find that Plaintiffs proved a violation of the Fair Labor Standards Act.  I further find that Plaintiffs are entitled to damages at $9.44 an hour for all hours worked between 22 and 40 hours a week and to overtime pay of $14.16 for hours worked in excess of 40 hours a week.

29.      I now turn to the actual calculation of damages in this case.  As to Plaintiff Schneider, she was paid at her regular rate of $9.44/ hour for 22 hours per week.  She should have been paid for an additional 18 hours per week at her regular rate of $9.44 per hour ($8,496.00).  For 32 weeks she should have been paid for an additional 3 ½ hours of work at $14.16 per hour totaling $1,589.92 (3.5 hours x $14.16 = $49.56 x 32 weeks = $1,585.92).  For 18 weeks Schneider should have been paid for an additional 7 ½ hours of work (3 ½ hours of overtime weekly plus 4 hours on Sunday) at $14.16 per hour totaling $1,911.60 (7.5 hours x $14.16 = $106.20 x 18 weeks = $1,911.60).  The total in regular and overtime pay is $11,993.52.

30.      However, there was evidence from Landvest that it did pay Schneider certain overtime at the rate of $14.16, which is not reflected in Schneider's assessment of her damages.  Specifically, Landvest indicates that it paid Schneider $1,239.00 in overtime.  I find that this amount must be offset from the unpaid overtime compensation of $3,497.52, meaning that Schneider is awarded $2,258.52 in overtime compensation.  That amount, when combined with the regular pay due of $8,496.00, totals damages due Schneider in the amount of $10,754.52.

31.      As to Plaintiff Wymer, he was paid at his regular rate of $9.44/ hour for 22 hours per week.  He should have been paid for an additional 18 hours per week at his regular rate of $9.44 per hour ($8,496.00).  He also should have been paid for an additional 2 hours per week at an overtime rate for 50 weeks totaling $1,416.00 (2 hours x 14.16 = $28.32 x 50 weeks = $1,416.00).  The total amount is $9,912.00.

32.      However, as with Schneider, Landvest presented evidence that it did pay Wymer certain overtime at the rate of $14.16, which is not reflected in Wymer's assessment of his damages.  Specifically, Landvest indicates that it paid Wymer $495.60 in overtime.  I find that this amount must be offset from Plaintiff Wymer's overtime of $1,416.00, meaning that the amount of overtime due Wymer is $920.40.  That amount, combined with the award of regular pay of $8,496.00, totals damages to Wymer in the amount of $9,416.40.

33.      I also find that an award of liquidated damages is proper.  29 U.S.C. § 216(b) states, "[a]ny employer who violates the [FLSA] shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages".  The Tenth Circuit has explained that "'[l]iquidated damages are not a penalty exacted by the law, but rather compensation to the employee occasioned by the delay in receiving wages due caused by the employer's violation of the FLSA.'" *Jordan v. U.S. Postal Serv.*, 379 F.3d 1196, 1202 (10th Cir. 2004) (quoting *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 142 (2d Cir.1999)).  A court may exercise its discretion in not awarding liquidated damages "when an employer shows that its action was in good faith and that it had reasonable grounds for believing the failure to pay . . .

was not a violation of the FLSA." *Crenshaw v. Quarles Drilling Corp.*, 798 F.2d 1345, 1351 (10th Cir. 1986) (citing 29 U.S.C. § 260).

34.     In this case, I find that Defendants did not plead a defense that their actions were in good faith and/or that they had reasonable grounds for believing the failure to pay was not a violation of the FLSA.  While Defendants plead that they did not "willfully" violate the FLSA, I find that this is not equivalent to pleading the good faith defense.  In fact, the first time this defense was raised was in Defendants' Supplemental Brief on Calculation of Damages and Liquidated Damages filed January 9, 2006, months after the trial ended and the parties' initial proposed findings of fact and conclusions of law were submitted.

35.     Even if this defense was timely, I find that Defendants have not established that they had good faith or reasonable grounds for believing the failure to pay was not a violation of the FLSA.  Defendants assert that, at the time of Plaintiffs' employment, they understood the Department of Labor's refusal to pursue an investigation to confirm that their wage and hour practices were lawful.  They further assert that after their counsel "presented a clear explanation as to Defendant Landvest's wage practices for resident managers", the Department of Labor "indicated to Landvest's counsel that Landvest's pay practices were fine."  I reject this argument. The letter to the Department of Labor prepared by counsel for Landvest to which Defendants cite (Defs' Ex. 30) does not accurately state the pay practices as I have found them to exist in this case.  For example, the letter say that "managers are limited to working no more than eight hours per day or forty-four hours per week" and "[m]anagers do not work (and in fact have no reason to work) after normal business

hours." *Id.* at A0030-002-003.  Here, the evidence presented was that Plaintiffs and

other resident managers routinely worked more than eight hours per week and after

normal business hours and were not compensated.  Accordingly, I find that Defendants

are not entitled to the good faith defense.

36.     In conclusion on liquidated damages, I find that Plaintiffs' request that

they be awarded liquidated damages equal to unpaid overtime compensation is

reasonable.  Plaintiff Schneider is awarded liquidated damages in the amount of

$2,258.52.  Plaintiff Wymer is awarded liquidated damages in the amount of $920.40.

   B.    Whether Plaintiffs Established a Breach of Contract (Second Cause of
         Action)

37.     In addition to the claim under the FLSA, Plaintiffs also brought an action

for wages under the common law of the State of Colorado through a breach of contract

claim.  See Am. Comp., Second Cause of Action.

38.     In order to establish a breach of contract under Kansas law, which I

previously found controlled the contract at issue, Plaintiffs must prove: (1) the existence

of a contract between the parties; (2) sufficient consideration to support the contract;

(3) the plaintiffs' performance or willingness to perform in compliance with the contract;

(4) the defendants' breach of contract, and (5) damages to plaintiffs caused by the

breach. *Commercial Credit Corp. v. Harris*, 510 P.2d 1322, 1325 (Kan. 1973).

39.     In the case at hand, I find that Plaintiffs have established the first three

elements of the claim, since there was a contract that I found Plaintiffs performed

under.  I further find that Plaintiffs established a breach of the contract because

Defendants did not compensate Plaintiffs at $9.44 for work up to 22 hours, did not allow

Plaintiffs to submit accurate time records even though the contract called for same, and did not compensate Plaintiff for hours worked over 22 hours.  Plaintiffs' damages, however, are the same damages that I found in connection with the violation of the FLSA.  Accordingly, Plaintiffs are not awarded any additional damages in connection with the breach of contract claim.

      C.     <u>Whether Plaintiffs are Estopped from Asserting an Unpaid Wages Claim</u>

      40.     As Defendants recognize, estoppel only applies to bar an employee's claim for unpaid wages when the employer had no knowledge that the employee was not accurately reporting hours worked.  *See McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998) (employee's failure to adequately record his time was fatal to claim for unpaid wages *where the company had no reason to be aware of the overtime*) (emphasis added); *Abel v. Dept. of Corrections*, No. 93-4070-SAC, 1995 WL 550045 (D. Kan. 1995) ("[f]or it to be a defense to a FLSA overtime claim, equitable estoppel must be based on more than the employee's mere failure to report overtime . . . . [where the] case . . . ha[s] evidence from which one can infer that the defendant had constructive knowledge of the overtime work", the defense is not applicable); *see also Reich*, 28 F.3d at 1081-84; *Brumbelow v. Quality Mills, Inc.*, 462 F.2d 1324, 1327 (5th Cir. 1972).  Here, since I find that Defendants knew or should have known that Plaintiffs were working additional hours that were not being reported, I find that the defense of estoppel is not available to Defendants.

      41.     Estoppel is also not available for an additional reason.  This defense is not  applicable to an employer who encourages workers to falsely report their hours. *See Brumbelow*, 422 F.2d at 1327.  Here, while the evidence is somewhat conflicting

on this point, I find that Plaintiffs have established that they were told by their regional

manager, John Cramer, to record only 4 hours per day and that if they performed

additional work per day that was not for an emergency, they would not be compensated

overtime.  Thus, it was reasonable for Plaintiffs to assume that they need not record

that time since they were told they would not be compensated for it

   D. <u>Whether Judicial Estoppel Applies to the Claims of Plaintiff Schneider</u>

   42. Finally, I address the judicial estoppel defense.  Defendants claim that

judicial estoppel bars recovery by Plaintiff Schneider based on her receipt of social

security disability benefits during the time frame that she was employed by Landvest.

Defendants assert that while Schneider was working at Landvest, reportedly full time,

she was receiving social security benefits that are awarded only where a person is not

able to engage in substantial gainful activity.  *See* 42 U.S.C. § 423(d)(2)(A).

   43. Judicial estoppel is a discretionary remedy courts may invoke "to prevent

improper use of judicial machinery."  *Johnson v. Lindon City Corp.*, 405 F.3d 1065,

1068 (10th Cir. 2005) (citing *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001)).  It

prevents parties from "deliberately changing positions according to the exigencies of

the moment."  *New Hampshire*, 532 U.S. at 750.  The doctrine is stated as follows:

"[W]here a party assumes a certain position in a legal proceeding, and succeeds in

maintaining that position, he may not thereafter, simply because his interests have

changed, assume a contrary position, especially if it be to the prejudice of the party

who has acquiesced in the position formerly taken by him."  *Johnson*, 405 F.3d at 1069.

   44. "The circumstances under which judicial estoppel may appropriately be

invoked are probably not reducible to any general formulation of principle."  *New*

*Hampshire*, 532 U.S. at 750.  Nevertheless, *New Hampshire* noted three factors courts should consider when determining whether to employ judicial estoppel:  (1) a party's later position must be clearly inconsistent with its earlier position; (2) whether the party persuaded a court to accept its earlier position, leading to "the perception that either the first or the second court was misled"; and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.  *Id.* at 750-51 (referring to this judicial inquiry as "balancing the equities").  "The requirement that a previous court has accepted the prior inconsistent factual position 'ensures that judicial estoppel is applied in the narrowest of circumstances.'" *Johnson*, 405 F.3d at 1069 (quotation omitted).

45.     I find that judicial estoppel does not apply in this case.  First, I find that this defense is barred as Defendants did not raise this in their Answer or in the Final Pretrial Order.  Defendants also did not raise this issue at any time during trial and first referenced this defense for the first time in their proposed Findings of Fact and Conclusions of Law submitted after trial.  A defense that is not raised in the Pretrial Order may not be asserted at trial.  *Oklahoma Natural Gas v. Apache Corp.*, Nos. 04-5064, 04-5065, 124 Fed. Appx. 604, 609 (10th Cir. 2005); *see also Expertise, Inc. v. Aetna Finance Co.*, 810 F.2d 968, 973 (10th Cir. 1987) (a defense not raised . . . is generally waived unless it is included in the pretrial order; the pretrial order is the controlling document for the trial).

46.     It is also apparent from Defendants' pleading filed November 7, 2005, that Defendants knew or should have known about this defense prior to trial.  Plaintiffs' answer to Interrogatory No. 6 of Defendants disclosed that Plaintiff is a recipient of

Social Security Disability Benefits.  *See* Defs.' Mot. to Supplement Findings of Fact and

Conclusions of Law Concerning Pl.'s References to Social Security, at 16.  Defendants

further state in that pleading that they became aware in April of 2004 at Schneider's

deposition that she had been receiving Social Security Disability benefits since she

was 18 years of age.  *Id.* at 17.  Defendants also state that they received a request

from SSA in March of 2005 regarding Schneider's employment.  *Id.* at 18.  While

Defendants argue that Schneider did not provide full discovery as to her social security

records, this should have been the subject of a motion to compel prior to trial.

Defendants' request for discovery of Schneider's social security records at this juncture

after trial is clearly not proper.

47.     Even if I were to allow this defense to be presented, however, I find that it

is not applicable.  I find that it has not been shown that Schneider's representations to

the SSA were "clearly inconsistent" with the position taken by her in this case.  The fact

the SSA awarded Schneider social security disability benefits, and that she was

collecting them at the time she worked for Landvest, does not establish a fact which is

"clearly inconsistent" with her contention that she worked over 40 hours in certain

weeks.  As the Supreme Court noted, "[a]n SSA representation of total disability differs

from a purely factual statement in that it often implies a context-related legal

conclusion, namely, 'I am disabled for purposes of the Social Security Act.'"  *Cleveland*

*v. Policy Management Systems Corp.*, 526 U.S. 795, 802 (1999).  In *Cleveland*, the

plaintiff brought suit under the Americans with Disabilities Act, claiming she could

perform work with reasonable accommodation.  At the same time, the plaintiff was

receiving benefits from the SSA as a result of being disabled.  The Supreme Court

noted that "despite the appearance of conflict that arises from the language of the two statutes, the two claims do not inherently conflict to the point where courts should apply a negative presumption [about judicial estoppel]." *Id.* "That is because there are too many situations in which an SSDI claim and an ADA claim can comfortably exist side by side." *Id.* at 802-03.

48.     In this case, Schneider claimed that she believed she could engage in a period of trial work without losing her benefits. The Supreme Court explained in *Cleveland* that "the SSA sometimes grants SSDI benefits to individuals who not only can work, but are working." *Id.*, 526 U.S. at 805. "For example, to facilitate a disabled person's reentry into the workplace, the SSA authorizes a 9-month trial-work period during which SSDI recipients may receive full benefits." *Id.* (citing 42 U.S.C. §§ 422(c), 423(e)(1); 20 C.F.R. § 404.1592 (1998)); *see also* 20 C.F.R. § 404.1592a (benefits available for an additional 15-month period depending upon earnings).  There is no evidence in the record as to what representations Schneider actually made to the SSA, and/or whether she was properly working as part of a trial work period that would have been proper in connection with her Social Security Disability benefits.  Indeed, Schneider testified that she "filled out their papers and put in the amount that I was earning."[6]  Accordingly, I find that Defendants have not shown that Schneider made statements to the SSA that were clearly inconsistent with her position in this case.

---

[6]  Defendants argue that Schneider admitted that the amount she represented to the SSA was less than that required for substantial gainful activity.  This argument is rejected.  Schneider testified that she represented that the amount she earned was less than SGA only "at times."  Tr. at 229:4.  This presupposes that there were other times when the amount she was earning was more than that required for SGA.  I find nothing in the record that substantiates Defendants' argument that Schneider actually represented to the SSA an amount less than she was actually earning.  I further note that to the extent Defendants may rely on newly submitted evidence on that issue, I previously denied both parties' attempts to supplement the record on this issue.

49.     Second, even if I were to assume (without evidence) that Schneider represented to the SSA, at some point in time, that she was unable to engage in "substantial gainful work," there is no evidence as to when such a representation was made.  She may have made such statement many years ago, when she first started receiving benefits at age 18.  Further, there is no evidence in the record that any statements made by Schneider to the SSA at age 18, or anytime thereafter, represented that she could not engage in gainful employment during the period that she worked for Landvest.  Accordingly, I find that such statements do not establish the type of "clearly inconsistent" representation that would support the first prong of the judicial estoppel doctrine.

50.     In short, Defendants did not produce any evidence that Schneider concealed her work and income from the SSA.  They also produced no evidence that she did anything unauthorized by the SSA.  In light of the trial-work period and the redetermination regulations, Defendants have failed to show a clear inconsistency, much less any evidence suggesting that "judicial acceptance of an inconsistent position in [this proceeding] would create the "perception that either the first or the second court was misled . . . " *New Hampshire*, 532 U.S. at 750.  Based on the foregoing, I also find that Defendants have not shown that Schneider took "an inconsistent position [that] would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id*.

III.    CONCLUSION

Based upon the foregoing, I find in favor of Plaintiffs on their claim under the FLSA.  Damages are awarded to Plaintiff Schneider in the amount of $10,754.52

($8,496.00 in regular pay and $2,258.52 in overtime), plus liquidated damages of $2,258.52.  The total amount of damages due Schneider is $13,013.04.  Damages are awarded to Plaintiff Wymer in the amount of $9,416.40 ($8,496.00 in regular pay and $920.40 in overtime), plus $920.40 in liquidated damages.  The total amount of damages due Wymer is $10,336.80.  An Order of Entry of Judgment is filed separately.

Dated:  February 9, 2006

BY THE COURT:

s/ Wiley Y. Daniel
Wiley Y. Daniel
U. S. District Judge